# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No.  CR-20-240-F** |
| | ) | |
| **BOBBY CHRIS MAYES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT BOBBY CHRIS MAYES'**
**MEMORANDUM IN SUPPORT OF BOBBY CHRIS MAYES' MOTION UNDER**
**28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE**
**BY A PERSON IN FEDERAL CUSTODY**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ii**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **v**

**UNITED STATES SUPREME COURT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **v**

**FEDERAL CASES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **v**

**FEDERAL STATUTES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vi**

**FEDERAL RULES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vi**

**UNITED STATES CONSTITUTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vi**

**OKLAHOMA RULES OF PROFESSIONAL CONDUCT** . . . . . . . . . . . . . . . . . . . **vi**

**I.    GROUND ONE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

> **Trial Counsel Was Deficient in Failing to Use Material Evidence in Trial Counsels' Possession, Which Prejudiced the Defense, and Trial Counsels' Errors Were So Serious as to Deprive Mr. Mayes of a Fair Trial, a Trial Whose Result Is Reliable**

> **Four Pages of Handwritten notes of material evidence** . . . . . . . . . . . . . . . . . . **2**

> **Elliott's Trial Testimony** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

> **Elliott's four pages of handwritten notes: No Bribes** . . . . . . . . . . . . . . . . . . **5**

> **Prejudice to Mr. Mayes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

> **No "role playing"** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

> **Ineffective assistance of counsel regarding Elliott's handwritten notes** . . . . . **8**

> **Trial counsels' performance was deficient** . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

Trial counsel made errors so serious that trial counsel was not functioning as "counsel" guaranteed Mr. Mayes by the Sixth Amendment . . 9

Under the circumstances, failing to use the handwritten notes cannot be considered sound strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Trial counsel's deficient performance prejudiced Mr. Mayes' defense . . . . . 12

Key Government Witness Mr. Elliott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Evidence Material to Mr. Mayes and Chart . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The outcome of the trial would have been different. . . . . . . . . . . . . . . . . . . . 18

The evidence against Mr. Mayes was not overwhelming. . . . . . . . . . . . . . . . 19

Deposition of Mr. Elliott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Comparison of Mullins' 302 and Handwritten Notes . . . . . . . . . . . . . . . . . . 21

II.     GROUND TWO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Trial Counsels' Failure to Conduct a Reasonable Investigation Regarding the Four Handwritten Pages Constituted Deficient Performance

Trial Counsel did not Conduct Any Investigation into Whether Mr. Elliott's Handwritten Notes were Attorney/Client Privileged Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Trial Counsel's Failure to Notify Mr. Adams About the Notes. . . . . . . . . . . 28

Failure to Investigate Facts and Circumstances . . . . . . . . . . . . . . . . . . . . . . . 30

Trial Counsel's Failure to Investigate Caused Prejudice to Mr. Mayes' Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Inadvertent Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**It was an Unreasonable Strategic Decision Not to Use Mr. Elliott's Notes at Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**The Handwritten Notes were Admissible** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**III.    GROUND THREE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Trial Counsel was Deficient in their Performance in Failing to Function As Counsel as Guaranteed Under the Sixth Amendment After Mr. Elliott testified about Undisclosed Evidence During the Trial**

**Mr. Elliott's Testimony: "[W]e gave them a handwritten letter - - "** . . . . . . . 39

**Mr. Elliott's Trial vs. Deposition Testimony** . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Mr. Elliott's Testimony Also Contradicted his Attorney's Statements.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**Prejudice to Mr. Mayes: The outcome of the trial would have been different** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**Ineffective Assistance of Counsel: Failure to Correct False Testimony** . . . . . 48

**IV.    PREJUDICE THE FAILURE TO USE AND INVESTIGATE THE "HANDWRITTEN NOTES" AND THE "HANDWRITTEN LETTER" HAD ON THE JURY'S VERDICT OF ALL COUNTS** . . . . . . . . . . . . . . . . . . . . . . . 51

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**EVIDENTIARY HEARING REQUESTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Glossip v. Oklahoma*, ___ U.S. ____ (2025), 2025 U.S. LEXIS 865. . . . . . . . . . . . . 41, 42

*Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 766,
    31 L. Ed. 2d 104, 108, (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Strickland v. Washington,* 466 U.S. 668, 671,104 S.Ct. 2052,
    80 L.Ed.2d 674 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *in passim*

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) . . . . 49

*United States v. Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). . 18

*United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440,
    73 L. Ed. 2d 1193 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL CASES

*Beltran v. Cockrell*, 294 F.3d 730, 735 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . 36,45,47,49

*Braun v. Medtronic Sofamor Danek, Inc*., 2013 U.S. Dist. LEXIS
    145477 (U.S. Dist. Ct. Utah Central Div.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 44

*Douglas v. Workman*, 560 F.3d 1156, 1192, 2009
    U.S. App. LEXIS 6602 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Heard v. Addison*, 728 F.3d 1170, 1176 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . 19

*Horsey v. Rankins*, 2023 U.S. Dist. LEXIS 99689 (W. Dist. Okla 2023) . . . . . . . . . . . 18

*Jones v. Bryant*, 2016 U.S. Dist. LEXIS 181269 (W. Dist. Okla. 2016) . . . . . . . . . . . . . 9

*In re Grand Jury Proceedings*, 616 F.3d 1172 (10th Cir. 2010) . . . . . . . . . . . . . . . 20,29,44

*Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir.) (per curiam),
    cert. dismissed, 469 U.S. 1199 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Taylor v. Boise Cascade Express*, 2005 U.S. Dist. LEXIS 56902 (W. Dist. Okla) . . . . 44

*United States v. Ahmed*, 2017 U.S. Dist. LEXIS 202733 (U.S. Dist. Ct. Utah). . . . . 20,44

*United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989). . . . . . . . . . . . . . . . . 20

*United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) . . . . . . . . . . . . . . . . 49

*United States v. Freeman*, 451 Fed. Appx. 783, 795,
    2011 U.S. App. LEXIS 25494 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . 49

*United States v. McGirt*, 71 F.4th 755, 756 (10th Cir. 2023). . . . . . . . . . . . . . . . . . . . 40

*United States v. Medlock*, 2015 U.S. Dist. LEXIS 45760 (N.D. Okla. 2015) . . . . . . 30,31

v

*Young v. Workman*, 383 F.3d 1233 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL STATUTES

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *in passim*

## FEDERAL RULES

Fed. R. Crim. P. 16(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Fed. R. Crim. Proc. 26.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Fed. R. of Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Fed. R. of Evid. 502(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36
Fed. R. of Evid. 502(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36
Fed. R. of Evid. Rule 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Fed. R. of Evid. Rule 607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,9,37
Fed. R. of Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,37
Fed. R. of Evid. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,37
Fed. R. of Evid. 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,37
Fed. R. of Civ. Proc. 26(b)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## UNITED STATES CONSTITUTION

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27, 49
U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 10,15,17,20,31,38,47

## OKLAHOMA RULES OF PROFESSIONAL CONDUCT

ORPC Rule 1.6(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
ORPC Rule 4.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,35

**MEMORANDUM IN SUPPORT OF BOBBY CHRIS MAYES' MOTION UNDER
28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY**

COMES NOW, Bobby Chris Mayes by and through his attorney, Bill Zuhdi, respectfully submits this Memorandum of Law in Support of his Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody [Doc. No. 401]. Mr. Mayes received ineffective assistance of counsel ("Trial counsel"). Mr. Mayes presents the following three Grounds of error founded upon ineffective assistance of trial counsel.

## BRIEF IN SUPPORT

**Ineffective Assistance of Counsel**

In a claim of ineffective assistance of counsel, Mr. Mayes must satisfy the two component test set forth in *Strickland.* "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 671,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Trial counsels' representation "fell below an objective standard of reasonableness" under prevailing norms, and under the circumstances cannot be considered sound strategy. *Strickland*, 466 U.S. at 671. The deficient performance prejudiced Mr. Maye's defense.

-1-

Trial counsels' errors were so serious as to deprive Mr. Mayes of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Mr. Mayes has shown herein that there is a reasonable probability that, but for counsel's unprofessional errors, there is a substantial likelihood of a different result.

## GROUND ONE

**(Failure to Use Material Evidence)**
**Trial Counsel Was Deficient in Failing to Use Material Evidence in Trial Counsels' Possession, Which Prejudiced the Defense, and Trial Counsels' Errors Were So Serious as to Deprive Mr. Mayes of a Fair Trial, a Trial Whose Result Is Reliable**

**Relevant Facts**
**(Other facts will be included as warranted herein)**

**Four Pages of Handwritten notes of material evidence**

On September 25, 2020, Mr. Mayes' attorney obtained two boxes of files from Scott Adams' office. The executed and dated Acknowledgment of Receipt set forth "These boxes represent the full and complete files as provided by Mr. Elliott relevant to Big Red Sports and Imports as maintained by Adams & Associates, P.C." **[Doc. 401-5].** In one of the files, four pages of handwritten notes ("handwritten notes" or "handwritten pages") consisting of thirteen (13) numbered paragraphs were found**. [Doc. 401-1].** Mr. Mayes recognized the handwriting on the four pages of handwritten notes to be Mr. Elliott's hand writing. **[Doc. 401-4, ¶¶ 4, 9]**

1. Mr. Mayes' lawyers had the four pages of handwritten pages in their possession for at least a year before trial. **[Doc. 401-4, ¶5]**

-2-

2.   At the time the handwritten notes were discovered and up to and including during trial, several times Mr. Mayes discussed the handwritten notes with his trial counsel telling trial counsel he wanted to use the handwritten notes as evidence during trial to impeach Mr. Elliott. **[Doc. 401-4, ¶4, 6]**

3.   The handwritten notes were available for use by trial counsel at trial.  The day before jury trial began, Elliott's four pages of handwritten notes were stored onto the hard drive by trial counsel under the exhibits folder, and was saved onto the hard drive in the exhibit folder on November 2, 2021 at 5:16 p.m.  Jury trial began the next day November 3, 2021.  The document was saved as "Andy elliott notes". **[Doc. 401-14].**

4.   During the trial, Mr. Mayes repeatedly asked his trial counsel to use the Elliott handwritten pages to impeach Mr. Elliott.  Mr. Mayes' trial counsel refused.  **[Doc. 401-4, ¶7]**

5.   Trial counsel told Mr. Mayes they could not use the four pages of handwritten notes at trial to impeach Mr. Elliott because the handwritten pages were attorney/client privileged between Mr. Elliott and his attorney Mr. Adams.  **[Doc. 401-4, ¶8]**

6.   Mr. Mayes did not agree with his attorneys to not use the handwritten notes at trial to impeach Mr. Elliott.  Mr. Mayes argued with his trial counsel and told them to use the handwritten pages, based on the content of the notes he wanted to impeach Mr. Elliott.  **[Doc. 401-4, ¶9]**

7.  Mr. Mayes told his trial counsel to talk to Mr. Adams about Mr. Elliott's handwritten pages.  Mr. Mayes was never told by any of his attorneys that Scott Adams was contacted by them to investigate if the handwritten notes were attorney/client privileged communications.  **[Doc. 401-4, ¶9]**

