```
 1   A.   No, sir.
 2   Q.   Okay.  Were you friends with Mr. Elliott?
 3   A.   Yes.
 4   Q.   Do you consider yourself to be personal friends?
 5   A.   Yes.
 6   Q.   Okay.  Now, at some point -- strike that.
 7        When you received loans from Norman Yamaha, did they come
 8   in the same system that you just described?
 9   A.   Yes.
10   Q.   Did you handle -- did you handle more of any one dealer's
11   loans than any other?
12   A.   No.
13   Q.   Did at some point that change?
14   A.   We were given certain loans by -- when I did car loans and
15   motorcycle loans, and we had certain dealerships that were
16   assigned to us.  So at times, yes, I would get more from some
17   dealerships than others.
18   Q.   Was Norman Yamaha one of the dealerships you got more of?
19   A.   Yes.
20   Q.   How about the other Big Red Dealerships I mentioned?
21   A.   No.
22   Q.   At some point, did you begin handling almost all Norman
23   Yamaha's submissions to Tinker?
24   A.   Yes.
25   Q.   How did that develop?
```

**Exhibit** 3

DONNA MULLINS - DIRECT BY MR. SNYDER                    80

```
 1  money from Andy Elliott?
 2  A.   We had been meeting for Bible studies and doing different
 3  things together.  I knew him and his wife.  And he knew that I
 4  was struggling, so he wanted to help me.
 5  Q.   Help you financially?
 6  A.   Yes, sir.
 7  Q.   How much money did he give you the first time?
 8  A.   I do not recall.
 9  Q.   How often did he give you money?
10  A.   I don't know.
11  Q.   What was your understanding of what he expected in return
12  for the money?
13  A.   There was no expectations.  It was just he -- there was no
14  defined -- no definition of what needed to be done.
15  Q.   Did your understanding of why you were getting money
16  change over time?
17  A.   Yes.
18  Q.   How did it change?
19  A.   Because he kept harassing me with phone calls, so I
20  realized that he was submitting deals and expecting me to do
21  all of them.
22  Q.   So you began to understand that the money was tied to your
23  role at the credit union?
24  A.   Yeah.  And it wasn't supposed to be.
25  Q.   Okay.  How much money do you think you received from
```

DONNA MULLINS - CROSS BY MS. BEHENNA                    94

```
1   Q.   Did you ever get access to those things again?
2   A.   No, sir.
3             MR. SNYDER:  Your Honor, I'd pass the witness.
4             THE COURT:  Cross-examination.
5                        CROSS-EXAMINATION
6   BY MS. BEHENNA:
7   Q.   Ms. Mullins, I believe during direct examination, a
8   question was asked whether or not you had had professional
9   interactions with Chris Mayes.
10  A.   Yes, ma'am.
11  Q.   Do you recall that?  And you said, no, you had not had any
12  professional interactions.  Is that your answer?
13  A.   I guess I didn't understand the question at the time when
14  he asked.
15  Q.   Okay.  So when -- let me define personal interactions. Did
16  Chris Mayes ever call you to have you look at a loan?
17  A.   No.
18  Q.   You were mentioning during direct examination that -- I
19  believe you said they started putting names on deals.  They
20  asked me to look at loans.  Who is "they"?
21  A.   Andy.
22  Q.   Andy Elliott?
23  A.   Uh-huh.
24  Q.   I believe you resigned from Tinker Federal Credit Union on
25  August 5th of 2016.  Does that sounds about right?
```

DONNA MULLINS - CROSS BY MS. BEHENNA                     100

```
1   Q.   And then they would also send loans over -- "they," Andy
2   Elliott, would send loans over "attention Donna" so that it
3   would be directed to you, correct?
4   A.   Yes.
5   Q.   And so that they wouldn't go in the queue for other loan
6   officers to see, just for you to see?
7   A.   They would go in the queue, and they would have to be
8   pulled up to see that my name was on them.
9   Q.   Fair enough.  And then it would be forwarded to you; is
10  that right?
11  A.   Yes.  But can I clarify something?
12  Q.   Sure.
13  A.   Andy is not the only one that submitted loans in the
14  system to me.
15  Q.   Fair enough.  Fair enough.  Did Chris Mayes?
16  A.   No.
17  Q.   From everything that you described, Ms. Mullins, it sounds
18  like Andy Elliott manipulated you.  Fair?
19  A.   Yes.
20  Q.   He did manipulate you to get you to do what he wanted you
21  to do; is that right?
22  A.   Yes.
23  Q.   And what he wanted you to do was approve loans from Norman
24  Yamaha, the dealership that he was the GM of, correct?
25  A.   Yes.
```

DONNA MULLINS - CROSS BY MS. BEHENNA                    101

```
1   Q.   Now, I think you resigned from Tinker Air Force -- I'm
2   sorry -- tinker Federal Credit Union, and you called Andy
3   Elliott, right?
4   A.   Yes.
5   Q.   Do you remember that?
6   A.   Yes, I do.
7   Q.   And you told him, I got fired because of you.
8   A.   Yes, I did.
9   Q.   And do you remember what Andy Elliott said to you?
10  A.   It wasn't because of me.
11  Q.   It wasn't because of him?
12  A.   Uh-huh.
13  Q.   Didn't apologize for putting you in that position, did he?
14  A.   No.
15  Q.   What he said to you was that, "I didn't do anything."  Do
16  you remember that?
17  A.   Yes.
18  Q.   Did he ever -- in that phone conversation when you called
19  him and said I got fired because of you, did he ever say, well,
20  it wasn't me; I mean, Chris Mayes did it?  Did he say that?
21  A.   No.
22  Q.   Chris Mayes didn't have anything to do with this
23  arrangement -- this position, maybe is a better word -- that
24  Andy Elliott put you in, did he?
25  A.   Not that I'm aware of.
```

```
 1   keep saying Big Red.  Thank you for that correction.
 2   A.    But yes.
 3   Q.    The point being, Andy Elliott was the common denominator
 4   there, right?
 5   A.    Yes, ma'am.
 6   Q.    At any time when you were having a personal relationship
 7   with Mr. Mayes, did he ever ask you or pressure you to approve
 8   loans for any of his dealerships?
 9   A.    No, ma'am.
10         MS. BEHENNA:  May I have just a moment, Your Honor?
11         THE COURT:  Surely.
12         MS. BEHENNA:  That's all we have.
13         THE COURT:  Any further recross?
14         MR. ADLER:  Yes, please, Your Honor.
15         THE COURT:  You may.
16              RECROSS-EXAMINATION
17   BY MR. ADLER:
18   Q.    Ms. Mullins, you lied to the FBI about whether or not you
19   had a personal relationship with Mr. Mayes, correct?
20   A.    I did at first.
21   Q.    Okay.  When did you correct that lie?
22   A.    I don't recall.
23   Q.    But you believe you told law enforcement agents about
24   that?
25   A.    Yes.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    202

1   A.   Yes, I do.

2   Q.   What is it?

3   A.   This is an agreement between my attorney, me, and the U.S.

4   Attorney's Office.

5   Q.   Okay.

6        MS. ANDERSON:  Your Honor, the United States moves to

7   admit into evidence Government's Exhibit 25 and to publish it

8   to the jury.

9        THE COURT:  Any objection?

10       MR. BEHENNA:  No objection, Your Honor.

11       MR. SHANNONHOUSE:  No objection, Your Honor.

12       THE COURT:  Any objection from the Defendant Wells?

13       MR. GIFFORD:  No objection.

14       THE COURT:  It will be received.

15       MS. ANDERSON:  All right.  And if we could zoom in on

16   the first paragraph, please.

17  Q.   (BY MS. ANDERSON) According to that first paragraph, what

18  do you get out of this agreement with the United States?

19  A.   To not be prosecuted, as long as I tell the truth.

20  Q.   All right.  And so the first paragraph, you won't be

21  prosecuted by our office for bank fraud, false statements to

22  banks, wire fraud, aggravated identity theft or any other

23  violations associated with that stuff?

24  A.   Yes, ma'am, that is correct.

25  Q.   Okay.  And according to the second paragraph, what do you

1   have to do?

2   A.    I give my testimony fully and make sure that it is

3   accurate and it is the truth and fully cooperate.

4   Q.    Okay.  And what does the last paragraph of that first page

5   say?

6   A.    That if I lie, the agreement is no good.

7   Q.    All right.  So what happens if my office thinks that

8   you've given false information or incomplete information or

9   misleading information?

10  A.    Then the agreement is void.

11  Q.    Okay.  You could be prosecuted for wire fraud, bank

12  fraud --

13  A.    Yes.

14  Q.    -- aggravated identity theft, bribery, or anything?

15  A.    Yes, exactly.

16  Q.    All right.  And if we look at the second page of this,

17  please.  At the top, could you also be prosecuted for perjury

18  and obstruction of justice?

19  A.    Yes, I can.

20  Q.    Okay.  Is that your signature on this?

21  A.    Yes, it is.

22  Q.    Do you know someone named Chris Mayes?

23  A.    Yes, I do.

24  Q.    How do you know him?

25  A.    I started working with him in, I believe, the year of 2001

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    216