8.  Mr. Mayes' lawyers did no investigation regarding the Elliott handwritten notes.  Mr. Mayes was never told by his attorneys that anyone ever conducted or did any investigations, made any calls, interviews, or did any other actions concerning the handwritten notes including the facts and circumstances surrounding the handwritten pages.  **[Doc. 401-4, ¶10]**

9.  Mr. Mayes told trial counsel to ask the Judge if the four handwritten pages could be used at trial.  **[Doc. 401-4, ¶12]**

10.  Mr. Mayes' trial counsel refused to use the handwritten pages and told him "We can't use it.  We'll get in trouble."  **[Doc. 401-4, ¶13]**

11.  Mr. Mayes is never mentioned in the handwritten notes. **[Doc. 401-1].**

**Elliott deposition testimony (additional argument below)**

Mr. Elliott testified the handwritten notes were his handwriting. **Exhibit 1, Tr. 9.**[1] Mr. Elliott did not tell Ms. Anderson or the FBI Agents Schmitz or Lowrance or anyone in the U.S. Attorney's Office that he had four pages of handwritten notes. **Exhibit 1, Tr. 14, 15.**

**Elliott's Trial Testimony**

During cross examination, Mr. Elliott was asked "you don't have a single text message that confirms anything you're saying about Chris?" Mr. Elliott answered "I don't need a text message to confirm everything." Mr. Elliott was asked "You don't have a single document, other than your word, for the jury to believe that anything you're saying is true?", to which Mr. Elliott answered, "I would not be here under oath telling a lie." **Exhibit 3, Tr. 590.**

Mr. Elliott never disclosed in trial that he had written four pages of handwritten notes. Mr. Elliott testified "we started paying her to do loans" and "Chris" was who first thought of giving her cash. **Exhibit 3, Tr. 378**, **385**. Mr. Elliott stated he was the one who always handed Ms. Mullins the money. **Exhibit 3, Tr. 496**. Though in the possession of trial counsel, handwritten notes contradicting Mr. Elliott's testimony were never used.

**Elliott's four pages of handwritten notes: No Bribes**

---

[1]

Mr. Elliott admitted the handwritten notes were his at his deposition. **Exhibit 1, Tr. 9.** Mr. Elliott's handwritten notes were supported by sufficient guarantees of trustworthiness, was a statement against interest, was relevant, probative, and material. Fed. R. of Evid, Rules 401, 607, 804(b)(3), 807, and 901.

Mr.Elliott's handwritten notes contained his handwritten facts which proved Mr. Mayes had nothing to do with the payments Mr. Elliott gave to loan officer Ms. Mullins.[2] **[Doc. 401-1, ¶¶ 9, 10].**  The handwritten notes contradicted Mr. Elliott's testimony about the bribes Mr. Mayes supposedly directed Mr. Elliott to give to Ms. Mullins.  The handwritten notes evidenced Mr. Elliott testified falsely when he testified Mr. Mayes directed him to pay Ms. Mullins bribes.  **Exhibit 3, Tr. 378, 384, 385, 537, 538.**  Mr. Mayes was prejudiced by trial counsel's refusal to use the handwritten notes to impeach Mr. Elliott with material evidence that by his own hand, avow there were no bribes given to Ms. Mullins.  For example:

Mr. Elliott's handwritten notes regarding Ms. Mullins state: "...SHE WAS NEVER PAID TO DO A LOAN.  PERIOD." and "IT NEVER HAD ANYTHING TO DO WITH WORK.  EVER"[3] [Doc. 401-1].  These statements were corroborated by Mr. Elliott's Attorney's Hypothetical Proffer that "...not attempting to bribe her to give the dealerships more loans. The dealerships were doing fine without the need to bribe Mullins as was evident by the yearly buying TFCU was doing."  **Doc. 401-1, ¶¶ 9, 10**; **Doc. 401-3, pg. 9.**

---

[2]

The Indictment charged Mr. Mayes with conspiracy, in part: "(2) unlawful payments and bribes paid to at least one financial institution employee designed to bypass the scrutiny the loan officer was obligated to provide before approving such loans."  Indictment, Count 1, The Object of the Conspiracy, ¶32(2). **[Doc. 1].**

[3]

All caps are used when quoting Elliott's handwritten notes because all caps were used by Mr. Elliott when he wrote the notes.

The four pages of handwritten notes contradicted Mr. Elliott's testimony on material facts. *see* **Exhibit 2**, **Chart**, Elliott's handwritten notes contradicting his trial testimony. Courtney Wells testified she did not have a meeting with Mr. Elliott and Mr. Mayes where it was supposedly decided Ms. Mullins would be bribed. Ms. Wells testified the meeting never took place. Ms. Wells testified that none of what Elliott testified about her involvement in the bribery of Ms. Mullins was true. **Exhibit 3, Tr. 2388, 2389.**

**Prejudice to Mr. Mayes**

**No Bribes**. The handwritten notes evidenced Mr. Elliott testified falsely when he testified Mr. Mayes directed him to pay Ms. Mullins bribes. **Exhibit 3, Tr. 378, 384, 385, 537, 538.** Mr. Mayes was prejudiced by trial counsel's refusal to use the handwritten notes to impeach Mr. Elliott because Elliott's handwritten notes denied Ms. Mullins was bribed.

The four handwritten notes also supported Mr. Mayes' testimony and Ms. Wells' testimony there was no bribing of Ms. Mullins. **Exhibit 3, Tr. 2263, 2266, 2388, 2389**. The handwritten notes evidence was material and favorable to Mr. Mayes' defense. Mr. Mayes was prejudiced by trial counsel's refusal to use the handwritten notes at trial to support his testimony that there was no bribery.

**No "role playing"**

The handwritten notes did not mention any "role playing." Mr. Elliott's repeated testimony about "role playing" was completely absent. Not cross examining Mr. Elliott using his handwritten notes and that there was no "role playing" in the handwritten notes

prejudiced Mr. Mayes. That "role playing" was not in the handwritten notes supported Mr. Mayes' testimony that there had been no "role playing". **Exhibit 3, Tr. 2269.** Mr. Elliott testified that one of the roleplays was that Mullins "... had never done anything wrong and had never gotten a dollar." **Exhibit 3, Tr. 411** Another role play Mr. Elliott testified was that Mullins was a "whore" she "slept" with Mr. Mayes and she "slept" with "me". **Exhibit 3, Tr. 425.** And, "we paid her money to screw" Mr. Mayes. **Exhibit 3, Tr. 561.** Mr. Mayes testified he has never role-played with anybody that he can remember in his life. **Exhibit 3, Tr. 2269.** Mr. Mayes was prejudiced by trial counsel not using the handwritten notes to impeach Mr. Elliott's "role playing" testimony.

The handwritten notes would have contradicted and impeached Mr. Elliott's testimony. Mr. Elliott testified that *"we"* gave Ms. Mullins the money, but there was no "we" in Mr. Elliott's four handwritten pages, only Mr. Elliott giving Ms. Mullins money to help her. **[Doc. 401-1, ¶¶ 6, 10].** Mr. Mayes testified he has never paid a loan officer and he's never been accused of paying a loan officer. Mr. Mayes testified he never instructed Mr. Elliott to jump on Ms. Mullins or try to keep her quiet. Mr. Mayes testified he absolutely did not tell Mr. Elliott to tell Ms. Mullins to lie about receiving money. **Exhibit 3, Tr. 2268.**

**Ineffective assistance of counsel regarding Elliott's handwritten notes**

Mr. Mayes must satisfy the two component test in *Strickland v. Washington***,** 466 U.S. 668, 671,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**Trial counsels' performance was deficient**

-8-

The handwritten notes were material impeachment[4] evidence against key government witness Elliott's testimony, was exculpatory evidence, and was additionally corroborative evidence for Mr. Mayes' testimony, Ms. Mullins and Ms. Wells testimony. Trial counsel failed to use the handwritten notes of exculpatory evidence regarding the claimed bribery of Mullins, the role playing, as well as to all the Counts. The failure to present and use handwritten notes material evidence at trial was deficient on the part of trial counsel.

Mr. Elliott was the sole witness that (1) testified Mr. Mayes was involved in the alleged bribery of Ms. Mullins; and that (2) testified he and Mr. Mayes role played. Elliott's handwritten notes evidence was material evidence to Mr. Mayes' defense.[5] The jury was never made aware the handwritten notes existed.[6]

**Trial counsel made errors so serious that trial counsel was not functioning as "counsel" guaranteed Mr. Mayes by the Sixth Amendment**

Trial counsels' representation "fell below an objective standard of reasonableness" under prevailing professional norms in not using: 1) the handwritten notes in cross-examination of Mr. Elliott to impeach him on multiple parts of his testimony; 2) using

---

[4] FRE 607.

[5] Material evidence is "that which is exculpatory—evidence that if admitted would create reasonable doubt that did not exist without the evidence." *Jones v. Bryant,* 2016 U.S. Dist. LEXIS 181269, *25 (W. Dist. Okla. 2016); *Young v. Workman*, 383 F.3d 1233, 1238 (10th Cir. 2004) *citing United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Evidence is material if its suppression might have affected the trial's outcome. *Valenzuela-Bernal*, 458 U.S. at 868.

[6] Even the government was unaware of Elliott's handwritten notes. Decl. Snyder, Doc. 415, ¶¶ 3, 4, 5.

Elliott's own handwriting that there was no bribery; 3) that role playing was nowhere to be found in the notes; 4) the reason Elliott gave Ms. Mullins money; 5) actual innocence of Mr. Mayes, using the notes in support of the testimony of Mr. Mayes and Ms. Wells; 6) using the handwritten notes in closing argument to show the jury once more all the exculpatory evidence of the handwritten notes; and 7) that Mr. Elliott did not disclose to the government nor during trial his handwritten notes which were material to Mr. Mayes defense.

The errors were so serious in failing to use the handwritten notes to impeach Mr. Elliott and to corroborate the testimony of Mr. Mayes, Ms. Wells and Ms. Mullins[7] to establish that trial counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. 668, 671; U.S. Const. amend. VI. The decision to not use the exculpatory handwritten notes evidence fell below an objective standard of reasonableness under prevailing professional norms. The handwritten notes were in Elliott's handwriting directly contradicting his testimony, denying bribing Ms. Mullins[8], stating the

---

[7]

Mr. Mayes never called Ms. Mullins to have her look at a loan. **Exhibit 3, Tr. 94.** Ms. Mullins testified she never received any money from Mr. Mayes. Mr. Mayes did not submit loans to Ms. Mullins. **Exhibit 3, Tr. 100.** Ms. Mullins testified she was not aware that Mr. Mayes had anything to do with the "arrangement" "position" that Elliott had put her in with the loans. **Exhibit 3, Tr. 101.** Ms. Mullins testified Mr. Mayes never asked her or pressured her to approve loans for his dealerships. **Exhibit 3, Tr. 116.**

[8]

Elliott's handwritten notes corroborated Ms. Mullins' testimony she was friends with him, he knew she was struggling so he wanted to help her. **Exhibit 3, Tr. 76, 80.** Elliott's handwritten notes, and a recorded conversation between Mullins and Elliott, evidences their close, personal relationship: Elliott: Ok, hey, I love you; Mullins: I love you too. **[Doc. 401-1, ¶¶ 1, 6, 10]; Exhibit 3, Tr. 91.**

reason he gave her money was to help her[9], no mention of role playing, and never mentioning Mr. Mayes, all contradicted the conspiracy allegations. The handwritten notes were never presented so the jury was not able to consider the handwritten notes to reach their verdicts. Trial counsels' representation of Mr. Mayes in not using the handwritten notes "fell below an objective standard of reasonableness under prevailing professional norms." *Strickland*, 466 U.S. 668, 671.