```
 1   Big Red.
 2       When you worked there in that first stretch in -- starting
 3   in December 2012, what was your title?
 4   A.   GM.
 5   Q.   And who did you report to?
 6   A.   Chris Mayes.
 7   Q.   As a general manager at Big Red, how did you get
 8   compensated?
 9   A.   I got paid off a salary and I got paid off of commission.
10   Q.   Okay.  And how was your commission calculated?
11   A.   By how much the dealership would put up in profit.
12   Q.   And so you got a percentage of the profits of the Big Red
13   Dealership?
14   A.   Yes, ma'am.
15   Q.   And how much was your percentage?
16   A.   I honestly don't remember.  I want to say, like, 5 percent
17   but maybe 3 percent, I don't remember.  I can -- I can get that
18   answer.
19   Q.   Based on what you recall, 3 to 5 percent or somewhere in
20   that ballpark?
21   A.   Yes, ma'am.
22   Q.   Okay.  And who got the rest of the profits?
23   A.   It would go to the company.
24   Q.   And who owned the company?
25   A.   Chris Mayes.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    217

1  Q.   Okay.  And when you were a general manager at Big Red

2  Sports & Imports, were you also the general manager at Norman

3  Mitsubishi?

4  A.   In the beginning, no, I wasn't.  It was -- there was

5  another -- there was a GM over there, there was a couple

6  different people when we first opened it.

7  Q.   Okay.  And were you ever the general manager at Mayes Kia?

8  A.   No.  There was a time where I was a platform GM, kind of

9  over all of them, I had the title, but Chris was in charge.

10 Q.   Okay.  Do you remember about when that was?

11 A.   I believe that was 2016 -- 2016.  It had to have been

12 2016.

13 Q.   Okay.  That's to the best of your recollection?

14 A.   I believe, yes, ma'am.  And it was only for, like, a

15 six-month period.

16 Q.   Were you ever a signatory on any of the bank accounts for

17 the dealerships?

18 A.   No, ma'am.

19 Q.   And I think you mentioned at one point in time you owned a

20 5 percent interest in Norman Mitsubishi?

21 A.   Yes, ma'am.

22 Q.   Did you ever have an ownership interest in any of the

23 other dealerships?

24 A.   No, ma'am.

25 Q.   When you -- and we're talking about that first period of

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    243

```
1  Q.   How do you know that Mr. Mayes or Mr. Gooch or Ms. Wells
2  knew about it?  Did you talk to them about it?
3  A.   I talked to Chris about it all the time.  We talked about
4  fake income, you know, how much is too much, how much is not
5  enough, you know, like, what does a really bad deal look like
6  that we just want to stay away from, you know, what is
7  acceptable, you know.
8       If a lady doesn't have a job at all, you know, can we give
9  her a job, does it show that she has a job on her credit
10 application.
11      You know, it's, like, we had to play it smart so we didn't
12 end up getting in trouble.  So we communicated all the time
13 together.
14 Q.   Okay.  And was Mr. Gooch ever involved in that?
15 A.   Absolutely.
16 Q.   And how do you know?
17 A.   Because he was in the conversations with us.
18 Q.   All right.  What about Ms. Wells?
19 A.   Courtney wasn't so much into a lot of those conversations
20 because she was in accounting, but she's very aware of it.
21 Anytime there was trouble, she was right there with us.
22 Q.   And you said if an ethical person came in to work at the
23 dealership, they didn't last.  What happened to them?
24 A.   Well, so somebody would come in and if they started
25 questioning, like, what we do -- it's, like, when I came in, I
```

```
 1  got a letter.  Marty Peterson was another person who quit with
 2  me, he got a letter.  I saw those letters.
 3  Q.   And what did you do?
 4  A.   Nothing.  It seemed like everybody was just getting
 5  threatened, so I made a deal to go back and work for Chris at
 6  Mitsubishi and he dropped everything with everybody.
 7  Q.   How did that come to be, you made a deal with Chris?
 8  A.   Yes.
 9  Q.   Did you talk to him about it?
10  A.   Yes.
11  Q.   What did he say?
12  A.   He said, if you come back to work, nobody gets messed
13  with, you don't owe me the money, just -- let's go make some
14  money.
15  Q.   Why did he want you to come back and work with him?
16  A.   Maybe because I helped him make a lot of money.  I was a
17  really hard worker and I did whatever he asked.
18  Q.   And so you went back to the dealerships?
19  A.   Yes.
20  Q.   Do you recall about when that was?
21  A.   Yeah, it was in January of 2016, I went back and worked
22  for him.
23  Q.   And which dealership did you work at that time?
24  A.   I went to the Mitsubishi/Yamaha dealership, which was
25  across the street from Big Red.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                              266

1  Q.   Okay.  And when you started back, was Norman Pawn & Gun

2  already being used?

3  A.   Norman Pawn & Gun in 2016 was being used, more at Big Red

4  than it was at Norman Mitsubishi and Yamaha, where I was at,

5  because we had a lot better credit.

6  Q.   Okay.  Whose idea was Norman Pawn & Gun?

7  A.   Chris Mayes and Chuck Gooch came up with it.

8  Q.   And what was the relationship with -- between it starting

9  and King Cash going away?

10 A.   It was a new way for us to be able to put cash down on a

11 contract when the customer did not have cash.

12 Q.   Okay.  And how did it work?

13 A.   So I remember when it first came out during the first

14 couple months, it was pretty strict:  A guy would come in, he

15 didn't have any money down, we would say "Do you have anything

16 that you can pawn."  The guy says, I've got a gun or I got a

17 couch or I got something.

18      And then we would go to Chuck and tell him what it is that

19 we had and he would assess the value.  He would be, like, you

20 got $300, you got $500, he would tell us what we have.

21      And we was, like, well, we need a thousand, and he was,

22 like, no, go get something else.

23      And that was in the beginning stages.

24      Once it started being used a lot, it just got to where,

25 literally, you would ask a customer "I need something to pawn"

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    270

1  Q.    Is there anything in the documents that go to the lender
2  that says that it's not actual cash?
3  A.    No.  If that happened, there wouldn't be -- there wouldn't
4  be a car loan.
5  Q.    And so, then, once the lender gets the documents, what
6  happens?
7  A.    They review all the paperwork, just kind of like in the
8  beginning, if it was King Cash, remember how I said we would
9  coach the customers on what they would need to say if the bank
10 called them, we would do the same thing in a pawn.
11        We'd be, like, hey, you tell the bank that you pawned
12 something, you're not going to have a car, so you need to tell
13 them that you put this down as cash down.  We would coach them
14 and then they would pass the interview, hopefully, when they
15 got the call.
16 Q.    Who was it that was coaching the customers?
17 A.    Every single person that worked in finance.  And if there
18 was a person who, you know, wasn't a person that we could trust
19 to coach, it would go to specific finance people who we knew
20 would handle it right.
21 Q.    Okay.  And was this happening at every dealership?
22 A.    Yes.
23 Q.    Did you ever talk to Chris about it, Chris Mayes?
24 A.    All the time.
25 Q.    What did you talk about?