In determining whether counsel's representation was objectively reasonable, "the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. 668, 689. Trial counsels' decision to not use the Elliott handwritten notes, material evidence that should have been used to impeach Mr. Elliott's testimony, material evidence available for trial counsel to use for Mr. Mays, was not conduct by trial counsel that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. 668, 689. Mr. Mayes has "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound . . . strategy.'" *Strickland*, 466 U.S. 668, 689.

Under the circumstances, trial counsels' failure to use the material evidence of Elliott's handwritten notes, for cross-examination of Mr. Elliott, and to expose Elliott's

---

[9]Elliott's handwritten notes state the money Mr. Elliott handed Ms. Mullins was to help her, help her to get her life together. **Exhibit 1, ¶¶ 1, 6, 10.**

concealing of the material evidence, and to corroborate Mr. Mayes' testimony, and Ms. Mullins and Ms. Well's testimony, cannot be considered sound strategy.

**Under the circumstances, failing to use the handwritten notes cannot be considered sound strategy**

It cannot be considered sound strategy to deny Mr. Mayes to present to the jury exculpatory handwritten evidence written by his key accuser Elliott of Mr. Mayes' actual innocence, no bribes done, no role playing mentioned, the real reason Elliott gave Ms. Mullins money, Mr. Mayes' name not mentioned, and the fact that Elliott concealed his handwritten notes evidence from the AUSA's office, from the FBI agents, and from the jury.[10] And it is not sound strategy because trial counsel thought that the handwritten notes were inadmissible because of attorney/client privilege between Elliott and Mr. Adams.

**Trial counsels' deficient performance prejudiced Mr. Mayes defense**

Trial counsels' deficient performance prejudiced Mr. Mayes, and trial counsels' errors were so serious as to deprive Mr. Mayes of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. There is a reasonable probability that but for trial counsels' unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. 668, 687, 694.

The handwritten notes were material to the outcome of Mr. Mayes' trial. Mr. Mayes' defense was prejudiced as a result of trial counsels' deficient performance in not impeaching

---

[10] The jury should have seen this handwritten notes evidence because then the jury would have had material evidence to find a different outcome.

Elliott with his handwritten notes, in not using the handwritten notes to establish Mr. Elliott concealed the handwritten notes existence from the government and from the jury.  And the handwritten notes are evidence of actual innocence, and would have supported the testimony of Mr. Mayes, Ms. Wells and Ms. Mullins.   Trial counsel's deficient performance so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  *Strickland*, 466 U.S. 671.

Mr. Mayes must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. 668, 671**.**  Trial counsel did not use the handwritten notes.  There is no reasonable excuse under professional norms not to have used the handwritten notes of material evidence. Elliott's handwritten notes contradicted his trial testimony, contradicted the governments' case against Mr. Mayes, and was the only written evidence regarding Mr. Elliott's testimony claims against Mr. Mayes.  Mr. Mayes was prejudiced by trial counsel's unprofessional errors.

But for counsel's unprofessional errors in not cross-examining Elliott on his handwritten notes, which contradicted his trial testimony and contradicted the governments' case against Mr. Mayes, and was the only written evidence regarding Mr. Elliott's testimony claims against Mr. Mayes, there is a reasonable probability that, but for trial counsels' unprofessional conduct, the result of the proceeding would have been different.  A reasonable

-13-

probability is a probability sufficient to undermine confidence in the outcome.  466 U.S. 668, 671.  That requires a "substantial" likelihood of a different result, which the material evidence not used establishes the likelihood of a different result.   Mr. Elliott's handwritten notes never mention Mr. Mayes, no statement of a bribery much less at Mr. Mayes direction, and no mention whatsoever of "role playing".  Elliott's handwritten notes deny bribery and states that Ms. Mullins "WAS NEVER PAID TO DO A LOAN.  PERIOD."  and "It never had ANYTHING TO DO WITH WORK.  EVER." **[Doc. 401-1, ¶¶ 9, 10]**.  The handwritten notes completely supported Mr. Mayes' innocence, stating that Ms. Mullins was never paid to do a loan. **[Doc. 401-1, ¶¶ 9, 10].**

The only evidence connecting Mr. Mayes to the commission of the crime of bribery and "the role playing" was Elliott's "word".  Mr. Elliott acknowledged he did not have a single document or a single text message that confirms anything he was saying about Chris, other than his "word", for the jury to believe that anything he was saying was true.  **Exhibit 3, Tr.  590.**  Elliott testified he didn't "need a text message to confirm", and "I would not be in here under oath telling a lie." **Exhibit 3, Tr.  590.**  However, the evidence contained in his handwritten notes that did not corroborate his testimony evidences Elliott was testifying falsely under oath.  Elliott had no handwritten notes  or letters or recordings to connect Mr. Mayes to the alleged bribery of Ms. Mullins.  No other witness corroborated Mr. Elliott's testimony that the "bribes" were given to Ms. Mullins at the direction of Mr. Mayes or that there was any bribes at all.

Due to trial counsel not using the handwritten notes, Mr. Mayes was denied his Sixth Amendment right to Confrontation, confronting Mr. Elliott with his own handwritten notes contradicting his direct examination testimony. U.S. Const. amend. VI. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. *Strickland*, 466 U.S. at 671.

Due to trial counsels' deficient performance, Mr. Mayes' defense was prejudiced. The jury never knew of Mr. Elliott's handwritten pages of material exculpatory evidence. The jury was never able to weigh the evidence contained within the handwritten notes in deliberation. Nor was the jury able to weigh relevant cross-examination impeachment testimony of Mr. Elliott about his handwritten pages. Nor was the jury able to weigh the fact that the handwritten pages corroborated crucial parts of Mr. Mayes', Ms. Wells and Ms. Mullins testimony.

**Key government witness Mr. Elliott.**

Mr. Elliott was the governments' key trial witness.[11] The following are comments regarding Mr. Elliott.[12]

---

[11]
Despite the acknowledged vast importance of Mr. Elliott to the governments' case, trial counsel never used the handwritten notes to impeach him. Mr. Elliott's handwritten notes had massive impeachment value and proof of Mr. Mayes' actual innocence. Use of the handwritten notes to impeach Mr. Elliott's intentional false testimony, including his repeated testimony that he was "telling the truth", would have resulted in a probability sufficient to undermine confidence in outcome.

[12]
Mr. Elliott was so fundamental to the governments' case that according to his testimony he was given immunity before he ever met with the government.

**The prosecutor:** "Your Honor, as this Court has recognized, the most important aspects of the case, and particularly from the defense side, are evidence of good character of Mr. Mayes and evidence or allegations that Andy Elliott is a liar." **Exhibit 3, Tr. 2448.**

**Defense counsel.** Trial counsel for Mr. Mayes stated "the credibility of Andy Elliott is a "key component of the defense theory." **Exhibit 3, Tr. 2425.** Trial counsel also stated to the Court "...as the Court has noted, because their case relies solely upon Andy Elliott to prove this conspiracy and this scheme." **Exhibit 3, Tr. 2446**.

Codefendant Wells' counsel stated in closing argument "The one and only linchpin, the glue of the government's entire case, is Andy Elliott." **Exhibit 3, Tr. 2593, 2597.**

**The Court.** The Court commented on the "extraordinarily prominent issue" of Mr. Elliott's credibility. The Court stated "And the jury is not going to have to be reminded that an extraordinarily prominent issue in this case is the credibility of Mr. Elliott." **Exhibit 3, Tr. 2432.**

**Evidence material to Mr. Mayes and Chart.**

The Chart attached to Mr. Mayes' Motion to Vacate [Doc. 401-2] compares in contrast [Doc. 401-1] Elliot's handwritten notes to Elliott's trial testimony.

**Conspiracy**

The handwritten notes material evidence went to the core of the alleged conspiracy of bribes paid to Ms. Mullins to approve loans and also to the substantive counts. The governments' case relied upon Mr. Elliott to prove the conspiracy and scheme, yet Mr.

Elliott was not cross-examined regarding his handwritten notes contradicting his trial testimony nor were the handwritten notes offered into evidence. Trial counsel was ineffective and deficient in not using Elliott's handwritten notes to impeach him, and if trial counsel had there is a substantial likelihood of a different result.

Mr. Elliott's handwritten pages materially contradicted and impeached his testimony. Trial counsel was ineffective and deficient in taking no action to use the handwritten notes to impeach Elliott, thereby prejudicing Mr. Mayes. Additionally, Mr. Elliott's handwritten notes proved actual innocence of Mr. Mayes. They also corroborated Mr. Mayes' testimony that he did not direct any bribery of Ms. Mullins, and there was no "role playing". Ms. Wells and Ms. Mullins' testimony would have also been corroborated if trial counsel had used the handwritten notes.

Mr. Elliott's handwritten notes are direct evidence of Mr. Mayes' innocense. Trial counsel made errors so serious as to deprive Mr. Mayes of a fair trial, a trial whose result is reliable, by not using the handwritten notes to impeach Mr. Elliott, to prove Mr. Mayes' actual innocence, and to corroborate the testimony of Mr. Mayes, Mullins and Wells. *Strickland*, 466 U.S. 668, 671;  U.S. Const. amend. VI.

There is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. *Strickland,* 466 U.S. 668, 695. Elliott's handwritten notes, material evidence contradicting his testimony and exposing his concealment of his

-17-

handwritten notes and the other exculpatory facts, absent the error of not using the material evidence, the fact finder would have had a reasonable doubt respecting guilt.

**The outcome of the trial would have been different**

Mr. Elliott's handwritten notes were material to the outcome. *See Kyles v. Whitley,* 514 U.S. 419, 433-34 (1995) ("[F]avorable evidence is material . . . 'if there is a reasonable [*22] probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)); see also *Bagley*, 473 U.S. at 685 (opinion of White, J., concurring in part and concurring in judgment). *Horsey v. Rankins*, 2023 U.S. Dist. LEXIS 99689, *21-22 (W. Dist. Okla. 2023). The handwritten pages material evidence was exculpatory and if the handwritten notes had been used during trial, the handwritten notes would have created reasonable doubt that did not exist without the handwritten notes.