```
 1   name was LeAnne at the time, she was helping make them.  There
 2   was a guy in RT and finance.
 3        All the documents together were made -- the total loss
 4   letters were by anybody and everybody who had access to a
 5   template.
 6   Q.   And who knew about it?
 7   A.   Everybody.
 8   Q.   Did Chris Mayes know?
 9   A.   Yes.
10   Q.   And in that time period, you were a general manager?
11   A.   Yes.
12   Q.   And you mentioned before the break that in 2013 you made
13   how much money?
14   A.   700 grand.
15   Q.   Okay.  And how much of that was your salary?
16   A.   My salary was 20 or 25 grand a month.  I think it was 20
17   or 25, so...
18   Q.   Okay.  So help me with the math.
19   A.   I had about a 400 grand to a 450 salary.
20   Q.   And the rest was that percentage of profits?
21   A.   Yes.
22   Q.   And it was -- so about $300,000 was the --
23   A.   Commission.
24   Q.   -- commission?
25        And that's 3 to 5 percent of the dealership's profits?
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    323

1   Q.   (BY MS. ANDERSON) On this document, on the right side,
2   what does it show for the cash deposit or the down payment?
3   A.   1,500 NPG.
4   Q.   And that notation means what?
5   A.   Norman Pawn & Gun, that it's a pawn.
6   Q.   Okay.  And does this sheet with the "NPG" on it go to the
7   lender?
8   A.   No, ma'am.
9   Q.   All right.  And let's look at Government Exhibit 152,
10  which we have a stipulation as to admissibility.
11           THE COURT:  It is received.
12  Q.   (BY MS. ANDERSON) Based on this cover sheet, did Mr. Gooch
13  sign off on Ms. Cox's deal?
14  A.   Yes, ma'am.
15  Q.   Okay.  And this cover sheet, does that go to the lender?
16  A.   No.
17  Q.   I think we spoke about it before, but Mr. Mayes knew about
18  the pawn shop?
19  A.   Yes, ma'am.
20  Q.   And whose idea was it?
21  A.   Chris Mayes and Chuck Gooch.
22  Q.   And how do you know?
23  A.   Because whenever they rolled it out to everybody, they
24  explained to us that this is how we're going to start selling
25  more cars again because we had did away with King Cash.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                      329

1  a deal.

2  Q.    And you said "Faith needed more documents," who is Faith?

3  A.    Faith was in accounting.  She was an accounting lady,

4  accounting manager.

5  Q.    Okay.  And so did the dealership need, like, odometer

6  readings for the trade-in?

7  A.    Yeah.  What they wanted was just proof of registration or

8  a copy of the title and proof that it was paid off towards the

9  end.  So we'd call the tag office and get faxes back just to

10 show that it was actually in this person's name that was

11 trading it, but in the beginning, that was irrelevant.

12 Q.    In the beginning, you didn't check their ownership?

13 A.    No.

14 Q.    In the beginning, did you check the odometer?

15 A.    No.

16 Q.    Did -- for an in-and-out, did the dealership assess the

17 condition of the car or do an appraisal?

18 A.    No, we never saw most of them.

19 Q.    Did Mr. Mayes know about in-and-outs?

20 A.    Absolutely.

21 Q.    How do you know that?

22 A.    Because we talked about them.

23 Q.    And what do you mean?  What did you talk about?

24 A.    Like, whenever things started getting really tight, he

25 was, like, make sure you guys get your paperwork showing these

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                              378

1          She started doing some loans with us, we started becoming
2   more profitable, and then we started paying her to do loans for
3   us.
4   Q.   And when you say "we," who are you talking about?
5   A.   Me and Chris, and then Courtney would give me the money
6   every Friday.
7   Q.   Okay.  How did that come about?
8   A.   So we had a Yamaha store that was not very profitable at
9   this time.  We had a lot of inventory.  It wasn't making money.
10  And we found this loophole how to start making a lot of money.
11  So we needed these loans to get bought.  And she was our magic
12  person to go to, to buy them.
13        So -- and, obviously, we wanted to sell more used cars
14  because the facility at Norman Mitsubishi was Yamaha on this
15  side and then cars on this side, so she could buy both.
16        So if we had customers over here or customers over here,
17  we knew that we could, a lot of the times, pick up the phone
18  and get her to buy them.  So we motivated her with money to buy
19  loans.
20  Q.   And who decided to motivate her with money?
21  A.   Chris.
22  Q.   How did that come about?
23  A.   He said we'll pay her money.
24  Q.   Who did he say that to?
25  A.   Me.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    384

```
 1              MS. ANDERSON:  Okay.  Just scroll down.
 2   Q.   (BY MS. ANDERSON) Who made these?
 3   A.   Everybody made them, but they were primarily made in the
 4   finance department because it was just a template.  We knew
 5   sending these to Tinker, when we were making these big, big
 6   monies, that we needed to put something in there where they
 7   didn't ask any questions.
 8   Q.   And so this was what you provided to support the purchase
 9   price on the lending grid?
10   A.   Right.
11   Q.   And so let's go back to -- how did -- how did you and
12   Chris first get -- you and Mr. Mayes first start talking about
13   cash for Ms. Mullins?
14   A.   Well, so, number one, because of this Yamaha situation --
15   like, on a car, making 2-, 3-, 4 grand was, like, awesome.
16   That's great.
17        These bikes, these -- these -- these deals, you know, you
18   made $800 on these things, you know what I'm saying?
19        So when we were able to take, like, this '15 Yamaha, this
20   whatever it is -- it looks like this is probably a 4-grand
21   bike, 5-grand bike -- long story short, we could send this over
22   for $25,000 and we'd get a check for 25 grand.  I mean, you
23   could make $20,000 on one of these.
24        And when that could happen, we got really excited,
25   everybody did.  Our salespeople were making tons of money, we
```

1   were making tons of money, so we decided that we needed Donna
2   to make sure that these loans went through.  It was a new way
3   to make a lot of money.
4   Q.   And so who first thought of giving her cash?
5   A.   Chris.
6   Q.   And did you talk about how much cash?
7   A.   No, we just said we'll come up with an amount.  So we just
8   started paying her a thousand a week.  She was always
9   struggling with money, complaining, so we felt like this would
10  really just send her right up to buy all our business.
11  Q.   And did it seem to affect her decision-making once you
12  were giving her cash?
13  A.   Absolutely.
14  Q.   How so?
15  A.   Well, we rarely did not get a deal bought.  Rarely.  So if
16  we submitted -- I mean, you could look to our look-to-book back
17  then in those days when Donna was with us and we would send her
18  ten deals, she would buy nine, you know.  Where before, Tinker
19  was -- we were sending ten, they were buying one.  So
20  everything flipped 360.  She was giving us full approvals and
21  it was -- it was just really easy.
22  Q.   How does cash get out of the dealership?  I mean, how did
23  this -- the mechanics?
24  A.   Courtney Wells.
25  Q.   Okay.  So walk me through that.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                          388

```
 1  A.    Me and Chris.

 2  Q.    And what did Mr. Mayes say about that?

 3  A.    "We got to give her a job immediately."

 4  Q.    Okay.  And so what happened?

 5  A.    She came to work for us.   And we wanted her to stay quiet

 6  and Chris wanted to contain her.

 7  Q.    How do you know that?

 8  A.    Because he told me.

 9  Q.    What did he say?

10  A.    He said:  We need to have her keep her mouth shut and we

11  need to make sure that she stays close to us so that she

12  doesn't go around running her mouth.

13  Q.    And how -- did you talk about how to keep her mouth shut?

14  A.    Yeah.  Well, number one -- there was two ways:  One,

15  letting her know that, as long as she stayed close to Chris,

16  Chris would always protect her and he would pay for her

17  attorney, he would do anything and everything he needed to do

18  to make sure that she was okay and that she's safe.  And then

19  "She never took any money," wink-wink, "you know what I'm

20  talking about."

21       And then the second part was put the fear of God in her,

22  that if she talks and she tells somebody and she goes and runs

23  her mouth, which she already did admit to taking it, but we

24  need to say that she got hot-boxed, that she was having a

25  nervous breakdown, she had a meltdown, she was having a midlife
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    389