Trial counsel's failure to use the handwritten notes as set forth herein, including that key government witness Elliott was intentionally testifying falsely regarding material matters of guilt, was deficient performance falling below "an objective standard of reasonableness" and falling "outside the wide range of professionally competent assistance." Trial counsels' deficient performance in failing to use the Elliott handwritten notes to impeach Mr. Elliott's testimony regarding material facts of guilt, use them for Mr. Mayes' actual innocence, use the notes to corroborate Ms. Wells and Ms. Mullins' testimony, and use the notes to show that Mr. Elliott had violated the terms of his agreement with the government, prejudiced Mr.

-18-

Mayes.  There exists a reasonable probability sufficient to undermine confidence in the outcome, and a substantial likelihood of a different result. *Strickland,* 466 U.S. 671, 694; *Heard v. Addison*, 728 F.3d 1170, 1176 (10th Cir. 2013).

**The evidence against Mr. Mayes was not overwhelming**.

Mr. Elliott was the sole witness that testified Mr. Mayes was involved in the alleged bribery of Ms. Mullins.   Mr. Elliott was the sole witness that he and Mr. Mayes "role-played." See also herein in Section IV (incorporated herein), where Mr. Mayes sets forth the prejudice Mr. Elliott's testimony had on the jury's verdict of all counts regarding trial counsel's failure to use and investigate the "handwritten notes."  The evidence at trial was contested by Mr. Mayes and Ms. Wells.  Mr. Elliott acknowledged he had no corroborating evidence for his testimony against Mr. Mayes, not a single document other than his word.  But there was a document that existed-and Mr. Elliott knew the document existed, because he wrote the document-the four pages of  handwritten notes.  The handwritten notes were material  evidence that Mr. Elliott was not credible.

Mr. Elliott's handwritten notes would have controverted his trial testimony.  There was no corroborating evidence that Mr. Mayes directed any payments for bribery of Ms. Mullins or any corroborating evidence tying him into the alleged bribery.  Mr. Elliott's handwritten notes would have fundamentally contradicted Mr. Elliot's trial testimony and establish a reasonable probability that the error of not using the handwritten pages affected the outcome of the trial.  Failure to use the handwritten notes evidence rendered Mr. Mayes

-19-

ineffective assistance of counsel denying him a fair trial.  U.S. Const. amend. VI; U.S.Const. amend V.

**Deposition of Mr. Elliott**

Mr. Elliott gave false testimony at his deposition when he claimed Mr. Mayes told him how to answer the supposed "questions" from Mr. Adams.[13]  Further, the handwritten notes were not privileged.  Though objected to on the basis of "privilege" by Mr. Adams at the deposition, according to Mr. Elliott's deposition testimony, he showed the "questions" provided to him by Mr. Adams to Mr. Mayes and the "answers" he wrote to his wife, waiving any claimed privilege. *In re Grand Jury Proceedings*, 616 F.3d 1172, 1184 (10th Cir. 2010) ("a party waives the privilege when he voluntarily discloses to a third party material or information that he later claims is protected."); *United States v. Bernard,* 877 F.2d 1463, 1465 (10th Cir. 1989) ("Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege."). In *United States v. Ahmed*, 2017 U.S. Dist. LEXIS 202733 (U.S. Dist. Ct. Utah), the court found the defendant waived his attorney-client privilege by voluntarily testifying about communications that he had with

---

[13] When asked about the handwritten notes at his deposition, Mr. Elliott was very quick to state "I know exactly what these are."  After authenticating the notes were written by himself, based on the evidence, Mr. Elliott falsely testified "Chris was the author of these questions I had" and that "Chris gave me the answers to every one of these."  **Exhibit 1, Tr. 10.**  Mr. Elliott's assertions at the deposition the notes were "all lies" was also not truthful. **Exhibit 1, Tr. 16, 17.** There were many statements in his handwritten notes which supported the handwritten notes were the same as his trial testimony. For instance: "I handed money..." "...doing Bible study w/ her" "When I gave her money..." "I gave her money..." "I gave her money..." "Clearly she's lying through her teeth..." "Shes a liar..."  **Exhibit 1, Tr. 23, 24.**

former counsel. In the case at bar, Mr. Elliott voluntarily interjected information about the notes and how and why they were written during the deposition, waiving any privilege (though Mr. Mayes asserts no privilege existed anyway based on Mr. Elliott's admissions he supposedly showed the "questions" to Mr. Mayes and his "answers" to his wife. **Exhibit 1, Tr. 11, 12.**

When questioned about Ms. Mullins' 302 at the deposition, Mr. Elliott claimed he didn't recognize Ms. Mullins 302 and when he wrote the notes, he "...didn't have anything in front of me but a series of questions from Scott." **Exhibit 1, Tr. 12.** These claims by Mr. Elliott are unbelievable. There were many statements from the 302, as demonstrated below and in **Exhibit 1 (Depo. Exhibits 1 & 2)**, which were duplicated in the notes Mr. Elliott wrote and this claim by Mr. Elliott is demonstrably false.

### COMPARISON OF MS. MULLINS' 302 AND HANDWRITTEN NOTES

**<span style="color:red">Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2). Pg. 1</span>**

4:45- Mullins never saw the invoices associated with loans she made.

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 4**

LINE  26.~  DONNA  SAID  SHE  NEVER
SAW  INVOICES  ASSOCIATED  W/LOANS.

- **Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2). Pg. 1**

3:58- Elliott did not specify what the money was for. He (Elliott) took advantage of me.

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 1)**



1. CLEARLY TOLD HER MONEY WAS TO HELP HER HAVE GET LIFE TOGETHER.

- **Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2). Pg. 2**

16:02- Only someone in the "tower" at Big Red Sports could have created the fake invoice. The only one that is currently in the tower at Big Red Sports, who was also in the tower at the time of all of the loans identified by Tinker Federal Credit Union (TFCU) was Elliott.

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 2**



5. SAYS BIG RED TOWER...
REMEMBER IT SAYING CURRENTLY IN TOWER CREATED INVOICES.---
WAS AT BIG RED & MITSU/YAMAHA...
SAID ELLIOTT (IM NEVER ONLY ONE IN TOWER)
STORY SEEMS TO START TO GO ROGUE —

- **<u>Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2).  Pg. 2</u>**

22:30-  Mullins has known Elliott and Chris Mayes for a long
time.  Elliott played with Mullins' heart strings and knew that Mullins
was struggling.  Mullins told Elliott no several times, but finally caved,

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 2**

6.   SAYS  I  PLAYED  HER

- **<u>Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2).  Pg. 2</u>**

Sometimes the loans were questionable

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 2**

QUESTIONABLE  LOANS  "SOMETIMES"

- **<u>Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2).  Pg. 2</u>**

27:19-  Elliott knew Mullins was "strapped" and he would lay out scenarios
of how Mullins could use the money he gave her.  Elliott told Mullins, if

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 3**

10.   I  KNEW  DONNA  WAS  STRAPPED
BECAUSE  SHE  TOLD  ME  EVERY  DAY.!

- **Exhibit 1: Ms. Mullins' 302 (Depo Ex. 2). Pg. 3**

45:07-  If the vehicle is brand new, the accounting department would have
an invoice.  The invoice Mullins viewed, was not an actual Yamaha invoice,
she said "they don't look like that."  The fake invoice was generated by
someone.  The fake invoice originated in the sales tower, which is three
people.

The original recording is maintained in the 1D section of the

**Exhibit 1: Mr. Elliott's handwritten notes (Depo. Ex. 1). Pg. 4**



In the last example above, Mr. Elliott is obviously referring to Ms. Mullins' 302 because he wrote the following phrases that proves he was reading from the 302 when writing his notes.  For instance, "As she closes..." Mr. Elliott is clearly referring to the last paragraph of the 302.  Mr. Elliott also wrote: "she said "they don't look like that"... which states word for word with identical "quotes" of how the exact phrase was stated in Ms. Mullins' 302.

The evidence is readily apparent, when comparing the excerpts from Ms. Mullins' 302 and the handwritten notes, Mr. Elliott's handwritten notes were written by him as he was viewing the 302 of Ms. Mullins.

-24-

Mr. Mayes submits Mr. Elliott could not admit he wrote the notes from Ms. Mullins' 302 because he wanted to testify, falsely, that Mr. Mayes told him what to "answer." Also, Mr. Elliott claimed at the deposition he wrote the notes in 2019. However, because Mr. Elliott's testimony about why and how he wrote the notes is implausible and obviously a lie, Mr. Mayes submits the timing of when the notes were written is not important. The material fact that was revealed from his deposition, and what would have been revealed at the trial if the notes had been used effectively by trial counsel, is that Mr. Elliott lied at his deposition about how and why the notes were written, implausibly claiming Mr. Mayes told him what to say. **Exhibit 1, Tr. 14, 15, 17, 18, 20, 25.**

Had Mr. Mayes received effective assistance of counsel and effective cross examination on Elliott's handwritten notes, it would have been revealed to the jury, as it was in the deposition, that Mr. Elliot was lying about Mr. Mayes and the circumstances of *how* and *why* he wrote the notes. Not only would this have been devastating to Mr. Elliott's credibility because he implausibly claimed Mr. Mayes directed him on how to "answer" the supposed "questions," the admission of Mr. Elliott's handwritten notes would have shown the jury the notes prove Mr. Mayes' innocence and that Mr. Mayes was not involved in Mr. Elliott's payments to Ms. Mullins. Mr. Mayes was denied the opportunity to present to the jury the truthfulness of the facts contained within his handwritten notes.

Further, in violation of his agreement with the government, and contrary to his trial testimony where he was questioned if he had been "complete" and truthful with the

government and repeatedly claimed he was telling the truth, **Exhibit 3, Tr. 203,** Mr. Elliott was *not* complete and truthful – both to the jury and the government.  Mr. Elliott did not truthfully disclose all information. He admitted at his deposition he never told the government about his handwritten notes where he wrote he was the one who wanted to give Ms. Mullins money.  Mr. Elliott did not testify at trial about the handwritten notes. Mr. Elliott did not testify at trial with the implausible claim that Mr. Mayes had supposedly told him what to say in his notes.  **Exhibit 1, Tr. 14, 15, 17, 18, 20, 25.**  As eager as Mr. Elliott was at the trial to always point the finger at Mr. Mayes for his own wrongdoings, one would think Mr. Elliott would have been eager to tell the jury the tall tale he invented at the deposition.

If Mr. Elliott had testified at the trial as he did at the deposition, the following material evidence as to Mr. Elliott's lack of credibility would have been revealed, to wit: 1) Mr. Elliott did not disclose to the government or the jury he had hand wrote notes that proved Mr. Mayes' innocence regarding Mr. Elliott's payments to Ms. Mullins; 2) Mr. Elliott lied when he claimed he did not recognize Ms. Mullins' 302;  3) Mr. Elliott lied when he claimed Mr. Mayes told him what to write in his notes; 4) Mr. Elliott lied when he claimed he was answering "questions" from his attorney; 5) Mr. Elliott lied when he testified the notes were "all lies"; 6) Mr. Elliott violated his agreement with the government when he testified at trial he was being truthful and complete; 7) Mr. Elliott never told the government about the notes during his extensive interview with law enforcement on October 2, 2020; and 8) Pretrial, Mr. Elliott violated his agreement to be complete and truthful with the government.  All this is

-26-

evidence which was extremely important for the jury to hear and evidence which greatly impacted Mr. Mayes' innocence and materially affected Mr. Elliott's credibility.   Trial counsel's failure to introduce Mr. Elliott's handwritten notes was outcome determinative.