```
1    crisis, she needed to own that because she didn't get any money
2    from us.
3         So I'll give her a job, you control her, you contain her,
4    and if she goes rogue, then we'll just say she's crazy and me
5    and you will run the same story.
6    Q.   And that's all stuff that Mr. Mayes told you?
7    A.   Yes.
8    Q.   And at the time --
9    A.   It was a daily deal.  He told me to keep her mouth shut
10   every day.
11   Q.   And at the time, where were you working?
12   A.   I was working for Chris at Norman Mitsubishi, Norman
13   Yamaha.
14   Q.   And who did you report to?
15   A.   Chris Mayes.
16   Q.   And where were you having these conversations?
17   A.   Every single day we would have meetings in Chris's office.
18   Q.   And was the information that you discussed information you
19   learned within the scope of your employment at Norman
20   Mitsubishi?
21   A.   Say that one more time.
22   Q.   So was this all related to your job when you talked to
23   Mr. Mayes about this?
24   A.   You mean everything about us -- I mean, not losing my job
25   or --
```

ANDREW ELLIOTT - DIRECT EXAMINATION                    411

1              MR. BEHENNA:  Objection to relevance, how he feels

2     about it, Your Honor.

3              THE COURT:  Overruled.

4     Q.   (BY MS. ANDERSON)  Why does it feel disgusting?

5     A.   Well, the way that I would speak to her.  I was told

6     directly by Chris, "keep her fucking mouth shut," and all I

7     cared about was to just shut her up so we didn't get in

8     trouble.

9     Q.   In that recording, you told Ms. Mullins repeatedly that

10    she had never done anything wrong and had never gotten a

11    dollar.  Was that true?

12    A.   Absolutely not.

13    Q.   Why did you keep saying it?

14    A.   Because that was the story that we had role-played so many

15    times with me and Chris, where if we ever got in trouble, we

16    needed her to be on that page.

17    Q.   What do you mean by "role-played"?

18    A.   "Role-played."  For probably two years straight, every

19    day, me and him would go to the gym.  When we would get back to

20    the gym, most days we would go upstairs, we would sit for hours

21    and role-play different scenarios every day of what would

22    happen today, what would happen tomorrow, what if this happens.

23    If the FBI came in today and they grabbed both of us and they

24    put you in that room and they put me in that room, we have to

25    say the same thing, the exact same thing.  If you break, you're

ANDREW ELLIOTT - DIRECT EXAMINATION                    417

1    if you recall?

2    A.    I think she was down the road, at Arvest Bank.

3    Q.    And where were you working?

4    A.    I was working at Norman Mitsubishi.

5    Q.    Who did you report to?

6    A.    Chris Mayes.

7    Q.    And in this recording, what were you talking to

8    Ms. Mullins about?

9    A.    So this is where things started to get really heated up,

10   and this is where, you know, it wasn't like other people were

11   being visited by the FBI; we were.

12        And every day, it felt like somebody was going to come in

13   and just lock up everybody and shut down the doors.  Because I

14   role-played every scenario with Chris every day, so this

15   recording was about making sure Donna was very aware about

16   keeping her mouth shut again, more aggressively.

17   Q.    And was she -- what was she supposed to keep her mouth

18   shut about?

19   A.    About talking about any money coming out of Tinker.

20   Q.    Money coming out of --

21   A.    I'm sorry.  Money getting bribed for loans from us from

22   Tinker.

23   Q.    And so it related to loans for customers of Norman Yamaha

24   while you worked there?

25   A.    Yeah, Norman Yamaha and Big Red -- I mean, and Mitsubishi.

ANDREW ELLIOTT - DIRECT EXAMINATION                    425

```
 1   Q.   Who hired your attorney?

 2   A.   Chris Mayes.

 3   Q.   And do you have an attorney now?

 4   A.   Yes.

 5   Q.   Who is paying for your attorney?

 6   A.   I pay for my attorney.

 7   Q.   When did that change?

 8   A.   That changed after I left Big Red.

 9   Q.   After Mr. Mayes found out that the FBI was investigating,

10   what happened?

11   A.   Well, so number one, massively, every day was -- again,

12   I'm going back into role play.  We role-played every single

13   scenario every single day, as in we would sit down, we would

14   play out she's a whore, what if she says she slept with you,

15   what if she said she slept with me.  And she did sleep with

16   Chris, but what if she said she slept with you, what are you

17   going to say?  I'm like, well, I didn't touch her.

18              THE COURT:  I'm going to ask you to slow down,

19   please.

20              THE WITNESS:  I'm sorry.

21         So we would role-play multiple different scenarios.  What

22   if she said she took the money, what if she said she didn't.

23   We role-played everything under the sun.  What if they ask

24   about old stuff, you know, like, going back in the past?  Like,

25   we just role-played every single thing possible like it was
```

ANDREW ELLIOTT - DIRECT EXAMINATION                    426

1    present and happening, as in like if the FBI came in right now,

2    if we're in court and they're -- you're on the stand and you're

3    over here, me and you have to be the exact same way.  I've

4    never even been in court so I'm just picturing in my head

5    what -- we have to be on the same thing.

6        So we didn't sell cars, we practiced what would happen

7    when this happened.

8    Q.   (BY MS. ANDERSON) And when you say "we," who are you

9    talking about?

10   A.   Me and Chris Mayes.

11   Q.   Did anyone else?

12   A.   And occasionally Courtney and Chuck, but mostly just

13   Courtney.  Chuck was not a part of a lot of our conversations

14   with this deal, except for when it came to the end, him taking

15   the phone.

16   Q.   And did anything change at the dealership after Mr. Mayes

17   found out about the FBI investigation?

18   A.   Absolutely.  A lot of things started changing all the way

19   around.  Everything started tightening up, you know.  I believe

20   Faith became the new compliance person.  Obviously, Chuck was

21   over at the pawn shop.  Everything got really strict.

22   Everything started getting dialed in to the T.

23       And it was planning everybody going rogue, in case

24   somebody went rogue.  The ultimate plan here is if someone goes

25   rogue, we have them recorded, we have them pinned down, and we

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                481

1    A.    No.  My idea of it is, is there was pawn books everywhere,

2    so the fact there's only 500 is pretty crazy to believe.

3    Q.    You want it to be more?

4    A.    No.

5    Q.    You're okay with it being 489?

6    A.    No, whatever number it is, I just want to tell the truth.

7    Q.    Got it.

8          Now, you were at Big Red Sports & Imports in November of

9    2015, correct?

10   A.    No.  That's when I left.

11   Q.    Right.

12         But you were in there for part of November of 2015?

13   A.    I'm not sure of the date I left.  I think it was the end

14   of October, but I can double check.  I think it was November

15   1st I left.

16   Q.    All right.  Well, here is one way we can check, I think.

17         If we look at Government's Exhibit 26 -- Government

18   Exhibit 26.

19         You said on direct that you were still working for Chris

20   when you printed this off, Exhibit 26, at his store, correct?

21   A.    Yes, I did say that.  That's what I believed.

22   Q.    Right.

23         And so you were there on November 2nd of 2015, correct?

24   A.    That's what it looks like.

25   Q.    And, you know, I didn't understand what this exhibit was

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    518

```
1          MS. ANDERSON:  Thank you, Your Honor.

2      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITH

3  ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE PRESENCE AND

4  HEARING OF THE JURY.)

5          THE COURT:  You may continue.

6          MR. BEHENNA:  Thank you, Your Honor.

7  Q.  (BY MR. BEHENNA) But to all of that, all that we've talked

8  about, the crimes that you have admitted to or say that you

9  participated in, you got immunity?

10 A.  Yes, I have.  I did.

11 Q.  Not charged with one crime?

12 A.  Yes.  To tell the truth.

13 Q.  Well, let me ask you this:  Were you given immunity before

14 you said Chris Mayes did it?

15 A.  What does that mean?

16 Q.  Well, in 2018, were you offered immunity?

17 A.  No, I was not offered immunity.

18 Q.  In 2019, were you offered immunity?

19 A.  No.

20 Q.  It was only when you said "Chris Mayes did it" that you

21 were offered immunity?

22 A.  That's not correct.

23 Q.  Okay.  Do you think you would have got immunity if you

24 would have said Chris Mayes had nothing to do with it?

25 A.  I got immunity to tell the truth.
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    497

1   Q.   That's not my question.

2   A.   What's your question?

3   Q.   When you got caught -- when she got caught taking money,

4   you told her to lie?

5   A.   Yes, by the permission of Chris Mayes.

6   Q.   I get that.

7        It's always Chris Mayes giving you permission to do these

8   things?

9   A.   This is correct.

10  Q.   And you gave Donna money at your so-called Bible study?

11  A.   Yes.

12  Q.   Isn't it true at the same time you're talking with Donna,

13  you're also talking to Chris separately?

14  A.   What does that mean?

15  Q.   Well, you're having conversations with Donna and then

16  you're having conversations with Chris Mayes separate.

17  A.   Explain.

18  Q.   Are there times where you and Donna have a conversation

19  about this bribery incident?