## II.  GROUND TWO

### Trial Counsels' Failure to Conduct a Reasonable Investigation Regarding the Four Handwritten Pages Constituted Deficient Performance

Mr. Elliott's handwritten notes discuss at length the payments he made to Donna Mullins but never once mention Mr. Mayes as being involved with the payments to her.  His notes never once mention Mr. Mayes directed Mr. Elliott to make the payments, contrary to Mr. Elliott's trial testimony.   **Exhibit 1, (Depo. Ex. 1); Exhibit 3, Tr. 378, 384, 385, 537, 538**; **[Doc. 401-1]**.   In addition to impeaching Mr. Elliott's trial testimony where he repeatedly claimed Mr. Mayes directed his payments to Ms. Mullins, the handwritten notes were material evidence of Mr. Mayes' innocence. The handwritten notes repeatedly state the reasons Ms. Mullins was given money by Mr. Elliott (because he wanted to "help" her, she was "strapped" for money, etc...).  The reason he gave her money stated in his notes was *not* because Mr. Mayes told him to do so. **Exhibit 1, (Depo. Ex. 1); [Doc. 401-1]**. Trial counsel's failure to investigate the handwritten notes violated Mr. Mayes' due process rights to present this material evidence to the jury.  U.S. Const. amend. V.

Trial counsel had a duty to reasonably investigate the handwritten notes to determine all relevant facts, circumstances, pleadings, and laws involved. *See Strickland*, 466 U.S. 668, 680. The Sixth Amendment imposes on counsel a duty to investigate.  Reasonably effective

assistance must be based on professional decisions. Informed legal choices can only be made after investigation of all the options and circumstances. *Strickland,* 466 U.S. 668, 680.

### Trial Counsel did not Conduct Any Investigation into Whether Mr. Elliott's Handwritten Notes were Attorney/Client Privileged Information

Trial counsels' failure to investigate was based on the mistaken belief the handwritten notes were attorney/client privileged communications between Mr. Elliott and Mr. Adams. Investigation for the 2255 motion uncovered evidence that any claims of attorney client privilege were waived or not applicable.

### Trial Counsel's Failure to Notify Mr. Adams About the Notes

Trial counsel did not notify Mr. Adams that they had in their possession Mr. Elliott's notes.[14]  After the two boxes of files pertaining to Big Red Sports and Imports (provided by Mr. Elliott and maintained by Adams & Associates, P.C.) were picked up by Mr. Mayes' trial counsel on September 25, 2020, Mr. Elliott's handwritten notes were found in one of the files. [Doc. 401-4; 401-5]. If trial counsel *had* contacted Mr. Adams after seeing the handwritten notes, the possibility that the handwritten notes were privileged would have been eliminated for multiple reasons.

By email dated October 24, 2024, Mr. Adams stated Mr. Elliott never provided him with a "handwritten statement", to wit:

---

[14]

ORPC Rule 4.4(b) states "A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender."

(By Mr. Adams): "I appreciate your email. Unfortunately, I do not believe I have anything that can be of any assistance. Mr. Elliott never provided me with any handwritten statement that I did or did not give to the Government.  The only statement that the Government ever received from Mr. Elliott, that I am aware of, was a proffer offered by me."  **Exhibit 2.**[15]

Mr. Elliott showed the "questions" provided to him by Mr. Adams to Mr. Mayes and the "answers" he wrote to his wife, waiving any claimed privilege.  *In re Grand Jury Proceedings*, 616 F.3d at 1184.  The privilege was waived when he voluntarily disclosed it to his wife.  *Bernard*, 877 F.2d at 1465, which provides any voluntary disclosure is inconsistent with the attorney/client relationship and the privilege is waived.  *Braun v. Medtronic Sofamor Danek, Inc*., 2013 U.S. Dist. LEXIS 145477, *2 (U.S. Dist. Ct., Utah Central Div.).

As is set forth in detail in Ground One, Mr. Elliott's testimony at the deposition that his handwritten notes were supposedly "answers" to "questions" by his attorney flies in the face of the actual evidence that many statements from the 302 were duplicated in the notes Mr. Elliott wrote.  The evidence is clear when comparing the excerpts from Ms. Mullins' 302 and the handwritten notes (**Exhibit 1, (Depo. Exhibits 1 and 2)**. Mr. Elliott was undoubtedly untruthful at his deposition when he claimed the notes were "answers" to "questions" with Mr. Mayes supposedly telling him what to say.  Indeed, it is clear Mr. Elliott wrote the notes

---

[15]

When Mr. Elliott was told about the content of the email received from his attorney at the deposition, Mr. Adams, who was present, did not object or dispute he wrote the email to Mr. Mayes' counsel. **Exhibit 1, Tr. 11; Exhibit 2.**

while viewing the 302 he claimed at his deposition he did not "recognize." **Exhibit 1, Tr. 12; Exhibit 1 (Depo Ex 1 and 2).**

**Failure to Investigate Facts and Circumstances**

Trial counsel did not investigate any facts and circumstances regarding the four handwritten pages, including (but not limited to): 1) any witnesses with knowledge of the notes; 2) facts regarding the disclosure of the handwritten notes evidence; and 3) if the written notes had been shared with others outside legal counsel, such as Mr. Elliott's friends, coworkers, family members, or other unknown individuals.

If trial counsel had cross examined Mr. Elliott on his handwritten notes, as discussed in Ground One, which facts and argument is incorporated, Mr. Elliott's untruthfulness at his deposition (when he claimed he did not recognize Ms. Mullins' 302; **Exhibit 1, Tr. 12**) and implausible explanation for his writing the notes (answering "questions" from his attorney)[16] would have been revealed, adversely affecting his credibility as well as the outcome of the trial. It was not reasonable for trial counsel just to conclude the handwritten notes were attorney/client privileged and to assume, without investigation, they could not be used in Mr. Mayes' defense.

**Trial Counsel's Failure to Investigate Caused Prejudice to Mr. Mayes' Defense**

Trial counsels' failure to investigate the handwritten notes denied Mr. Mayes using the handwritten notes in his defense. *Compare United States v. Medlock*, 2015 U.S. Dist.

---

[16]**Exhibit 1, Tr. 14, 15, 17, 18, 20, 25.**

LEXIS 45760 (N.D. Okla. 2015) where the district court denied Plaintiff's motion to reconsider its order granting motion for new trial based on ineffective assistance of trial counsel for overlooking evidence favorable to Medlock's primary defense to the charges of bank fraud and money laundering. The district court found that trial counsel had failed to investigate the details of bank transactions and in so doing, overlooked evidence favorable to Medlock's defense to the charges. *See also Wiggins v. Smith*, 539 U.S. 510 (2003) (where the Supreme Court held trial counsel did not conduct a reasonable investigation, counsel's decision not to expand investigation fell short of prevailing professional standards).

Trial counsel's performance was deficient and was error so serious in not investigating the facts and circumstances about Mr. Elliott's handwritten notes, that counsel was not functioning as counsel guaranteed by the Sixth Amendment. An investigation pre-trial and through cross examination of Mr. Elliott at the trial would have revealed and established Mr. Elliott's notes were admissible for use at trial. Trial counsel had a duty to investigate before presuming, without investigation, that the handwritten notes could not be used at trial based on privilege. The failure to do so fell below an objective standard of reasonableness.

If the notes had been used, the outcome of Mr. Mayes' trial would have been different. The following cross-examination would have occurred (along with additional cross examination questions based on Mr. Elliott's responses):

1)    At trial, Mr. Elliott repeatedly testified he was telling the truth.  **Exhibit 3, Tr. 202,**
**203, 481, 518, 521, 534, 535, 536, 537, 565, 590, 592**). The handwritten notes would
have impeached his testimony.

2)    Mr. Elliott also repeatedly testified Mr. Mayes directed him to make the payments to
Ms. Mullins.  **Exhibit 3, Tr. 202, 203, 481, 518, 521, 534, 535, 536, 537, 565, 590,**
**592)** Mr. Elliott's handwritten notes would have been impeached his testimony.

3)    Mr. Elliott's testimony on cross examination that he had nothing but his word to show
he's telling the truth was not true. **Exhibit 3, Tr. 590.**  Mr. Elliott's four pages of
notes that were hand written by him was evidence that would have impeached his
testimony.

4)    Mr. Elliott knew he had written the handwritten notes that were exculpatory evidence
of Mr. Mayes' innocence but admittedly, Mr. Elliott did not tell anyone from the
government about it.  **Exhibit 1, Tr. 14, 15.**

5)    The jury would have learned Mr. Elliott breached his agreement with the US
Attorney's office, as set forth in the non prosecution letter, that "he will truthfully
disclose all information..." "Concerning all matters relating to the ... offenses..." and
"at all times give complete, truthful, and accurate information and testimony,..."
**Exhibit 1, (Depo Ex. 8).**

5)      Mr. Elliott did not write about any "role playing" with Mr. Mayes in the handwritten notes. **Exhibit 1, (Depo. Ex. 1).** This fact should have been brought up during cross examination.

6)      Mr. Mayes was not mentioned in the handwritten notes, nor was Ms. Wells. **Exhibit 1, (Depo. Ex. 1).**

The handwritten notes disprove Elliott's testimony that he was paying Ms. Mullins bribes at the direction of Mr. Mayes. **Exhibit 3, Tr. 378, 384, 385, 537, 538**. The jury would have had before it that Mr. Elliott violated his oath to tell the truth at trial, violating the terms of the non prosecution letter and breaching his agreement with the government. **Exhibit 1, (Depo Ex. 8).**

Under the circumstances, there exists a reasonable probability sufficient to undermine confidence in the outcome and a substantial likelihood of a different result.  See also Ground One, incorporated herein, which sets forth additional bases of why the material handwritten notes should have been used (i.e., Mr. Elliott's unbelievable testimony at his deposition.

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, and a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments. *Strickland v. Washington*, 466 U.S. 668, 671.

**Inadvertent Disclosure**

It was unreasonable for trial counsel not to investigate the statutory and other legal procedures for admission of what they thought was privileged communications for use in

cross-examination and as corroboration of evidence supporting Mr. Mayes' innocence. Trial counsel's failure to investigate if Mr. Elliott's handwritten notes were inadvertently disclosed to them by Mr. Adams was also error.[17]  At the deposition, Mr. Adams objected to the handwritten notes and claimed attorney/client privilege.  In his objection, Mr. Adams also stated he "did not know Mr. Mayes' side had these." **Exhibit 1, Tr. 8.** Yet Mr. Adams also stated by email he had not received any handwritten statement from Mr. Elliott. **Exhibit 2.**

An adequate investigation by trial counsel would have produced material evidence on whether a claim of attorney/client privilege regarding the four handwritten pages would have been raised, and if a privilege claim was made, the privilege was waived.  Even though Mr. Adams has stated Mr. Elliott did not provide him a "handwritten statement", if trial counsel had notified Mr. Adams about the four pages of handwritten notes in their possession and if Mr. Adams claimed they were inadvertently disclosed in the boxes of files that were retrieved from Mr. Adams office and the handwritten notes were privileged, Rule 502(b) of the Federal Rules of Evidence provides the information should have been presented to the Court under seal for a determination of the claim.  Or, other investigations would have revealed additional violations that would have overcome an attorney/client privilege claim (such as not taking reasonable steps to prevent disclosure), or if there were any other waivers, such as sharing his notes with third parties.