20  A.   Is there -- just me and her?

21  Q.   Yes.

22  A.   Yes.

23  Q.   Are there times when you have a conversation with Chris

24  Mayes separately?

25  A.   Yes.  And there are times with all three of us.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    519

```
 1   Q.   That's not my question.
 2        Would you have got immunity if you said Chris Mayes had
 3   nothing to do with it?
 4   A.   I don't know the answer to that.
 5   Q.   Now, after your lawyer sent that letter, did you talk with
 6   the government before you testified at the grand jury?
 7   A.   I don't believe so.
 8   Q.   Okay.  So if I set the timeline, your lawyer sends a
 9   letter to the government requesting immunity for you in January
10   of 2020?
11   A.   I need to check those dates.  I'm sorry.
12            MR. BEHENNA:  May I approach the witness, Your Honor?
13            THE COURT:  You may.
14        (DOCUMENT HANDED TO THE WITNESS BY MR. BEHENNA.)
15   Q.   (BY MR. BEHENNA) I'm only interested in that time.
16   A.   January 30, 2020.  Hand-delivered January 31, 2020.
17   Q.   Did that sufficiently refresh your memory?
18   A.   Yes.
19   Q.   So your lawyer sent a letter on January 20th requesting
20   immunity for you, correct?
21   A.   I'm not sure of the exact request, but I believe that was
22   what we wanted.
23   Q.   Okay.  And if I could have -- well, I can't remember if
24   it's been admitted.
25        The key here is that date.  You were offered immunity on
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    520

```
 1   July 20th of 2020, correct?
 2   A.    That is correct.
 3   Q.    Prior to being offered immunity by the government, did you
 4   ever have a meeting with them?
 5   A.    I don't believe so.
 6   Q.    So the government offered you immunity without ever
 7   talking to you?
 8   A.    We had been communicating through a lawyer.
 9   Q.    So your -- the government had talked to your lawyer and,
10   through that, they decided to give you immunity without ever
11   talking to you directly?
12   A.    They spoke many times.
13   Q.    I get that.
14         Did they ever talk to you directly?
15   A.    I don't believe so.
16   Q.    Did they ever ask you to give a statement about what you
17   would say before you got immunity?
18   A.    We gave them a handwritten letter --
19   Q.    Right, your lawyer --
20   A.    -- before that.
21   Q.    Your lawyer wrote what you might say, right?
22         I think he called it a "hypothetical statement," right?
23   A.    Right.
24   Q.    These events, should they turn out to be real or
25   hypothetical situations or vignettes?
```

1  A.    Yes, I wanted to tell the truth.

2  Q.    Right.

3        But -- and so your lawyer wrote a hypothetical letter to

4  the government in January, correct?

5  A.    Yes.

6  Q.    And the government offered you immunity in July, without

7  ever talking to you?

8  A.    After reading the letter, yes.

9             THE COURT:  When you -- for the sake of clarity, when

10  you refer in this line of questioning to the government, are

11  you including just the U.S. Attorney's Office or are you

12  including the U.S. Attorney's Office and the FBI?

13            MR. BEHENNA:  I will say the U.S. Attorney's Office.

14  They're the name on the letter.  Forgive me, Your Honor.

15  Q.    (BY MR. BEHENNA) Correct?

16  A.    Yes, sir.

17  Q.    Okay.

18            MR. BEHENNA:  May I have one moment, Your Honor?

19            THE COURT:  Surely.

20  Q.    (BY MR. BEHENNA) In truth, Mr. Elliott, when someone gets

21  in your way, what you do is run them over, right?

22  A.    Is that, like, a saying?

23  Q.    Yeah, it's your saying.

24  A.    I was going to say that's a saying that's on the Internet,

25  but that's not who I am.

ANDREW ELLIOTT - CROSS BY MR. ADLER                                    534

```
 1  worked this out.
 2  Q.    So what you're saying to Donna here isn't true.  You would
 3  never come into a courtroom and tell something untrue, correct?
 4  A.    I have never been in a courtroom and told a lie.  That was
 5  a plan that me and Chris Mayes had made for Donna.
 6  Q.    And why did you think it was important to counsel her on
 7  how to perjure herself?
 8  A.    Chris told me to make sure that she was prepared and
 9  willing or else we were going to turn against her.
10  Q.    Why did you say those things to her?
11  A.    Because Chris told me to.
12  Q.    Chris made you?
13  A.    Chris made me, yes.
14  Q.    And in these conversations, you're the one that tells her
15  the story to go with about where the money came from, right?
16  A.    I was giving her ideas where she should say it came from.
17  Q.    Well, you gave her more than an idea, didn't you?
18  A.    What do you mean?
19  Q.    You gave her quite a few specific examples of where she
20  can say this money came from.
21  A.    Yes.
22  Q.    Okay.  And you're coaching her to lie, and you're coaching
23  her to have a complete story, and you're coaching her to
24  practice it again and again and again, right?
25  A.    Yeah.
```

1    Q.    How does that make you feel today?

2    A.    Makes me feel disgusting and sick.

3    Q.    It is disgusting and sick, is it not?

4    A.    Yeah.  You know, we were --

5    Q.    That was the end of the question.

6    A.    Sure.

7    Q.    Do you remember telling Donna in those -- in one of those

8    car rides that "I'll give you anything you need"?

9    A.    Yes.

10   Q.    Do you remember telling the government, when you met with

11   them, "I'll give you anything you need"?

12   A.    I told them I would tell the truth, yes.

13   Q.    You did, in fact, meet with these lawyers for the

14   government at some point, correct?

15   A.    You mean, like, in person, after we made a deal?  Yes.

16   Q.    Okay.  I'm not trying to trick you.

17         If I told you that was in October of 2020, would you have

18   any reason to disagree with that?

19   A.    October of 2020 was when I met with them?

20   Q.    Uh-huh.

21   A.    I don't know the dates, but --

22   Q.    And that's why my question was phrased "would you have any

23   reason to disagree with that."

24   A.    Yeah, I mean, I'm not good with dates.  That's why I keep

25   asking for dates.

1  Q.   Okay.

2  A.   And I apologize.

3  Q.   Do you believe that date is inaccurate?

4  A.   If you have that that is the date, then I'll go with it.

5  Q.   Okay.  And do you remember telling them, "Whatever you

6  need, I can help you with"?

7  A.   I don't remember that.

8  Q.   Okay.  Do you deny that you told that to them?

9  A.   No.

10  Q.   Okay.  And that's part of the sale, right?  You're

11  building trust.  That's a sales tactic, right?

12  A.   There's no tactic in this room.  It's the truth.  That's

13  it.

14  Q.   I'm talking about your dealings with Donna, your dealings

15  with the government, you're trying to convey to them something

16  they perceive to be of value, right?

17  A.   Everything was a lie until I met them, and that's why I'm

18  here to tell the truth.

19  Q.   Okay.  So anything you said until what date was a lie?

20  A.   Everything that I did while I worked for Norman

21  Mitsubishi, the entire time, the way that we worked, the way

22  that me and Chris planned everything for everybody, if they

23  didn't fall in line, to have an exit out, including Chuck,

24  Courtney, all them, everything was a lie.  It was a daily new

25  lie.