---

[17] Mr. Mayes is not aware any steps were taken by trial counsel to rectify the error. [Doc. 401-4, ¶¶7-10, 12, 13]

Rule 502(b) provides:

(b)     Inadvertent Disclosure. When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:

(1)     the disclosure is inadvertent;
(2)     the holder of the privilege or protection took reasonable steps to prevent disclosure; and
(3)     the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).[18]

In addition to trial counsel not notifying Mr. Adams about the handwritten notes,[19]

Mr. Adams did not promptly take reasonable steps to rectify the error in disclosure nor did

he ever even ask or question trial counsel to determine if trial counsel had received Mr.

Elliott's handwritten notes.  That Mr. Adams' **"<u>Acknowledgment of Receipt</u>"** [Doc. 401-5]

signed by trial counsel indicated Mr. Adams had provided the "sole copies" of the documents

and retained "no digital copies" of the files "provided by Mr. Elliott relevant to Big Red

---

[18]

Though the notes were not produced in discovery and may have been produced inadvertently, if subject to a claim of privilege the procedure in Federal Rule of Civil Procedure 26(b)(5)(B) is instructive, a party after being notified "may promptly present information to the court under seal for a determination of the claim." Federal Rule of Civil Procedure 26(b)(5)(B) does not appear to be applicable.

[19]

"A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender."  ORPC 4.4(b).

Sports and Imports", supports that Mr. Adams did not take reasonable steps to prevent disclosure.[20] Fed. R. Evid. P. Rule 502(b)(2).

Failure to use Mr. Elliott's handwritten material evidence prejudiced Mr. Mayes. If there was a claim of privilege, then their admission into evidence would have occurred by utilizing Fed. R. Evid. P. Rule 502(b)(3), and conducting a through investigation of any third party disclosure, impeachment rules, and other means of waiver.

**It was an Unreasonable Strategic Decision Not to Use Mr. Elliott's Notes at Trial**

Under the facts and circumstances, trial counsel's decision not to use Mr. Elliott's notes could not have been based on a reasonable strategic decision since the notes contain evidence of Mr. Mayes' innocence of the bribery allegations. Mr. Elliott's handwritten notes also contain corroborating evidence, as set forth above, with Mr. Mayes, Ms. Wells, Ms. Mullins, and with the agents (to show how Mr. Elliott had breached his agreement with the government) and evidence of actual innocence of Mr. Mayes. "Defense counsel's unreasonable strategic decisions and investigative failures amounted to ineffective assistance of counsel." *Beltran,* 294 F.3d at 735.

There can be no presumption of trial counsels' competence in this matter. Trial counsels' representation of Mr Mayes and failure to investigate was unreasonable under prevailing professional norms and could not have been sound strategy. *Strickland*, 466 U.S.

---

[20]

And *see* ORPC Rule 1.6(c) which states "A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client."

at 671. As part of a reasonable investigation into the handwritten notes, as Mr. Mayes did for his 2255 motion, trial counsel could have retained a handwriting expert.[21] However, expert testimony became unnecessary when Mr. Elliott authenticated the handwritten notes at his deposition. **Exhibit 1, Tr. 9.**

**The Handwritten Notes were Admissible**

If trial counsel had conducted an investigation of the facts and law, that investigation would have revealed the handwritten notes were admissible[22] and the notes should have been used at trial to: a) corroborate and support Mr. Mayes' testimony; b) corroborate the testimony of Ms. Mullins regarding Mr. Mayes (that Mr. Mayes was not involved in the payments to her); c) corroborate the testimony of Ms. Wells (Ms. Wells testified none of what Mr. Elliott testified about her involvement in the bribery was true. **Exhibit 3, Tr. 2388, 2389)**; d) in cross-examination of Mr. Elliott to impeach his testimony;[23] e) in cross-examination of S.A. Schmitz to enforce that Mr. Elliott had violated the terms of his agreement with the government; and f) in closing argument.

---

[21] Handwriting forensic expert Brenda Petty was hired to examine the handwritten pages [Doc. 401-6].

[22] Mr. Elliott admitted the handwritten notes were his at his deposition. **Exhibit 1, Tr. 9.** FRE 901. Mr. Elliott's handwritten notes were thus supported by sufficient guarantees of trustworthiness, was a statement against interest, was relevant, probative, and material. FRE 401, 607, 804(b)(3), and 807.

[23] Elliot had warning about the handwritten notes before testifying at the deposition and was able to review the notes and come up with the story of why he wrote the handwritten notes. If Mr. Elliott had been impeached with the notes at trial, he would not have had the lead time that he was able to have for the deposition.

Counsel was ineffective in failing to use the material evidence of Mr. Mayes' innocence, Mr. Elliott's untruthfulness (exposed in his deposition), and corroborating evidence. This would have changed the outcome of the proceedings. Due to his attorneys' refusal to use Mr. Elliott's notes at trial, Mr. Mayes lost the chance to have the jury determine Mr. Elliott's credibility after cross examination on his hand written notes revealed the material contradiction from his trial testimony, contradiction of Mr. Elliott's recorded interview with the FBI, and his violation of his nonprosecution agreement.

To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Strickland, supra,* at 694. Mr. Mayes has demonstrated within this Ground how, but for trial counsel's unprofessional errors, the result of his trial proceedings would have been different. Consequently, his motion to vacate should be granted.

### III.  GROUND THREE

**Trial Counsel was Deficient in their Performance in Failing to Function as Counsel as Guaranteed Under the Sixth Amendment after Mr. Elliott testified about Undisclosed Evidence During the Trial**

Mr. Mayes' was denied his constitutional rights to effective assistance of counsel as guaranteed under the Sixth Amendment to render the judgment vulnerable to collateral attack. When the jury and trial counsel heard Mr. Elliott's testimony "We gave them a handwritten letter - -" in answer to the question about what he would say before he got

immunity, Mr. Mayes was prejudiced due to his trial counsel's inaction on the previously undisclosed evidence, undermining the confidence in the outcome of Mr. Mayes' trial.

**Mr. Elliott's Testimony: "[W]e gave them a handwritten letter - - "**

Trial counsel's conduct during Mr. Mayes' trial fell below an objective standard of reasonableness. Trial counsel completely failed to take any action whatsoever when the government's key witness, Mr. Elliott, testified on cross examination about the handwritten letter. Mr. Elliott's credibility was an extraordinarily prominent issue in the case against Mr. Mayes. **Exhibit 3, Tr. 2425, 2432, 2448; 2446; 2593, 2597.**

Trial counsel's performance was deficient in multiple ways. Trial counsel failed to: 1) move for a mistrial; 2) move for a *Brady* hearing;[24] 3); bring to the Court's attention Mr. Mayes had never received from the government in discovery a handwritten letter by Mr. Elliott;[25] 4) cross examine Mr. Elliott about the handwritten letter; and, 5) if it had been

---

[24]

The evidence about Mr. Elliott's "handwritten letter" was not disclosed to Mr. Mayes until cross examination of Me. Elliott. [Doc. 401-4, ¶14]; **Exhibit 3, Tr. 520**. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Court held suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104, 108, 1972 U.S. LEXIS 83, *7.

[25]

The text of Rule 16 offers trial courts a host of discretionary remedies for discovery violations. See Fed. R. Crim. P. 16(d)(2). These remedies include an order requiring the prosecution to permit the defendant to inspect the undisclosed evidence, granting a continuance, prohibiting introduction of the undisclosed evidence, and "any other order that is just under the circumstances." Id. Granting a mistrial would have fallen under the last category of remedies. *United States v. Freeman,* 451 Fed. Appx. 783, 795, 2011 U.S. App. LEXIS 25494, *30 (10th Cir. 2011). "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives. Fed. R. Crim Proc., Rule 26.3.

revealed after hearings and/or investigation by trial counsel that the "handwritten letter" Mr. Elliott testified about did not exist, trial counsel was ineffective in failing to have the government correct Mr. Elliott's false testimony.[26]

When the jury heard Mr. Elliott's testimony about the handwritten letter, it adversely influenced the jury's verdicts because it both enforced and bolstered Mr. Elliott's grant of immunity by the government. Further, government witness Special Agent Schmitz also bolstered Mr. Elliott's testimony about the immunity. After Mr. Elliott had testified, when SA Schmitz testified on redirect, he was questioned about the nonprosecution agreement. In both the questions and the answers, Mr. Elliott's credibility after receiving immunity was bolstered by the government and the agent. Former AUSA McKenzie asked SA Schmitz the following:

> Q.    So that nonprosecution agreement – or as it was referred to on cross-examination, immunity – could have been unwound at any moment *and still be;* is that correct?
>
> A.    Yes. (Emphasis added). **Exhibit 3, Tr. 1844.**

---

[26] Mr. Snyder's post trial Declaration states neither he, nor former AUSA McKenzie Anderson, nor any Special Agent have a "recollection" of receiving or seeing a handwritten letter. [Doc. 415, ¶¶1, 2]. Mr. Snyder also stated he consulted with Mr. Elliott's attorney, Scott Adams, who informed Mr. Snyder "he is unaware of any such letter." [Doc. 415, ¶1]. These statements, or conceivably other facts, would have been revealed if trial counsel had moved for a mistrial, or requested an evidentiary hearing, and/or if trial counsel had conducted follow up cross examination. In the case herein, the government did not correct or dispute the testimony by Mr. Elliott about the handwritten letter. Now, the government states no one has a "recollection" of its existence. A witness's statement he or she has "no recollection" of the subject may be treated as inconsistent with a former statement concerning the now-forgotten matter. *United States v. McGirt*, 71 F.4th 755, 756 (10th Cir. 2023).

First, though it was the perfect opportunity to correct Mr. Elliott's testimony about the handwritten letter, neither the AUSA McKenzie nor the agent told the jury Mr. Elliott had testified falsely about the handwritten letter. Second, the agent's answer to the "and still be" part of the question did just the opposite. SA Schmitz's testimony in essence bolstered to the jury that Mr. Elliott had truthful when he testified, but according to Mr. Snyder's Declaration, SA Schmitz, as well as both AUSAs, all knew Mr. Elliott had not been truthful when he testified. [Doc. 415, ¶1].

Mr. Elliott's testimony about the "handwritten letter" was material and prejudicial to Mr. Mayes and his defense. There is a reasonable probability trial counsel's unprofessional conduct was sufficient to undermine the confidence in the outcome of Mr. Mayes' trial. Had trial counsel not been deficient, as set forth herein, and the government had corrected Mr. Elliott's false testimony as was required under the law, Mr. Elliott's credibility would have been affected and there is a substantial likelihood of a different result. *Strickland*, 466 U.S. 671, 694. Mr. Elliott's truthfulness and reliability was determinative of Mr. Mayes' guilt or innocence.