```
 1        And when I had the opportunity to get immunity, I'm not
 2   lying.  I'm so glad to tell the damn truth.  So you're not
 3   going to get a lie out of me.
 4   Q.   Okay.  Well, there's a lot of value in immunity, is there
 5   not?
 6   A.   Yeah.
 7   Q.   It's priceless, right?
 8   A.   Yeah.  I don't have to lie.  It feels amazing.
 9   Q.   You don't have to be sitting over there (pointing), do
10   you?
11   A.   I get to tell the truth.
12   Q.   It keeps you from sitting at the defense table, does it
13   not?
14   A.   Yes.  I get to tell the truth.
15   Q.   And this investigation allegedly started looking into
16   illegal bribes, cash bribes, that you paid to Donna Mullins,
17   correct?
18   A.   That me and Chris and Courtney paid to her, yes.
19   Q.   Okay.  On what date did Courtney Wells give Donna Mullins
20   cash?
21   A.   Courtney brought me money every single Friday.
22   Q.   Please listen carefully to the question.
23        On what day, to your knowledge, did Courtney Wells hand
24   Donna Mullins money?
25   A.   Nobody ever handed Donna Mullins a dollar, except me, and
```

ANDREW ELLIOTT - CROSS BY MR. ADLER                     538

1   I was handed it from Courtney by permission of Chris.

2   Q.   Okay.  We'll get into that in a minute.

3   A.   Sure.

4   Q.   The point is, the FBI tells you this investigation is

5   about you bribing a bank official, correct?

6   A.   No.

7   Q.   When they came and saw you in March of '18, they didn't

8   say:  Hey, we'd like to talk to you about you bribing a bank

9   official, and we've got you on recording?

10  A.   In 2018, yes.

11  Q.   Okay.  So that was what they told you this investigation

12  was about, right?

13  A.   Yes.

14  Q.   And they had solved that case, right?

15  A.   I don't know what that means.

16  Q.   They -- Donna had admitted that it happened.  They had you

17  on recording admitted (sic) it happened.  You consider that

18  case solved?

19  A.   No.  I'm not in -- I'm not in law.

20       THE COURT:  Mr. Adler, let me know when you get to a

21  convenient stopping point, we'll take our mid-afternoon break.

22       MR. ADLER:  I'm happy to take a break now.

23       THE COURT:  Very well.

24  You may be seated.

25  Members of the jury, we'll take our mid-afternoon break at

ANDREW ELLIOTT - CROSS BY MR. ADLER                          545

1   A.    Yeah.  Like, we won't repeat history with giving cash out

2   anymore, I wish it could go away.

3   Q.    Okay.  But we're -- you're actively encouraging her to lie

4   again and again and again until the grave, and you don't

5   consider that a bad idea or a bad thing?

6   A.    That was the only choice I had on the table.

7   Q.    But at some point, somebody presented you another option,

8   right?

9   A.    I would have taken that option any day, to tell the truth.

10  Q.    When the agent came and met you on March 18th -- or pardon

11  me -- March 12th of 2018 and asked you "will you talk to me and

12  tell me the truth," did you take him up on it?

13  A.    If I would have taken him up on it, I would have had to

14  fight that guy.

15  Q.    Yes or no.  Did you take him up on that opportunity to

16  tell the truth?

17  A.    No, I didn't.

18  Q.    Do you remember telling him that you have done nothing

19  wrong?

20  A.    Yes.

21  Q.    Okay.  So you did, in fact, have an opportunity to tell

22  the truth, did you not?

23  A.    We role-played that moment for three years.

24  Q.    Did or did you not have an opportunity to tell the agents

25  the truth in March of 2018?

BOBBY CHRIS MAYES - DIRECT BY MS. BEHENNA                    2268

1   probably would have been Marty or Jeanie.  And those two would

2   have been pretty difficult to get any petty cash out of.  And

3   we don't keep enough, it's 3- to 5-, $600.

4   Q.   In the time that you've been a dealer principal and even

5   before that, when you were a salesman, have you ever paid a

6   loan officer?

7   A.   I have never paid a loan officer.  And I've never been

8   accused of paying a loan officer.

9   Q.   There was also testimony from Mr. Elliott where he was

10  getting rather harsh with Ms. Mullins in that July 2017 audio

11  and video recording.

12  A.   Yes.

13  Q.   Mr. Elliott testified that you told him to kind of jump on

14  her to keep her quiet; do you remember that?

15  A.   Yes.

16  Q.   Can you tell the jury:  Did you ever instruct Andy Elliott

17  to try to keep Donna Mullins quiet?

18  A.   No, that never happened.  I mean, there wouldn't have been

19  a reason for me to say that.  I hadn't bribed her.  I hadn't

20  given him money to bribe her, so there would be no reason for

21  me to ever even have that conversation with him.

22  Q.   Did you ever tell Andy Elliott to tell Donna Mullins to

23  lie about receiving money?

24  A.   Absolutely not.  I mean, it just -- it wasn't on my radar

25  like that at that time.

ANDREW ELLIOTT - CROSS BY MR. ADLER                                561

1   can hide it, so they're figuring out how to hide it in the

2   computer system.

3   Q.    And you don't remember what bank this was?

4   A.    No, sir.

5   Q.    Okay.  And --

6   A.    But you can check my bank accounts.  They've all been

7   checked.

8   Q.    Sure.  I didn't ask a question.

9         But you said you were there for this conversation about

10  how to hide the bank transactions?

11  A.    The money that was taken out each week that was given to

12  me, when we first got in trouble, Chris said, Let me see if

13  this is something they can go back and look and see and see us

14  deposit -- withdrawing this money.

15        And, you know -- and then it was, like, there's no way we

16  can hide it, let's just say we gave it to her.

17        I mean, we role-played so many different stories.  Let's

18  say we just gave it to Donna because she's dead broke, you

19  know.  Let's say that, you know, she got in trouble so we gave

20  it to her.  Let's say that Chris is screwing her, we paid her

21  money to screw him.

22        I mean, we thought of every scenario possible and then --

23  but the hiding it part, it was simple.  It was said there's a

24  way that we could probably hide it in the system.

25        I don't see the computer.  I get on Reynolds & Reynolds

1  A.   No.

2  Q.   In your experience, is Andy Elliott an honest person?

3  A.   No.

4  Q.   Please tell the jury why Andy Elliott lies.

5          MR. SNYDER:  Objection, Your Honor; no foundation for

6  that; calls for speculation; relevance.

7          THE COURT:  Sustained.

8  Q.   (BY MR. ADLER) Ms. Wells, how did it feel to hear Andy

9  Elliott lie to this jury and involve you in his bribery of

10 Donna Mullins?

11         MR. SNYDER:  Objection, Your Honor; leading; no

12 foundation; calls for speculation; it's not a question.

13         THE COURT:  It is a question and the objection is

14 overruled.

15         THE WITNESS:  Can you repeat the question?

16 Q.   (BY MR. ADLER) Ms. Wells, tell this jury how it feels to

17 hear Andy Elliott lie to this jury and involve you in his

18 bribery of Donna Mullins.

19 A.   I think the word that he used was "disgusting."  And I

20 would say that instead of feeling disgusting, that him

21 involving me in that made me feel very disgusted with him.

22 Q.   Did you even know that was happening when it was

23 happening?

24 A.   No.

25 Q.   And to your knowledge, by the time the FBI interviews you

ANDREW ELLIOTT - CROSS BY MR. ADLER                          565

1    A.   They want my help to tell the truth, and that's all I want

2    to do.  I don't want anybody to get in trouble; I'm just going

3    to tell the truth.

4    Q.   Okay.  You understand the government's goal is to try to

5    get this jury to convict all three of these defendants,

6    correct?

7    A.   I believe the government just wants the truth from me.

8    Q.   Okay.  And the reason that -- when asked "was there

9    anybody else there," the reason that you then added Chuck and

10   Courtney is because you remembered, oh, yeah, I left them out

11   the first four times I testified that --

12   A.   Sir, I believe that they just want to do the right thing,

13   and I'm just telling the truth.

14   Q.   True or false:  That's why you added them the fifth time

15   --

16   A.   That is false why I added them.

17        MR. ADLER:  Just a moment, Your Honor.

18        THE COURT:  Surely.

19        MR. ADLER:  Thank you very much, Mr. Elliott.  No

20   further questions.

21        THE WITNESS:  Thank you.

22        THE COURT:  Now, we can either have redirect or take

23   the witness that the government wants to take out of time.  It

24   would seem -- or out of order.  It would seem to me logical to

25   take the witness.

ANDREW ELLIOTT - RECROSS BY MR. BEHENNA                    590

```
1   Q.   Right.
2        You're the one that expanded this loophole, right?
3   A.   Yes.
4   Q.   Right.
5   A.   With Chris.
6   Q.   Right.  It's always with Chris.  And maybe that's one
7   other point I want to make.
8        You don't have a single text message that confirms
9   anything you're saying about Chris?
10  A.   I don't need a text message to confirm everything.
11  Q.   You don't have a single document, other than your word,
12  for the jury to believe that anything you're saying is true?
13  A.   I would not be in here under oath telling a lie.  And if I
14  didn't have anything to lie about, I wouldn't have had a -- I
15  wouldn't have had an agreement with the U.S. Attorney.  I would
16  have just told the truth over here at this table.
17  Q.   Right.
18       Well, Andy, in truth, you could have told the truth at any
19  time.  You could have come and been a defendant, pled guilty to
20  bribery, you would have admitted your mistake.  You never did
21  any of that, right?
22  A.   Right.  I didn't do that stuff.
23  Q.   In fact --
24  A.   We were all going to lie about it.
25  Q.   -- all you ever did was tell people to not tell the truth.
```

ANDREW ELLIOTT - RECROSS BY MR. ADLER                    592

1  Q.   Does it make it easier for you to compute in your own mind
2  that you're not such a bad guy because everything you did, you
3  did because Chris told you?
4  A.   I believe these things that I did were awful, but I'm
5  going to tell you that I did them with everybody sitting right
6  there at that table.
7  Q.   Okay.  I'm asking you does it make you feel better in your
8  own mind to blame what you did on somebody else?
9  A.   See, those words, that's not the truth, and I'm going to
10 stick to the truth.
11 Q.   Okay.  So these deals that you made, these loopholes that
12 you exploited, these overpriced vehicles that you get these
13 people to buy, those were things you personally participated
14 in, right?
15 A.   Communicated from above what we were allowed to do
16 internally in that store, we talked about it, and then we
17 attacked it as a plan through the company to make more money,
18 which is how we did more deals when I was there.
19 Q.   Did you hear my question?
20 A.   You said "me."
21 Q.   I said all of those were things that you personally
22 participated in.  Yes or no?
23 A.   I personally did, absolutely.
24 Q.   And that was a decision you made, to be involved in those
25 sorts of things, right?

1552