The United States Supreme Court on February 25, 2025, reversed a conviction of a man on death row finding a Due Process violation due to the prosecution's failure to correct a witness's testimony. *Glossip v. Oklahoma*, ___ U.S. ____ (2025), 2025 U.S. LEXIS 865, *1. Similar to the case at bar where Mr. Elliott's testimony was the only direct evidence to connect Mr. Mayes to the payments Mr. Elliott made to loan officer Donna Mullins as

alleged in Count 1 of the Indictment, in *Glossip,* the witness's testimony was the only direct evidence of Glossip's guilt of capital murder.  The *Glossip* Court stated the jury's assessment of the witness's truthfulness and reliability was determinative of guilt or innocence and found Glossip was entitled to a new trial due to a *Napue v. Illinois*, 360 U.S. 264 (1959) violation.

In reversing the judgment and remanding for a new trial, the Glossip Court held that because the witness's trial testimony was false, the prosecution knew the statements were false, and the prosecution knowingly failed to correct the false statements, there was a reasonable likelihood correcting the witness's testimony would have affected the judgment of the jury.  "Evidence can be material even if it "goes only to the credibility of the witness," *Napue*, 360 U. S., at 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217;" *Glossip*, 2025 U.S. LEXIS 865, *27. In the instant case, according to the Declaration of Snyder wherein he states none of the AUSAs or agents recollect receiving or seeing a hand written letter [415-¶¶1,2], the prosecution knew Mr. Elliott's statements were false, the prosecution knowingly failed to correct his false statements, and there is a reasonable likelihood correcting Mr. Elliott's false testimony would have affected the judgment of the jury.

**Mr. Elliott's Trial vs. Deposition Testimony**

Based on Mr. Elliott's deposition testimony, Mr. Elliott gave false testimony at the trial.  At his deposition (which Mr. Elliott had plenty of time to prepare for, rather than what should have occurred during cross examination at trial), Mr. Elliott contradicted his trial testimony about the "handwritten letter" and also contradicted his trial counsel.

At trial, when Mr. Elliott was asked if the **government** ever talked to him directly, Mr. Elliott answered "I don't believe so."  **Exhibit 3, Tr. 520.**

The following exchange then occurred:

Q.    (By trial counsel):  Did **they** ever ask you to give a statement about what you would say before you got immunity?
A.    (Andrew Elliott): **We gave them a handwritten letter** –
Q.    Right, your lawyer –
A.    – **before that**. (Emphasis added)
**Exhibit 3, Tr. 520** [Doc. 401-13]

Based on the context of the questioning prior to this recited testimony, it is clear the questions centered around the communications Mr. Elliott had with the government and the immunity Mr. Elliott was ultimately offered.  **Exhibit 3, Tr. 519-520.**  However, Mr. Elliott's deposition testimony changed materially from his trial testimony.  Mr. Elliott claimed at the deposition when he responded to the question about the government with "We gave them a handwritten letter" it wasn't a handwritten letter he had testified about at trial. Instead, Mr. Elliott testified the notes were supposedly:

1)    "...pages of facts that happened..." **Exhibit 1, Tr. 28.**
2)    "That was a handwritten letter that I wrote in his [Mr. Adams'] office." **Exhibit 1, Tr. 28, L. 5,6.**
3)    "I sat in his office and wrote out facts on a legal pad." **Exhibit 1, Tr. 28, L 17,18.**
4)    Q.  So who was "them"?
       A.  Scott. **Exhibit 1, Tr. 10, 11, 28.**
5)    "...it's not a letter..."  **Exhibit 1, Tr. 29**
6)    "...the line of events I gave to Scott." **Exhibit 1, Tr. 29**

Mr. Elliott's answer at trial of "*We* gave ***them*** a handwritten letter" to the question "Did ***they*** ever ask you to give a statement about what you would say before you got

immunity?" was obviously a question about what the government had asked him about what he would say before he got immunity and was not a question about his counsel or "...the line of events I gave to Scott." **Exhibit 3, Tr. 520; Exhibit 1, Tr. 29.** Mr. Elliott's unbelievable claim at the deposition he gave what he wrote out on a legal pad to his attorney also materially contradicted his trial testimony. **Exhibit 1, Tr. 28.** Mr. Elliott's claims at his deposition were fabricated falsehoods. However, the opportunity to discover and impeach Mr. Elliott on his responses at trial to any questioning about the previously undisclosed handwritten letter was lost due to trial counsel's inaction and investigative failures.

**Mr. Elliott's Testimony Also Contradicted his Attorney's Statements**

Mr. Adams contradicted Mr. Elliott's deposition testimony. In response to an email Mr. Mayes' counsel sent to Mr. Adams on October 28, 2024, Mr. Adams responded via email stating "Mr. Elliott never provided me with any handwritten statement..." **Exhibit 2.** At the deposition, Mr. Elliott was told about the content of the email Mr. Mayes' counsel had received from Mr. Adams. Mr. Adams, who was present at the deposition, did not dispute this fact or object.[27] **Exhibit 1 Tr. 11; Exhibit 2.** Based on Mr. Adams' email and Mr.

---

[27] Any claim of attorney/client privilege was waived when there was no objection at the deposition to Mr. Elliott's testimony regarding the "notes" and when Mr. Adams responded to the email from Mr. Mayes' counsel. "A party's failure to make a clear and timely showing that privilege applies constitutes a waiver of the privilege, regardless of the nature of the documents at issue. See *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir.) (per curiam), cert. dismissed, 469 U.S. 1199 (1985); *Taylor v. Boise Cascade Express*, 2005 U.S. Dist. LEXIS 56902, *5 (W. Dist. Okla.); *In re Grand Jury Proceedings*, 616 F.3d at 1184; *Bernard*, 877 F.2d at 1465; *Braun*, 2013 U.S. Dist. LEXIS 145477, *2 (U.S. Dist. Ct. Utah Central Div). In *United States v. Ahmed*, 2017 U.S. Dist. LEXIS 202733 (U.S. Dist. Ct. Utah), the court found the defendant waived

Elliott's implausible deposition testimony versus his trial testimony, Mr. Elliott lied when he testified at the deposition that he had given Mr. Adams handwritten notes and when he testified at the deposition his testimony at trial was not about a "handwritten letter."

There can be no presumption of trial counsels' competence in this matter. Trial counsels' representation of Mr Mayes and their complete inaction in addressing Mr. Elliott's testimony about the handwritten letter was unreasonable under prevailing professional norms and could not have been sound strategy. *Strickland*, 466 U.S. at 671. "Defense counsel's unreasonable strategic decisions and investigative failures amounted to ineffective assistance of counsel." *Beltran,* 294 F.3d at 735 (where habeas relief was granted based on the ineffective assistance of counsel).

**Prejudice to Mr. Mayes: The outcome of the trial would have been different**

Mr. Elliott's false claims which were manifested during his deposition was fertile grounds for material impeachment. As is apparent from the testimony of Mr. Elliott at his deposition and due to the complete inaction of trial counsel, the outcome of Mr. Mayes' trial would have been different. A mistrial would have been granted, and/or an evidentiary hearing would have occurred where the material impeachment evidence set forth herein would have been revealed, and/or Mr. Elliott would have been impeached with his own testimony as effective cross examination would have revealed as set forth above, and/or Mr.

_____

his attorney-client privilege by (1) voluntarily testifying about communications that he had with former counsel.

Elliott's testimony would have been corrected in front of the jury once the government informed the Court Mr. Elliott's testimony about the "handwritten letter" was false.

Trial counsel's decision not to cross examine Mr. Elliott and the other errors of trial counsel complained of herein was not a matter of reasonable trial strategy and would have changed the outcome of trial. This is because the jury would have learned that Mr. Elliott lied to them during his testimony when he testified and bolstered himself by answering "We gave them a handwritten letter" about what he would say before he got immunity. Mr. Elliott's testimony about the handwritten letter was material to his credibility.

The jury knew Mr. Elliott received immunity. When the jury heard Mr. Elliott testify about the "handwritten letter" given to "them" before the proffer letter, the jury had to have believed whatever was in the "handwritten letter" was evidence against Mr. Mayes and evidence which helped Mr. Elliott receive immunity. Mr. Elliott was the only witness connecting Mr. Mayes to the bribery and was the key government witness in the entire case. Mr. Elliott's handwritten notes (see Grounds One and Two) do not mention Mr. Mayes and do not state that Mr. Mayes was involved in any manner in the payments Mr. Elliott willingly gave to Ms. Mullins. The proffer letter also stated there was no bribery but trial counsel did not bring this fact up to the jury.[28] [Doc. 401-3, Pg. 9]. The jury was left with the

---

[28]

Mr. Elliott's grand jury testimony was devoid of any mention of Mr. Mayes being involved in the bribery of Ms. Mullins. After Mr. Mayes was indicted on the bribery allegations, a few weeks later, for the first time during an interview with the government on October 2, 2020, Mr. Elliott told the government Mr. Mayes was the one who instructed Mr. Elliott to bribe Ms. Mullins.

uncorrected belief a handwritten letter had in fact been written, that it was about what Mr. Elliott would say before he got immunity, it was given to the government before the typed proffer letter, that Mr. Mayes had directed Mr. Elliott to bribe Ms. Mullins, and after receiving the handwritten letter and the proffer letter, Mr. Elliott received immunity.

Mr. Elliott's testimony about the handwritten letter given to the government had significant and negative impact on the case because ultimately, the jury believed Mr. Elliott over Mr. Mayes and Mr. Mayes was found guilty. These failures by trial counsel to function as counsel guaranteed under the Sixth Amendment are so serious that it can not be found to be harmless. In reversing the district court's denial of *Beltran's* ineffective assistance of counsel claim, the Fifth Circuit disagreed with the district court's conclusion that "...counsel's relevant strategic choices could have been reasonably made "after thorough investigation of law and facts relevant to plausible actions." Instead, the Fifth Circuit found trial counsel's unreasonable strategic decisions and investigative failures was ineffective assistance of counsel. *Id.*

It was the jury's role to evaluate the evidence and determine if Mr. Elliott was being truthful about what he meant by his answer "We gave them a handwritten letter..." to the question "Did they ever ask you to give a statement about what you would say before you got immunity?" **Exhibit 3, Tr. 520.** As the fact finder at trial, the jury was the sole judge of the credibility of each witness and the weight to be given. [Doc. 157, Instruction No. 12, Pg. 36].

Had trial counsel been effective as set forth herein and Mr. Elliott's testimony been corrected by the government, Mr. Elliott would have been caught red handed changing his testimony (as he did in his deposition), the jury would have heard him change his testimony, and it would have affected Mr. Elliott's credibility.   That Mr. Elliott was lying to the jury was very important to Mr. Mayes' defense because Mr. Elliott repeatedly and emphatically told the jury he was "telling the truth." **Exhibit 3, Tr. 202, 203, 481, 518, 521, 534, 535, 536, 537, 565, 590, 592.**  If trial counsel had been effective and shown the jury Mr. Elliott falsely testified about the "handwritten letter" after he had repeatedly asserted *ad nauseam* at trial that he was telling the truth, it would have greatly affected Mr. Elliott's credibility and the jury's verdict.