```
1              MR. ADLER:  Because it makes them look like the ones
2     that came up with it.  Like it -- it impugns on them in the way
3     that it operated that it was intended to operate the way that
4     it, in fact, did.
5         It's misrepresentative of the intent.  It goes directly to
6     criminal intent under conspiracy, intent to defraud.  The
7     context of this answer that she's providing is directly
8     relevant to intent and the questions they're asking her are
9     trying to establish that, and so their questions bring it into
10    issue and she gives them a straight answer in full context.
11             THE COURT:  Very well.
12         Ms. Behenna.  Please work from the lectern.
13             MS. BEHENNA:  Your Honor, the government's entire
14    case is premised upon Andy Elliott, if you recall the
15    testimony --
16             THE COURT:  I emphatically disagree with that.
17             MS. BEHENNA:  Well --
18             THE COURT:  Find some other premise for your
19    argument.
20             MS. BEHENNA:  It's Andy Elliott who said that the
21    pawn shop scheme started after King Cash was put to bed.  That
22    is simply not true.  That's just simply not true, Your Honor.
23         And because the government has represented the evidence
24    that way, relying upon Andy Elliott, it is imperative that the
25    jury understand how this concept came to be.
```

TIM SCHMITZ - REDIRECT BY MS. ANDERSON                    1844

1  A.   Yes.

2  Q.   -- is that right?

3       MS. ANDERSON:  And if we go to the next page, please,

4  at the top of the next page.

5  Q.   (BY MS. ANDERSON) Could he also have been prosecuted for

6  perjury and obstruction of justice?

7  A.   Yes.

8  Q.   So that nonprosecution agreement -- or as it was referred

9  to on cross-examination, immunity -- could have been unwound at

10 any moment and could still be; is that correct?

11 A.   Yes.

12 Q.   All right.  When you interviewed Mr. Elliott after the

13 nonprosecution agreement had been entered, did he deny

14 responsibility for any of the types of fraud?

15 A.   No.

16      MS. ANDERSON:  Let's go to Government Exhibit

17 previously admitted 12.3, please, and if we could zoom in on

18 the bottom left quadrant.  Thank you.

19 Q.   (BY MS. ANDERSON) Now, in this -- this was discussed on

20 cross-examination.  Mr. Gooch was asked is there anyone else

21 that does this as well, in addition to him; is that correct?

22 A.   Yes.

23 Q.   Okay.  And he indicated other people also review every

24 deal; is that right?

25 A.   Yes.

BOBBY CHRIS MAYES - DIRECT BY MS. BEHENNA                    2263

1   Q.   And who told you that Donna Mullins had been fired?

2   A.   I believe it was Andy.

3   Q.   Did Andy Elliott tell you why she was fired?

4   A.   He had told me that someone at Tinker had put her in an

5   office and his -- hotboxed her into saying that Andy or the

6   dealership had given her money to buy loans.

7   Q.   Did you ask him if he had been giving money to Donna?

8   A.   Yes.

9   Q.   Did he represent to you that he had been?

10  A.   He represented to me that he had not ever given her any

11  money to buy car loans.

12  Q.   Why did he give her money?

13  A.   He said that he had given her a few hundred dollars here

14  and there because she was a single mom.  Her daughter -- maybe

15  her daughter was pregnant and getting ready to have a baby

16  then.  You know, they did Bible study together and whatnot.

17  Q.   Did you believe what Andy Elliott was telling you?

18  A.   I mean, at the time.  I didn't have a reason not to.

19  Q.   Did you have any conversation with Andy Elliott whereby

20  you told him to pay money to Donna Mullins to make sure that

21  these loans went through from Norman Yamaha?

22  A.   That's never happened.  And it's ridiculous.

23  Q.   During your conversation with Andy about Donna being

24  fired, was there a discussion about whether or not she should

25  be hired by the dealership?

1  Q.   And you didn't see anything on their phones?

2  A.   No.

3  Q.   And after that, did you agree to hire Donna?

4  A.   Yes.

5  Q.   And do you remember what position you hired her for?

6  A.   She did finance at the Mitsubishi and Yamaha store.

7  Q.   Did you hire Donna Mullins at your dealerships in order to

8  keep her quiet and to control her throughout this FBI

9  investigation?

10  A.   No.  I mean, that doesn't even seem rational.

11  Q.   Did you ever have a conversation with Andy Elliott wherein

12  you told him to pay Donna during 2015 or 2016?

13  A.   That conversation never happened.  And it's never happened

14  with anyone in my career where I would say to someone pay a

15  bank money.  That's not ever going to happen.

16  Q.   Did you hear Mr. Elliott say that you and Courtney Wells

17  and Andy Elliott had a meeting and a discussion whereby it was

18  agreed that Ms. Wells would get money, I guess, every Thursday

19  or Friday so that Andy Elliott could pay money to Donna Mullins

20  during their Saturday morning Bible study lessons or

21  whatever -- meetings?

22  A.   Yes, I heard that.

23  Q.   Did you ever have a conversation with Andy Elliott and

24  Courtney Wells wherein Courtney was instructed to go get cash

25  from the bank?

BOBBY CHRIS MAYES - DIRECT BY MS. BEHENNA                           2269

1   Q.    Andy Elliott also told this jury that you and he role-

2   played; do you recall that testimony?

3   A.    I've heard that, yes.

4   Q.    You did it for hours.

5   A.    Yes.

6   Q.    In the upstairs office of Mitsubishi; do you remember

7   that?

8   A.    Yes, I do remember that.

9   Q.    Can you tell this jury:  Did that ever happen?

10  A.    Sure.

11        I've never role-played with anybody that I can remember in

12  my life.  It's just not really my style.  And as we've already

13  heard, that particular office is like this room.  And there

14  were people up there the whole time.  It's just never happened.

15  That didn't even make sense to me.

16  Q.    And even if you had role-played with him for hours at the

17  upstairs office in Mitsubishi, would somebody have seen that?

18  A.    Yes.  Yes.

19  Q.    Somebody like Janet Schulz?

20  A.    Yes.

21  Q.    Was she there every day?

22  A.    Every day that I know, yes.  I didn't go up there that

23  often.

24  Q.    That was going to be my next question:  How many times do

25  you even go to the Mitsubishi office during that period of

2425

```
 1   credibility of witnesses.  Defendant Mayes has requested the

 2   Tenth Circuit's pattern instruction --

 3            THE COURT:  And if you could, give me the page that

 4   I'm supposed to be looking at.

 5            MS. JORDAN:  Page 36, Instruction Number 12.

 6            THE COURT:  Okay.  I'm with you.

 7            MS. JORDAN:  So the Defendant Mayes has requested the

 8   pattern instruction for the Tenth Circuit.  1.08 is the pattern

 9   instruction.

10       The reason for that request is that the style of the

11   pattern instruction includes a list of questions that prompt

12   the reader to ask themselves certain questions about the

13   credibility of a witness.  And we feel that that is a more

14   effective way to convey this instruction to the jury, rather

15   than summarizing, as it's been done.

16            And that's particularly important in this case because the

17   credibility of Andy Elliott is a key component of the defense

18   theory.  And so this is a very important instruction to the

19   defense.

20            THE COURT:  Thank you.

21            MS. JORDAN:  The investigative techniques instruction

22   is on page 44, I believe.  Instruction Number 20.

23            THE COURT:  I'm with you.

24            MS. JORDAN:  The Tenth Circuit case that Mr. Gifford

25   has previously cited, United States v. Cota-Meza, addresses
```

COURTNEY WELLS - DIRECT BY MR. ADLER                    2389

```
 1  A.   No.

 2  Q.   In your experience, is Andy Elliott an honest person?

 3  A.   No.

 4  Q.   Please tell the jury why Andy Elliott lies.

 5          MR. SNYDER:  Objection, Your Honor; no foundation for

 6  that; calls for speculation; relevance.