**Ineffective Assistance of Counsel: Failure to Correct False Testimony**

There was no redirect examination or correction by the government of Mr. Elliott's false testimony about the handwritten letter.  **Exhibit 1, Tr. 30, 31; Exhibit 3, Tr. 520,** Based on Mr. Snyder's Declaration, the government knew Mr. Elliott's testimony was false at the time he testified, yet due to trial counsel's deficient performance, the government was allowed to have the testimony stand uncorrected.   Trial counsel should have objected, asked to approach the bench, explained to the court that new and previously undisclosed evidence had just been interjected in the trial, and taken the effective and reasonable steps discussed herein.  At that point, if it was shown the handwritten letter did not exist, trial counsel should have, at the minimum, argued the government needed to correct Mr. Elliott's false testimony.

The jury should have been informed Mr. Elliott had just told them something about a "handwritten letter" that was not true. Instead, trial counsel did nothing and Mr. Mayes' due process rights were violated due to trial counsel's deficient performance.

The Due Process Clause is violated when a prosecutor knowingly fails to correct perjured testimony, even when the evidence went only to the credibility of the witness. "A Napue[29] violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material. See *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002)." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). *See also* U.S. Const. amend. V.

In *Beltran*, eyewitnesses were allowed by the prosecution to testify falsely. The *Beltran* Court found there was no due process violation from prosecutorial non-disclosure[30]of false testimony because defense counsel was aware of the evidence and failed to object. In the case at bar, according to three of Mr. Mayes' trial counsel (Michelle Green, Billy Bock,

---

[29]

*Napue v. Illinois*, 360 U.S. 264 (1959). *Beltran*, 294 F.3d at 736. A prosecution's failure to correct a witness's testimony has been found to be reversible error, warranting a new trial. *Glossip*; *Napue*, *supra*. "The prosecutor's knowing use of false testimony involves, not "just" prosecutorial misconduct, but "more importantly . . . [the] corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)." *Douglas v. Workman*, 560 F.3d 1156, 1192, 2009 U.S. App. LEXIS 6602, *103 (10th Cir. 2009).

[30]

In the case herein, the government did not fulfill its duty of disclosure when the government failed to disclose to Mr. Mayes that Mr. Elliott's testimony about the "handwritten letter" was false. As a "spokesman for the Government," the prosecutor's office is expected to ensure and preserve the rights of the accused by complying with constitutional and statutory disclosure requirements. *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

and Rachel Jordan), until Mr. Elliott testified at trial, no one knew of the existence of the "handwritten letter." Mr. Behenna, who was conducting cross examination of Mr. Elliott at the time the "handwritten letter" was testified about by Mr. Elliott, has not responded to 2255 counsel. Mr. Mayes did not know of the existence of the "handwritten letter" until trial. [Doc. 401-4, ¶14].

At trial, on cross examination, had trial counsel followed up and investigated the existence of the handwritten letter, Mr. Elliott may have revealed there indeed *was* a handwritten letter.[31] From the evidence of the testimony of Mr. Elliott about the letter, it is obvious to Mr. Mayes the handwritten letter would have been a bountiful source for cross examination and impeachment of Mr. Elliott about the supposed bribery of Donna Mullins that was supposedly done by Mr. Elliott at Mr. Mayes' direction. This is based on existing corroboration evidence that Ms. Mullins had not been bribed by Mr. Elliott as found in Mr. Elliott's handwritten notes (as discussed in Ground One herein) and his proffer letter [Doc. 401-3]. The importance of Mr. Elliott's handwritten notes for impeachment purposes is supported by not only the fact that Mr. Elliott admittedly hand wrote the words (as acknowledged in his deposition), but also that the pages contain statements by Mr. Elliott

---

[31] AUSA Snyder's Declaration insufficiently addresses information from the government's perspective about personal knowledge about the "handwritten letter." First, AUSA Snyder could not have had personal knowledge of communications that may have transpired between former AUSA Ms. McKenzie and Mr. Elliott during the government's investigation that was ongoing for almost two years prior to when Mr. Snyder was hired to work at the US Attorney's office in December of 2018. AUSA Snyder's Declaration is contrary to the requirements of personal knowledge as set forth in FRE 602.

which greatly contradicted his testimony at trial and supported Mr. Mayes' innocence.  The handwritten letter likely corroborated the handwritten notes and likely was outcome determinative in its own right.

## IV.     PREJUDICE THE FAILURE TO USE AND INVESTIGATE THE "HANDWRITTEN NOTES" AND THE "HANDWRITTEN LETTER" HAD ON THE JURY'S VERDICT OF ALL COUNTS

As set forth in Grounds One and Two herein, trial counsel had proof of Mr. Mayes' innocence in their possession which was contained in Mr. Elliott's handwritten notes.  Yet they refused to use the evidence and/or investigate the evidence as discussed herein, adversely affecting the jury's verdicts.  Likewise, Mr. Elliott's false testimony about the "handwritten letter" adversely influenced the jury verdicts.

As recognized by the parties, the government's case hinged upon Mr. Elliott's credibility.  **Exhibit 3, Tr. 2425, 2446, 2448, 2593, 2597**.  The Court early in the trial disagreed with trial counsel's argument the entire case is premised upon Andy Elliott. **Exhibit 3, Tr. 1552.**  However, later in the trial after the presentation of evidence was concluded, the Court stated "And the jury is not going to have to be reminded that an extraordinarily prominent issue in this case is the credibility of Mr. Elliott." **Exhibit 3, Tr. 2432.**

The evidence against Mr. Mayes was not overwhelming.  The evidence at trial was contested by Mr. Mayes and Ms. Wells.  Mr. Elliott acknowledged he had no corroborating evidence for his testimony against Mr. Mayes, not a single document other than his word.

**Exhibit 3, Tr. 590.** Mr. Elliott, who was General Manager, claimed he had the "title" but Mr. Mayes was "in charge." **Exhibit 3, Tr. 217.** A summation of Mr. Elliott's testimony where he extraordinarily and prominently placed Mr. Mayes at the heart of the conspiracy and substantive counts follows:

Mr. Elliott testified Mr. Mayes knew about the "fake cash." **Exhibit 3, Tr. 243**. He did whatever Mr. Mayes asked. **Exhibit 3, Tr. 261.** He testified Mr. Mayes and Mr. Gooch came up with the idea of Norman Pawn & Gun. **Exhibit 3, Tr. 323.** He testified he talked to Mr. Mayes about the "pawn" deals all the time. **Exhibit 3, Tr. 270.** He stated Chris Mayes knew about the total loss letters. **Exhibit 3, Tr. 282.** He testified Chris Mayes knew about the in-and-outs. **Exhibit 3, Tr. 329.** Mr. Elliott identified a great deal of the government's exhibits used at the trial and was used extensively to explain the conspiracy, substantive counts, and exhibits to the jury. Mr. Elliott testified he "reported" to Mr. Mayes every day. **Exhibit 3, Tr. 216, 389.** Mr. Elliott told the jury he was told by Mr. Mayes to keep Donna Mullins' "fucking mouth shut", to "contain her", and to "control her." **Exhibit 3, Tr. 388, 411, 417.** Mr. Elliott testified about the supposed "roleplaying" that he did with Mr. Mayes to avoid getting caught for his illegal actions. **Exhibit 3, Tr. 411, 417, 425, 426, 545.** Regarding the recordings of the conversations between Ms. Mullins and Mr. Elliott that were admitted into evidence, Mr. Elliott testified he was coaching Ms. Mullins to lie because Mr. Mayes told him to do so. **Exhibit 3, Tr. 497, 534.** Mr. Elliott claimed the money that

he gave Ms. Mullins was by permission of Mr. Mayes, that Mr. Mayes told him to start paying her for the loans. **Exhibit 3, Tr. 378, 384, 385, 537, 538.**

The above testimony by Mr. Elliott placed the guilt squarely upon Mr. Mayes for all of the offenses charged in the Indictment. Additionally, the testimony about how Mr. Mayes had instructed him how to handle Ms. Mullins, that Mr. Elliott had told her to lie if she was caught because Mr. Mayes told him to do so, that Mr. Mayes had told Mr. Elliott that Ms. Mullins should be "contained" and "controlled" and that he was to keep her "fucking mouth shut" was highly prejudicial and tainted the entire trial proceedings. There were no witnesses to these highly prejudicial claims made by Mr. Elliott about Mr. Mayes. The testimony of Mr. Elliott when he claimed the bribery was done because Mr. Mayes wanted him to do so and the "roleplaying" Mr. Elliott testified the two supposedly did if they were caught with the bribery infected and materially permeated the entire proceedings. Mr. Elliott's false testimony about the "handwritten letter" would have affected his credibility and would have negatively impacted his constant haranguing and bolstering of himself about his supposedly "telling the truth." Mr. Elliott was the sole witness to testify about Mr. Mayes being involved in the payments to Ms. Mullins. Mr. Elliott's testimony was critical to the government's entire case and his credibility was the key component and was relied upon by the government to prove the conspiracy count as well as the substantive counts.

## CONCLUSION

Mr. Mayes' motion under U.S.C. §2255 to Vacate, Set Aside or Correct a Sentence by a Person in Federal Custody should be granted. There is a reasonable probability that but for trial counsel's unprofessional errors described herein, the results of the proceedings would have been different and there is a probability sufficient to undermine confidence in the outcome and a substantial likelihood of a different result. Trial counsels' errors were so serious as to deprive Mr. Mayes of a fair trial, a trial whose result is reliable. There is a reasonable probability, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. Mr. Mayes' fundamental rights under U.S. Const. amends V and VI were violated as set forth herein. That Mr. Elliott has now been proven to have testified falsely at the trial, by the facts set forth in Mr. Mayes' motion to vacate and new facts obtained from Mr. Elliott's deposition, Mr. Elliott's credibility is in shambles. Plus, trial counsel failed to have the government correct Mr. Elliott's false testimony of the handwritten letter. Counsel's errors prejudiced him and rendered the proceeding fundamentally unfair or unreliable. Mr. Mayes submits as set forth herein he has met both prongs under *Strickland* to sufficiently prove his grounds of error predicated upon ineffective assistance of trial counsel and prejudice.

## EVIDENTIARY HEARING REQUESTED

Based upon the ineffective assistance of counsel grounds herein, Mr. Mayes requests an evidentiary hearing regarding the grounds raised.

Respectfully submitted,


s/Bill Zuhdi
Bill Zuhdi, OBA #10013
Bill Zuhdi, Attorney at Law, P.C.
P.O. Box 1077
Oklahoma City, OK  73101
(405) 232-1400 (office)
(405)920-6164 (facsimile)
**ATTORNEY FOR MOVANT/DEFENDANT**
**BOBBY CHRIS MAYES**

## Certificate of Service

I hereby certify that on March 14, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

AUSA Thomas Snyder


s/Bill Zuhdi
Bill Zuhdi