 7          THE COURT:  Sustained.

 8  Q.   (BY MR. ADLER) Ms. Wells, how did it feel to hear Andy

 9  Elliott lie to this jury and involve you in his bribery of

10  Donna Mullins?

11          MR. SNYDER:  Objection, Your Honor; leading; no

12  foundation; calls for speculation; it's not a question.

13          THE COURT:  It is a question and the objection is

14  overruled.

15          THE WITNESS:  Can you repeat the question?

16  Q.   (BY MR. ADLER) Ms. Wells, tell this jury how it feels to

17  hear Andy Elliott lie to this jury and involve you in his

18  bribery of Donna Mullins.

19  A.   I think the word that he used was "disgusting."  And I

20  would say that instead of feeling disgusting, that him

21  involving me in that made me feel very disgusted with him.

22  Q.   Did you even know that was happening when it was

23  happening?

24  A.   No.

25  Q.   And to your knowledge, by the time the FBI interviews you
```

COURTNEY WELLS - DIRECT BY MR. ADLER                          2388

1   Q.   And did you hear Ms. Mullins mention you at any point

2   during her testimony about Mr. Elliott bribing her?

3   A.   No.

4   Q.   And I assume that you heard and paid close attention to

5   Andy Elliott's testimony?

6   A.   Yes.

7   Q.   And did you hear him tell this jury that you knew he was

8   bribing Donna Mullins?

9   A.   I heard that.

10  Q.   And did you hear Andy Elliott tell this jury that you were

11  part of the meeting where it was decided that Donna Mullins

12  would be bribed?

13  A.   I did hear that.

14  Q.   Did that meeting ever take place?

15  A.   No.

16  Q.   Did you hear him tell this jury that you discussed with

17  him every single week for five months the amount of money that

18  he wanted you to deliver to him to bribe Donna Mullins with?

19  A.   Yes, I heard that.

20  Q.   And did you hear him tell this jury that you brought him

21  cash every week in a bank envelope on Friday for five months so

22  he could bribe Donna Mullins?

23  A.   Yes, I heard that.

24  Q.   And is one single word that Andy Elliott said about your

25  involvement in this bribery of Donna Mullins true?

1    credibility of witnesses.  Defendant Mayes has requested the

2    Tenth Circuit's pattern instruction --

3              THE COURT:  And if you could, give me the page that

4    I'm supposed to be looking at.

5              MS. JORDAN:  Page 36, Instruction Number 12.

6              THE COURT:  Okay.  I'm with you.

7              MS. JORDAN:  So the Defendant Mayes has requested the

8    pattern instruction for the Tenth Circuit.  1.08 is the pattern

9    instruction.

10        The reason for that request is that the style of the

11    pattern instruction includes a list of questions that prompt

12    the reader to ask themselves certain questions about the

13    credibility of a witness.  And we feel that that is a more

14    effective way to convey this instruction to the jury, rather

15    than summarizing, as it's been done.

16        And that's particularly important in this case because the

17    credibility of Andy Elliott is a key component of the defense

18    theory.  And so this is a very important instruction to the

19    defense.

20              THE COURT:  Thank you.

21              MS. JORDAN:  The investigative techniques instruction

22    is on page 44, I believe.  Instruction Number 20.

23              THE COURT:  I'm with you.

24              MS. JORDAN:  The Tenth Circuit case that Mr. Gifford

25    has previously cited, United States v. Cota-Meza, addresses

2432

```
1   page 36, I'm well-satisfied with that instruction.  And I
2   frankly -- as I mentioned last night, I frankly don't like the
3   style of the Tenth Circuit pattern instruction.  I think it's a
4   little glib, I think borders on setting the wrong tone, if you
5   will.
6       And the jury is not going to have to be reminded that an
7   extraordinarily prominent issue in this case is the credibility
8   of Mr. Elliott.  And I have full confidence in the ability of
9   defense counsel to point out any possible deficits in the
10  credibility of Mr. Elliott.
11      On Instruction Number 20 -- and so that objection is
12  overruled.
13      On Instruction Number 20, relating to investigative
14  techniques, this is the instruction that is to be found in the
15  Tenth Circuit's Lemon decision.  I'm well-satisfied with the
16  fairness and balance of this instruction.  And I actually think
17  that the addition that's been suggested is potentially
18  confusing.
19      But aside from that, I take this instruction, looking at
20  it within its own four corners, I believe that it is a fair and
21  adequate statement of the law.
22      So whether some other instruction might be better yet,
23  which I don't agree is the case, but whether some other
24  instruction might be better yet, is essentially beside the
25  issue.  And that objection is overruled.
```

2446

1   provide a down payment.  But they didn't bring Ms. Maynard to

2   testify, they used the transcript of a witness that had no idea

3   what the guidelines were for Ally Financial.

4       Today, Mr. Mayes was asked about an illegitimate child.  I

5   objected to that and the Court sustained that objection.

6       On the heels of that, Ms. Anderson asked Mr. Mayes:  So

7   your company -- as the Court has pulled out here -- so your

8   company is -- has both dispensary locations and a grow location

9   for marijuana; is that correct?

10      I objected to relevancy; you sustained that.

11      And immediately Ms. Anderson asked the question:

12  Mr. Mayes --

13          THE COURT:  Well, it was not a question, it was a

14  flat-out statement.

15          MS. BEHENNA:  It was a statement.

16      "The sale of marijuana is a federal crime."  I have never

17  in my life seen anything like that by the U.S. Attorney's

18  Office.  It was done for one purpose.  It was done

19  intentionally to infer to this jury that they should convict

20  him of the crimes that are charged here, which are

21  questionable, at best, as the Court has noted, because their

22  case relies solely upon Andy Elliott to prove this conspiracy

23  and this scheme.

24      But she has repeatedly introduced evidence to malign and

25  to injure, not based upon the facts of the case, but based upon

2448

1  motion for a mistrial.

2      Your Honor, I'm not asking for a mistrial just to start

3  this all over again.  Because of the intentional acts of

4  Ms. Anderson, I'm asking for a mistrial with prejudice, and

5  there is authority for that, Your Honor.

6          THE COURT:  I'm aware of that option.

7          MS. BEHENNA:  And may I have just a moment?  I think

8  I'm about ready to wind down.

9          THE COURT:  Surely.

10         MS. BEHENNA:  I failed to follow up, Your Honor.

11     It was mentioned in this hypothetical proffer letter that

12 Scott Adams sends to the U.S. Attorney's Office, Mr. Elliott

13 testified -- was interviewed and testified in grand jury, and

14 he was never asked that question, whether or not he knew about

15 vehicles being hammered at the dealership.  And I failed to

16 mention that as part of the basis for not having a factual

17 basis to ask that question.

18         THE COURT:  Thank you.

19     I'll hear from the government.

20         MS. ANDERSON:  Thank you, Your Honor.

21     Your Honor, as this Court has recognized, the most

22 important aspects of the case, and particularly from the

23 defense side, are evidence of good character of Mr. Mayes and

24 evidence or allegations that Andy Elliott is a liar.

25     Our view of Rule 404(a)(2)(A) and 405(b) is that -- and,

2593

1   you've served well.  And every time I've been up here, it's

2   been very apparent that each and every one of you is paying

3   close attention.  And for that we thank you.  Because this is a

4   long case and this is a complicated case, and you have to pay

5   close attention to understand what's happening.

6        The truth, ladies and gentlemen, is that Courtney Wells is

7   not guilty of any crime.  And the truth should set her free.

8        Courtney Wells never ever entered into any agreement with

9   anybody or any conspiracy with anybody to commit fraud, and the

10  government failed to prove that.

11       Courtney Wells never ever created or passed a forged check

12  to anybody.  You heard from multiple witnesses that simply

13  wasn't true.  The government failed to prove that.  The truth

14  is that she was never part of stealing anybody's identity, and

15  the government failed to prove that because it is the truth.

16       She sits here, now, facing the grave consequences of 25

17  felony convictions for three reasons:  For doing her job the

18  way she was she was trained to do it, the way she was taught to

19  do it, to the best of her ability; she sits here because she

20  wasn't willing to lie to the FBI and tell them Chris Mayes made

21  me do it all; and she's sitting here because Andy Elliott sure

22  as heck was.

23       Make no mistake, ladies and gentlemen:  The one and only

24  linchpin, the glue of the government's entire case, is Andy

25  Elliott.  You must believe the story Andy Elliott is trying to