# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs- | ) | Case No. <u>CR-20-240-F</u> |
| | ) | |
| | ) | |
| **BOBBY CHRIS MAYES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO <u>VACATE SENTENCE UNDER 28 U.S.C. § 2255</u>

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

<u>s/ Thomas B. Snyder</u>
THOMAS B. SNYDER (OK 31428)
Assistant United States Attorney
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (telephone)
(405) 553-8777 (fax)
thomas.snyder@usdoj.gov

# <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ................................................................... ii

PROCEDURAL HISTORY ............................................................... 1

ARGUMENT & ANALYSIS .............................................................. 4

    I.    Background to Mr. Mayes' Section 2255 Motion ........................... 4

    II.    Legal Standard for Ineffective Assistance of Counsel .................. 5

    III.    Each of Mr. Mayes' claims regarding Trial Counsel's representation fails both prongs of the *Strickland* analysis. ........ 7

        A.    Grounds One and Two: Failure to Use or Investigate the Andy Elliott Handwritten Notes ........................................... 7

        B.    Ground Three:  The "Handwritten Letter" ......................... 17

    IV.    Mr. Mayes Cannot Demonstrate Prejudice From Any Alleged Error .................................................................................. 25

CONCLUSION .................................................................................. 35

CERTIFICATE OF SERVICE / MAILING ....................................... 36

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Federal Cases

*Bullock v. Carver,*
297 F.3d 1036 (10th Cir. 2002) .................................................... 13, 14, 16, 23

*Byrd v. Workman,*
645 F.3d 1159 (10th Cir. 2011) ......................................... 7, 9, 10, 11, 12, 13

*Fox v. Ward,*
200 F.3d 1286 (10th Cir. 2000) ....................................................... 6

*Harrington v. Richter,*
562 U.S. 86 (2011) ................................................................. 30, 31

*Hooks v. Workman,*
606 F.3d 715 (10th Cir. 2010) ......................................................... 7

*Kimmelman v. Morrison,*
477 U.S. 365 (1986) ..................................................................... 6

*Lockhart v. Fretwell,*
506 U.S. 364 (1993) ..................................................................... 7

*Napue v. Illinois,*
360 U.S. 264 (1959) .................................................................... 24

*Strickland v. Washington,*
466 U.S. 668 (1985) ................................................................... 6, 7

*United States v. Crockett,*
435 F.3d 1305 (10th Cir. 2006) ...................................................... 24

*United States v. Deiter,*
890 F.3d 1203 (10th Cir. 2018) ..................................................... 6, 7

*United States v. Dominguez,*
998 F.3d 1094 (10th Cir. 2021) ....................................................... 6

*United States v. Dunnigan,*
507 U.S. 87 (1993) .................................................................... 24

*United States v. Espinoza,*
  545 Fed.Appx. 783 (10th Cir. 2013).........................................28, 29

*United States v. Frazier,*
  429 Fed. Appx. 730 (10th Cir. 2011)..............................................25

*United States v. Griley,*
  814 F.2d 967 (4th Cir.1987) .........................................................25

*United States v. Kennedy,*
  225 F.3d 1187 (10th Cir. 2000) .......................................................7

*Zilm v. Harpe,*
  2024 WL 4677412 (10th Cir. 2024)................................................24

## Federal Statutes

18 U.S.C. § 513(a) .............................................................................2

18 U.S.C. § 1028A(a)(1) ....................................................................2

18 U.S.C. § 1343 ................................................................................1

18 U.S.C. § 1349 ................................................................................1

28 U.S.C. § 2255............................................................................1, 13

Before this Court is Bobby Chris Mayes' Motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 401, 422) In his, Motion, Mr. Mayes claims that his former trial counsel[1] was ineffective during their representation of him at trial, that he was prejudiced due to this ineffectiveness, and that the outcome of his case would have been different absent the ineffectiveness. (Doc. 422) Because Mr. Mayes has failed to show that his counsel was deficient or that he has been prejudiced, the Court should deny his motion.

## PROCEDURAL HISTORY

On September 16, 2020, a federal grand jury indicted Bobby Chris Mayes, Charles Gooch and Courtney Wells on twenty-five counts, including Conspiracy to Commit Wire Fraud (Count 1) in violation of 18 U.S.C. § 1349; Wire Fraud (Counts 2–13) in violation of 18 U.S.C. § 1343; Uttering Forged Securities (Counts 14–19) in violation of 18 U.S.C. § 513(a) and Aggravated

---

[1] The Motion alleges ineffectiveness against his entire trial team. Mr. Mayes was represented by at least five attorneys during trial, including Vicki Behenna, Brett Behenna, William Bock, Michelle Greene and Rachel Jordan. Without minimizing their involvement in the case, it appears that Ms. Greene was only tangentially involved in the matters raised in Mr. Mayes' motion and Ms. Jordan served in a junior role to Ms. Behenna and Mr. Behenna. Therefore, the Government is analyzing and responding to this motion premised on the fact that it is directed toward the "lead" counsel at the trial, specifically Ms. Behenna, Mr. Behenna and Mr. Bock. Their declarations are submitted along with this response.

Identity Theft (Counts 20-25) in violation of 18 U.S.C. § 1028A(a)(1). (Doc. 1)

On November 3, 2021, all three defendants proceeded to trial. On November 19, 2021, the jury found Mr. Mayes and Mr. Gooch guilty on all counts and found Ms. Wells guilty on certain counts and not guilty on others.

Following those guilty verdicts, things became much more interesting. While the standard post-trial motions were pending, Mr. Mayes was behind the scenes beginning the process of trying to de-rail his convictions in his first attempt to obtain a new trial through fraud. In the early part of 2022, Mr. Mayes began discussing with Mr. Gooch a plan to flee from prosecution.[2] He proposed to Mr. Gooch a plan to run to Mexico which Mr. Mayes would fund. When Mr. Gooch refused his overtures, Mr. Mayes then turned his attention to Ms. Wells, talking to her about the same plan to flee. According to the plan, Ms. Wells and Mr. Landers would leave for Mexico first, followed by Mr. Mayes who would cross in a separate location.

A hearing was scheduled for May 10, 2022, on various outstanding pre-trial motions. (Doc. 211) On the morning of that hearing, Ms. Wells' counsel reported that she was missing. (Doc. 221) Shortly thereafter, Mr. Mayes, through his counsel, presented evidence, including e-mails purporting to be

---

[2]Mr. Gooch and Ms. Wells both testified to these facts at Mr. Mayes' Joint Sentencing Hearing. (Doc. 370)

between Ms. Wells and Mr. Elliott, that supposedly "exonerated" Mr. Mayes. Mr. Mayes' counsel filed a new motion for a new trial relying on this new "evidence." (Doc. 227) Moreover, as the FBI was trying to track down Ms. Wells, and these post-trial motions were being briefed and awaiting disposition, Mr. Mayes made another attempt to defraud the Court.  In early October 2022, an anonymous person using the e-mail derickwilliamsok@gmail.com sent an e-mail to undersigned counsel and the Court alleging that a meeting had taken place where hundreds of e-mails relevant to the trial had been given to the Government, many of which contained allegations against Mr. Elliott. These allegations led Mr. Mayes' counsel to immediately accuse the Government of various ethical violations and seek an extension of the hearing so that further investigation could be done. (Doc. 241)

Before those various motions and issues could be resolved, Ms. Wells and Mr. Landers were found in Mexico, brought back to the United States and confirmed what the Government suspected all along – the e-mails were fake, Mr. Mayes convinced Ms. Wells to flee to Mexico and Mr. Mayes then used her absence to try to exonerate himself with fake evidence. These facts led to a second indictment in Case No. CR-23-0053, in which Mr. Mayes was charged with three counts of tampering with an official proceeding by: (1) securing Ms. Wells' absence from the case by convincing her to flee to Mexico; (2) fabricating the Wells/Elliott e-mails and other evidence in an effort to secure a new trial;

3

(3) fabricating and sending the anonymous "derrickwilliams" e-mail to the Court in an attempt to further his efforts in obtaining a new trial. Mr. Mayes ultimately pled guilty to the first and third of those allegations, specifically admitting in his Plea Petition that he had helped to secure Ms. Wells' unavailability from trial and that he was in fact behind the false allegations made in that "derrickwilliams" e-mail, all as a part of his efforts to obtain a new trial. (Doc. 35 in Case No. CR-23-0053) While he did not specifically admit to fabricating the Elliott/Wells e-mails, there is little doubt he was also behind that effort given he admitted to convincing Ms. Wells to flee, that the e-mails were found immediately after she left, and Mr. Mayes was the only person who could have in any way benefited from those e-mails.

It was necessary to refresh the record on these facts for two reasons. First, the 2255 motion does not address Mr. Mayes' conviction in the Case No. 23-0053-F. That conviction will stand, and any Section 2255 motion deadline has long since passed. Second, as the Court will see below, the present Section 2255 motion is simply another effort by Mr. Mayes to secure a new trial through false accusations. It should come as little surprise that the true facts are different than those relayed by Mr. Mayes in his declaration.

## ARGUMENT & ANALYSIS

### I.    Background to Mr. Mayes' Section 2255 Motion

Mr. Mayes originally filed his Motion to Vacate on November 1, 2024.

(Doc. 401) That motion was timely filed. Mr. Mayes also sought to conduct discovery, some of which was allowed by the Court and some of which was not. (Doc. 411) Among the discovery allowed was a brief deposition of Andy Elliott. (Doc. 422-1) Following that discovery, Mr. Mayes filed a memorandum in support of his Motion to Vacate (Doc. 422) Needing to obtain declarations as to the true facts to respond to the Motion and Memorandum, the Government filed a motion seeking a finding that the attorney client privilege had been waived, which Mr. Mayes did not oppose and which the Court granted. (Doc. 429, 432)

Mr. Mayes raises three separate grounds for relief. First, that his trial counsel was ineffective in failing to cross examine Mr. Elliott at trial about the "four pages of handwritten notes" that Mr. Elliott apparently wrote at some early point in the case before he began cooperating with the Government. Second, that his trial counsel was ineffective in failing to investigate the origin and admissibility of those "four pages of handwritten notes." As will be seen below, these first two Grounds, for all practical purposes collapse into one. Third, trial counsel was ineffective and/or there was some form of Government misconduct when Andy Elliott made a single reference to a "handwritten letter" in an interrupted answer regarding his attorney's proffer letter.

## II.    Legal Standard for Ineffective Assistance of Counsel

A petitioner claiming ineffective assistance of counsel must make two

showings: "(1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *United States v. Deiter*, 890 F.3d 1203, 1209 (10th Cir. 2018) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1985).). A court "may address the performance and prejudice components of the *Strickland* test in any order but need not address both if [the defendant] fails to make a sufficient showing of one." *United States v. Dominguez*, 998 F.3d 1094, 1110 (10th Cir. 2021) (internal cites and brackets omitted).

The first prong, deficient performance, requires a defendant to "show 'counsel's representation fell below an objective standard of reasonableness.'" *Deiter*, 890 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 688) The Courts have described this showing as a heavy burden. *See Fox v. Ward,* 200 F.3d 1286, 1295 (10th Cir. 2000). The standard that defendant must meet is both "rigorous" and "highly demanding," and requires a showing of "gross incompetence" on counsel's part. *Kimmelman v. Morrison*, 477 U.S. 365, 381 82 (1986). The reasonableness of counsel's performance is assessed in light of "the facts of the particular case, viewed as of the time of counsel's conduct." *Deiter*, 890 F.3d at 1209. And this assessment is "'highly deferential,' because 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 689– 90). *See also United States v. Kennedy,* 225 F.3d 1187, 1197 (10th Cir. 2000) (reiterating the "strong

presumption" that counsel provided effective assistance.); *Hooks v. Workman*, 606 F.3d 715, 723 (10th Cir. 2010) (affirming that trial counsel's performance "must have been completely unreasonable, not merely wrong.")

The second prong, prejudice, requires the movant to prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The focus of the inquiry is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" *Deiter,* 890 F.3d at 1209 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A "reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *Hooks,* 606 F.3d at 724. Moreover, "mere speculation is not sufficient to satisfy [the petitioner's] burden." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011)).

## III. Each of Mr. Mayes' claims regarding Trial Counsel's representation fails both prongs of the *Strickland* analysis.

### A. Grounds One and Two: Failure to Use or Investigate the Andy Elliott Handwritten Notes

It may come as little surprise that Mr. Mayes' allegations about the handwritten notes is, to put it mildly, inconsistent with that of his trial counsel. *See* Decl. of William Bock, Ex. 1, Decl. of Vicki Behenna, Ex. 2 and Decl. of Brett Behenna, Ex. 3. Mr. Mayes' first two grounds for relief are based on the four pages of Andy Elliott handwritten notes. The first focuses on the

alleged failure to use those notes during cross-examination at trial. The second, focuses on an alleged duty to investigate them.  When the true facts are set forth through the declarations of trial counsel, those two grounds essentially collapse into one and ultimately collapse all together.

It is not disputed that Mr. Elliott wrote four pages of handwritten notes and gave them to his counsel. Mr. Elliott admitted these facts at his deposition. (Doc. 422-1, p. 9-10) It is also not disputed that Mr. Adams had placed those notes into a box with other files that were ultimately given to Mr. Bock on or about September 25, 2020, where they fell into the hands of Mr. Mayes. (Bock Decl., ¶ 5) It is also not disputed that Mr. Mayes did, at some point well before trial, raise the issue of the handwritten notes with his trial team and ask how they might be used. (Bock Decl., ¶ 6-8; Brett Behenna Decl., ¶ 6; Vicki Behenna Decl., ¶ 4) The remainder of Mr. Mayes' story about these notes is simply false and represents little more than an effort to defraud the Court - again.

Mr. Bock was initially Mr. Mayes primary attorney in connection with this matter. (Bock Decl., ¶¶ 1-2) Over time, as trial approached, he stepped back from that lead role and turned those matters over to Brett Behenna and Vicki Behenna, both learned and experience trial attorneys. (Bock Decl., ¶ 3) Brett Behenna specifically took the lead role in preparing for the cross examination of Mr. Elliott at trial and therefore was in the primary position to discuss the issue of these handwritten notes with Mr. Mayes. (Bock Decl., ¶ 4,

Brett Behenna Decl., ¶ 18)

Mr. Behenna recalls Mr. Mayes coming to him about these notes. (Brett Behenna Decl., ¶ 6) According to Mr. Behenna, Mr. Mayes first raised the issue with him a few months before the trial. (*Id*.) He presented the notes as being written by Andy Elliott. (Brett Behenna Decl., ¶ 8) However, when Mr. Behenna inquired about where Mr. Mayes had obtained the notes, Mr. Mayes stated that he could not tell him for Mr. Behenna's "own protection." (Brett Behenna Decl., ¶ 12) Mr. Behenna was understandably skeptical of doing *anything* with any evidence presented under such circumstance.[3] In light of Mr. Mayes' suspicious statement about the notes, Mr. Behenna explained the dangers of asking questions about a document that which could have questionable authenticity. (Brett Behenna Decl., ¶ 13) He also explained to Mr. Mayes that the trial team had an effective strategy for impeaching Mr. Elliott and that introducing a document of questionable origins being presented in

---

[3]     Though not determinative Mr. Mayes' presentation of the notes as something that was generated and/or obtained under such suspicious circumstances is wholly consistent with Mr. Elliott's version of how the notes came to be. At his deposition, Mr. Elliott explained how he and Chris Mayes sat down and concocted the notes together as a joint story on how they would explain the Donna Mullins situation. (Elliott Depo., Doc. 422-1, at p.10) Mr. Mayes couldn't explain to Mr. Behenna how the notes were obtained because Mr. Mayes had a hand in generating them. Generating evidence in this fashion is a *modus operandi* of Mr. Mayes, well proven at this stage of this litigation.

such a secretive manner was a real concern. (Brett Behenna Decl., ¶ 14) Mr. Mayes expressed that he understood Mr. Behenna's position and that it was just something he wanted Mr. Behenna to see. (Brett Behenna Decl., ¶ 16) Mr. Behenna does not recall those notes being a topic of conversation thereafter. (Brett Behenna Decl., ¶ 17)

Putting aside Mr. Mayes' mysterious introduction of the notes, Mr. Behenna also did not believe they were particularly relevant. (Brett Behenna Decl., ¶ 26) At trial, it was clear that Mr. Elliott was going to admit to bribing Donna Mullins and further implicating Mr. Mayes. (Brett Behenna Decl., ¶ 26) Indeed, at trial the jury was going to hear and did hear the recordings of conversations between Andy Elliott and Donna Mullins where the former was clearly coaching Ms. Mullins, constantly invoking Mr. Mayes' name, on how to explain the money she had received and how she should deny receiving bribes. (*See* Gov't Exhs. 9 and 10) The strategy to impeach Mr. Elliott was not to deny that bribery occurred, but to try to show that Mr. Elliott was untrustworthy in general and that his claim that Chris Mayes was involved in the bribery was not true. (Brett Behenna Decl., ¶¶ 14, 26) Notes indicating Mr. Elliott initially denied any involvement in any bribery before ultimately admitting his guilt was not particularly helpful in that regard. (*Id*.) Again, the jury was going to and did hear Mr. Elliott make these same "admissions" and claims during his recorded conversations with Ms. Mullins. (*See* Gov't Exhs. 9 and 10) In this

light, the notes appeared to have marginal relevance in Mr. Elliott's cross examination, particularly given Mr. Mayes refusal to explain where he got the notes or how they came to be. (Brett Behenna Decl., ¶ 26)

Following that meeting, Mr. Behenna declares that the issue of the notes never came up again between Mr. Mayes and Mr. Behenna. (Brett Behenna Decl., ¶ 17) Mr. Mayes knew Mr. Behenna was taking the lead on Mr. Elliott's cross examination. (Brett Behenna Decl., ¶¶ 17-19) They met many times to discuss that cross examination and Mr. Mayes never again raised the issue of the notes with Mr. Behenna during that process. (*Id.*)

At the trial, again Mr. Mayes never even mentioned the notes. (Brett Behenna Decl., ¶ 20) During the cross-examination, Mr. Mayes never asked Mr. Behenna to use the notes. (*Id.*) In fact, Mr. Mayes expressed his satisfaction with the cross-examination and how it had gone. (Brett Behenna Decl., ¶ 21)

Mr. Bock and Ms. Behenna's recollections are consistent with Mr. Behenna's. Mr. Bock does recall a time early in the case when Mr. Mayes presented him with the notes claiming that he thought they might be a "smoking gun" of some kind and expressing an interest in using them. (Bock Decl., ¶¶ 7-8) He also generally recalls the issue about the notes coming up a on a few occasions before trial, but recalls the issue being raised months or even a year before trial (Bock Decl., ¶¶ 9-10) However, as trial approached Mr.

Bock had stepped back from the task of preparing for and crossing Andy Elliott and was working on other things. (Bock Decl., ¶¶ 4, 11-13) He was not involved in making those strategic decisions about how to cross examine Mr. Elliott or what documents to use. (*Id*.) However, Mr. Bock was at counsel table every day of the trial. (Bock Decl., ¶¶ 14-17) He was with Mr. Mayes throughout, including during the cross-examination of Andy Elliott. (*Id*.) At no time did Mr. Mayes bring up these handwritten notes, demand that the notes be used, demand that the matter be brought to the attention of the Court or anything else.(*Id*.) Indeed, at the conclusion of the cross-examination, Mr. Bock remembers Mr. Mayes expressed a wish that the cross had been more forceful, but that he was not unhappy about how it had gone. (Bock Decl., ¶¶ 17-18) Most importantly, Mr. Mayes said ***nothing*** about the notes at the conclusion of the cross. (*Id*.)

Similarly, Ms. Behenna recalls that some time in advance of trial Mr. Mayes had raised the issue about the handwritten notes purportedly from Andy Elliott. (Vicki Behenna Decl., ¶ 4) Consistent with Mr. Behenna, Ms. Behenna recalls that Mr. Mayes was unable (or unwilling) to explain the origin of the notes or how he came to possess them. (*Id*.) After discussing the cross-examination strategy with Mr. Behenna, Ms. Behenna believed that the handwritten notes were a distraction and would not further the cross-examination strategy that was being developed. (Vicki Behenna Decl., ¶ 5) Mr.

Mayes participated in meetings and was aware of the cross-examination strategy and Ms. Behenna does not recall Mr. Mayes stating that he wanted to use the handwritten notes for the cross examination. (Vicki Behenna Decl., ¶ 6) Further, Mr. Mayes did not "repeatedly" raise the issue of the notes at trial. (Vicki Behenna Decl., ¶ 7) As far as Ms. Behenna can recall, the notes were not further discussed following the initial discussion. (*Id*.) After Mr. Elliott's cross-examination, Ms. Behenna remembers Mr. Mayes being happy with the cross and does not remember Mr. Mayes ever bringing up the handwritten notes or demanding they be used or being angry about any aspect of the cross-examination. (Vicki Behenna Decl., ¶ 8)

In light of the foregoing facts, Mr. Mayes' claims of ineffective assistance of counsel based on the handwritten notes fall apart. There simply is no factual basis for them. First, the decision not to use these handwritten notes of mysterious origin at trial was a sound strategic decision. Trial counsel is entitled to make sound strategic decisions based on informed judgment and such decisions should not be second guessed the context of a Section 2255 motion. In *Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002), the court noted that there are two presumptions at issue in addressing claims of ineffective counsel with respect to such strategic decisions. First, there is a presumption that trial counsel acted in an objectively reasonable manner and that their choices could have been part of a sound trial strategy. *Id*. at 1046. Second,

where the facts show that the decision was an adequately informed strategic decision, the presumption that the decision was reasonable becomes "virtually unchallengeable." *Id.*

Mr. Mayes' introduction of the notes as having a mysterious origin, that he could not disclose to Mr. Behenna for his own protection, is dispositive on its own. In fact, using the notes for cross-examination under such circumstances would be far more troubling than not using them. Second, Mr. Mayes expressly agreed with the decision not to use them. He raised the issue, at best, a few times, well before trial. However, he knew Mr. Behenna was not planning to use them prior to trial and expressed no disagreement with that decision. All three trial attorneys, all respected members of the bar, expressly disavow that Mr. Mayes raised the issue ***even one time*** during trial. It is only now, years later, that Mr. Mayes has concocted the story about repeatedly demanding that they be used in a desperate gambit to obtain a new trial and secure his release.

While the sworn declarations conflict on this point, it hardly bears repeating that Mr. Mayes' credibility in connection with this case is suspect to say the least. In his plea on the obstruction case, he has already admitted to engaging in essentially a scheme to defraud the Court to obtain a new trial. There is little reason to credit his testimony now or view this current effort as anything more than another such scheme.

14

Third, counsel was correct in noting that there was little probative value to the notes themselves. What do those handwritten notes really show? Mr. Elliott, either alone or with Mr. Mayes, sat down at some point and denied bribing Donna Mullins. These notes are not "exculpatory" for Mr. Mayes. While Mr. Mayes' claims that they prove his "actual innocence" (Doc. 422, at p. 23) he never explains how that is so. In fact, as discussed above, trial counsel would have known that the Government was going to play the recordings of Donna Mullins and Andy Elliott in which Mr. Elliott essentially repeated the same "company line" to try to explain away the payments to Ms. Mullins that are reflected in the handwritten notes. Mr. Behenna's and Ms. Behenna's strategic decision not to walk into a potential ambush for marginal gain was and is an objectively reasonable one.

Moreover, as Mr. Behenna points out and which was abundantly clear at trial, impeachment of Andy Elliott was a tricky matter. The evidence at trial established that Mr. Mayes rehired Mr. Elliott again and again. For example, after Mr. Mayes "fired" Mr. Elliott total loss letters, he brought him back and re-hired him. (Tr. 449-450, 587) The more trial counsel made Mr. Elliott look like a scoundrel, the more Mr. Mayes bringing him back, time and again, made it look like Mr. Mayes was cut from the same cloth. Mr. Behenna viewed this as his "biggest hurdle" in impeaching Andy Elliott and he was not wrong. (Brett Behenna Decl., ¶ 26) The decision note to use suspicious notes of

undetermined origin for marginal additional impeachment and which did nothing but potentially exacerbate this hurdle was and is a sound decision.

Mr. Mayes presents nothing of substance other than his self-serving declaration to even attempt to rebut the presumptions at play. In short, the facts show that this was a sound strategic decision that was adequately founded and which is "virtually unchallengeable." *Bullock*, 297 F.3d at 1046.

Turning to Ground Two, the failure to investigate, the facts above easily dispel that issue as well. Mr. Mayes refused to explain the origin of the notes, he agreed and understood Mr. Behenna's concerns about using the notes and he rarely, if ever, brought them up. What then, exactly, was trial counsel supposed to investigate? Mr. Mayes claims that they should have talked to Mr. Adams about the notes and essentially kicked the tires on the attorney client privilege issues. How would they have known to do that when Mr. Mayes didn't explain the origin of the notes?  While Mr. Elliott has now explained that he prepared the notes for and at the request of Mr. Adams (and with Mr. Mayes' direction as well), that was not a fact that was apparent to trial counsel at the time of trial. Given the way that the notes were presented to trial counsel, there was simply no reason to "investigate" them any further.  Indeed, when Mr. Mayes told them that he couldn't explain where he obtained the notes "for their own protection", he was essentially telling them "don't ask" which is

tantamount to "don't investigate."[4] Ground Two is without merit.

## B.  Ground Three:  The "Handwritten Letter"

For his third ground, Mr. Mayes cites to the trial testimony of Andy Elliott in which he mentions a "handwritten letter" in regard to his cooperation with the Government. (Doc. 422, p. 44) Government counsel must confess that it has great difficulty following the various arguments that Mr. Mayes is making based on this handwritten letter. However, at core Mr. Mayes appears to allege five different ways in which he believes his trial counsel was ineffective in dealing with the alleged handwritten letter. (Doc. 422, p. 45) Mr. Mayes claims that when Mr. Elliott said "handwritten letter" on that one isolated occasion, his counsel should have immediately:

1) Moved for a mistrial;

2) Moved for a *Brady* hearing;

---

[4] Had Mr. Mayes explained where he got them and those facts had been clear, there is the very strong likelihood that the notes could *not* have been used in any event at trial. The notes were clearly prepared by Mr. Elliott as a communication to his lawyer, which is core privileged information. The issue of whether the privileged had been waived in some way could have been litigated at the time, including whether Mr. Elliott's wife going with him to a meeting with Mr. Adams somehow waived the privilege as to the notes. However, it is not necessary to further develop that point. Trial counsel did not use the notes because Mr. Mayes refused to explain where they came from and agreed with the strategy not to use them, not because of any alleged privilege issue.

3)  Brought to the Court's attention that the Government had never produced a "handwritten letter."

4)  Cross-examined Mr. Elliott about the "handwritten letter", and

5)  Corrected Mr. Eliott's "false" testimony if a handwritten letter did not exist.

The first four appear to be based on the contention that there *was* in fact a handwritten letter. The last appears to be based on the alternative contention that there was *not* a handwritten letter. Fundamentally, all of these contentions take a single, innocuous and interrupted answer from Mr. Elliott and try to turn it into a basis to overturn a conviction based on an overwhelming amount of other evidence. The Court should reject that effort.

At the outset, this entire misguided attempt is based on a tortured and misleading view of the record. The complete and accurate portion of the trial transcript surrounding Mr. Elliott's "handwritten letter" comment reveals that everyone, including trial counsel and surely the jury, understood that what was being discussed was the hypothetical proffer letter prepared by Mr. Elliott's attorney Scott Adams. Below is the complete, relevant portion of the testimony:

Q. So your -- the government had talked to your lawyer and, through that, they decided to give you immunity without ever talking to you directly?

18

A. They spoke many times.

Q. I get that. Did they ever talk to you directly?

A. I don't believe so.

Q. Did they ever ask you to give a statement about what you would say

***before you got immunity***?

A. We gave them a handwritten letter --

Q. Right, your lawyer --

A. ***-- before that***.

Q. Your lawyer wrote what you might say, right? I think he called it a

"hypothetical statement," right?

A. Right.

Q. These events, should they turn out to be real or hypothetical

situations or vignettes?

A. Yes, I wanted to tell the truth.

Q. Right. But -- and so your lawyer wrote a hypothetical letter to the

government in January, correct?

A. Yes.

Q. And the government offered you immunity in July, without ever

talking to you?

A. After reading the letter, yes.  (Tr., 520-521)

The entire point of this line of questioning was to attack Mr. Elliott's

19

credibility and/or the Government's reliance upon him as a witness because he was offered immunity before any face-to-face interactions with him. When Mr. Behenna asked him about whether he had given a statement before getting immunity, he identified the "handwritten letter" that had been provided before the grant of immunity. Mr. Behenna then *immediately* clarified what everyone understood, namely that when Mr. Elliott mentioned the "handwritten letter" what everyone was talking about was the Adams letter. (*"Your lawyer wrote what you might say, right? I think he called it a "hypothetical statement," right?")* He went on to make the relevant point in this line of questioning, namely that "the government offered you immunity in July without ever talking to you?" to which Mr. Elliott clearly replied, "After reading the letter", again clearly referencing the Adams letter.

Now, years later, Mr. Mayes is grasping at straws and tries to contend that there was a second handwritten letter, separate and apart from the Adams proffer letter. That contention is factually and legally without merit. First, it is based on a vague and interrupted question and answer. Again, focusing on the actual transcript here is what is recorded:

Q. Did they ever ask you to give a statement about what you would say **before you got immunity**?

A. We gave them a handwritten letter --

Q. Right, your lawyer --

A. -- *before that.*

Mr. Behenna interrupted Mr. Elliot's answer. It is entirely based on this interruption that Mr. Mayes now claims that when Mr. Elliot said "before that" was referring to a handwritten letter *before* the hypothetical proffer letter. This is simply an incorrect reading of the transcript. The question posed to Mr. Elliott was about "before you got immunity". Stripping away the interruption, what Mr. Eliott said was "We gave them a handwritten letter before that", meaning **before he got immunity**. "Before that" did not mean a separate handwritten letter before the Adams proffer letter. To read this exchange as false testimony of some kind about an undisclosed second proffer letter is simply wrong. Moreover, it was clear at trial, that the only letter that ever existed prior to the grant of immunity was the hypothetical proffer letter from Mr. Adams. This is clear, again, because Mr. Behenna immediately interrupted Mr. Elliott when he said "handwritten letter" with the comment "Right, your lawyer". He then went on to discuss more details about that hypothetical proffer letter. Everyone knew that Mr. Elliott was talking about the Adams proffer letter. (Brett Behenna Decl., ¶ 27-28; Vicki Behenna Decl., ¶ 10)

There is no handwritten letter. Mr. Mayes makes vague attacks in his motion against Government counsel for claiming that they are "unaware of any such letter" implying some equivocation on the part of the prosecution team. It is hard to understand what more undersigned counsel can say. In prior

21

declarations on file, undersigned counsel confirmed that having checked the Government's files and discussed the matter with Ms. Anderson and *all* of the FBI agents on the case, there is simply no evidence of any such handwritten letter. (Doc. 415) It does not exist, and it is unclear how else the Government can say it.

The motion goes on to further torture the facts beyond recognition. Mr. Mayes contends that Mr. Elliott told a different story at his deposition than at trial. (Doc. 422, p. 42-43) In what could generously be called a very confusing line of questioning Mr. Elliott was asked about sitting down with his attorney and writing him notes that Mr. Adams used to put together his written proffer letter. Mr. Zuhdi conflated these handwritten notes, with the "handwritten letter" comment that Mr. Elliott made at trial and now tries to turn that exchange into something of substance, claiming that Mr. Elliott lied at his deposition. The confusion on this point is clearly reflected in the deposition transcript. Mr. Elliot explained that there was no handwritten letter:

"it's not a letter, it's a – it's my testimony. I wrote down a story – the line of events I gave to Scott. And then Scott, I believe turned it into this [the proffer letter] and then gave that to them". (Elliott Depo., Doc. 422-1 at p. 29) Mr. Zuhdi then tried to press the issue conflating these attorney-client privileged notes prepared for Mr. Adams with the "handwritten letter" testimony from trial.  In response to which Mr. Elliott stated, "I really don't understand that

22

part" and the Court echoed "Nor do I." (*Id.*) Nor does the Government. In fact, this entire line of questioning was muddled and confusing, at best. The only clarity came at the end when the *Court* asked a series of questions confirming that what Mr. Elliott had done for Mr. Adams was to write notes, on a legal pad that was an account of the facts "relating to this overall matter" and that the only purpose of those notes was communication with his lawyer. (Elliott Deposition, Doc. 422- 1 at p. 30).[5]

With all of that in mind, Mr. Mayes' claims that his lawyers should have moved for a mistrial, moved for a *Brady* hearing, brought to the Court's attention the Government had never produced a "handwritten letter" or cross examined Mr. Elliott about the handwritten letter are all misguided.  There is no handwritten letter and therefore was no basis to do any of this.

Mr. Mayes final complaint is that if there was no handwritten note, then the Government should have corrected Mr. Elliott's testimony and/or trial counsel should have done so. It is true that a prosecutor has an obligation to

---

[5]      The Motion attaches an e-mail from Mr. Adams from October 28, 2024, in which Mr. Zuhdi specifically asks about the "handwritten letter". (Doc. 422-2) In response, Mr. Adams confirms that he never received any "handwritten statement" from Mr. Adams. (*Id.*) Mr. Mayes' motion now takes that response out of context, compares it to the privileged notes Mr. Elliott drafted and argues that either Mr. Elliott (or Mr. Adams I suppose) is lying about them. (Doc. 422, 48-51) Mr. Mayes is conflating all manner of testimony and taking responses out of context to try to construct this attack.  It has no merit.

correct *perjured* testimony. *See Napue v. Illinois*, 360 U.S. 264 (1959). However, the touchstone for that obligation is Mr. Mayes proving that Mr. Elliott committed perjury. *See Zilm v. Harpe*, 2024 WL 4677412 (10th Cir. 2024). The definitions of perjury used in other circumstances, including prosecutions for perjury are instructive. Perjury is "false testimony concerning a material matter within the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Even if Mr. Mayes could prove that the testimony was actually perjurious, Mr. Mayes must also show that the prosecution *knew* that he had committed perjury *and* that it was material. "However, the movant does not sustain his burden of demonstrating perjury merely by proving that a government witness has testified falsely or has given testimony that conflicts with other statements." *See United States v. Crockett*, 435 F.3d 1305, 1317 (10th Cir. 2006) (citations omitted).

In this case, as discussed at length above, the statement about the handwritten letter was clearly intended by Mr. Eliott to refer to the Scott Adams proffer letter. While he incorrectly referred to it as a "handwritten" letter that was given *before he got immunity*, that was simply a mistake by a lay witness on a relatively innocuous matter. That is a far cry from knowingly committing perjury. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by

government witnesses do not establish knowing use of false testimony. *See United States v. Griley,* 814 F.2d 967, 971 (4th Cir.1987); *see also, United States v. Frazier*, 429 Fed. Appx. 730 (10th Cir. 2011) ("Discrepancies in testimony are common and can generally be explained as resulting from human failings short of intentional lying. To reverse Defendant's conviction on this ground would bring many, perhaps most, convictions into question.")

Even if Mr. Mayes could prove that Mr. Elliott's reference to the "handwritten letter" was *actual perjury*, there is no evidence that the Government knew it was *perjury* versus an innocuous mischaracterization of the Adams letter. As discussed at length above, everyone understood at the time what Mr. Elliott was saying.

Moreover, it is simply inconceivable that this single statement could have had *any* impact on the outcome of the trial, as discussed more below. If this kind of singular, and at best imprecise, testimony on a collateral matter was sufficient to overturn a jury's verdict based on three weeks of overwhelming evidence, it is hard to imagine a verdict that could withstand collateral attack.

## IV. Mr. Mayes Cannot Demonstrate Prejudice From Any Alleged Error

Even assuming Mr. Mayes could demonstrate *any* ineffective assistance of counsel, he must also demonstrate prejudice. While Mr. Mayes' motion

repeats the bare contention that there was some impact on the overall proceeding, it fails to articulate that prejudice with any clarity. Rather, the motion simply repeats, again and again, that Mr. Elliott was a key witness and therefore *anything* that could impeach him, even a little bit more, would have yielded a different result at trial. This argument, and the speculation it is based on, does not satisfy Mr. Mayes' burden on this issue and ignores the truly overwhelming evidence that was presented to the jury at the trial in this case.

Starting with Ground Three first, Mr. Mayes' motion fails to cite any coherent impact that alleged error had on the trial. There are vague allegations that "Mr. Elliott's credibility would have been effected and there is a substantial likelihood of a different result." (Doc. 422, p. 52) In trying to articulate prejudice, Mr. Mayes speculates that the single reference to a "handwritten letter" surely caused the jury to infer not only that a second handwritten letter existed, but that it was "about what Mr. Elliott would say before he got immunity, it was given to the government before the typed proffer letter, that Mr. Mayes had directed Mr. Elliott to bribe Ms. Mullins, and after receiving the handwritten letter and the proffer letter, Mr. Elliott received immunity." (Doc. 422, pg. 52-53) In other words, from Mr. Elliott's single reference to a "handwritten letter", the jury supposedly inferred not only that there ***was*** a separate handwritten letter, but also that the specific contents of that unidentified handwritten letter implicated Mr. Mayes in bribery of Donna

26

Mullins, thereby somehow bolstering the jury's view of Mr. Elliott's trial testimony? This is rank speculation of the highest order and does not follow from the facts.

There is no handwritten letter. Trial counsel knew it. The jury knew it when Mr. Behenna immediately framed Mr. Elliott's testimony about the handwritten letter in the context of the attorney proffer letter. If Mr. Behenna or anyone else had asked Mr. Elliott about what he meant by "handwritten letter" at the time of the trial, he would have confirmed that he was referring to the attorney proffer letter and that would have been the beginning and end of the matter. There is no plausible prejudice.

Turning to the first two grounds, there is no prejudice for several reasons. First, any probative value of the handwritten notes was limited to the possible incremental impeachment of Mr. Elliott on a discrete and minor point. Second, the evidence against Mr. Mayes was and is overwhelming.

The Court presided over the trial. The Government has previously summarized the overwhelming evidence against Mr. Mayes in prior filings. For instance, in its response to the Mr. Mayes' Motion for Acquittal, the Government exhaustively went through the evidence that was presented at trial that supported the verdict and which was, indeed, overwhelming. (Doc. 208.) Accordingly, there is no need to exhaustively go through each and every part of that evidence again. However, some discussion and framing of Mr.

Mayes' motion is important.

With respect to the handwritten notes, the only prejudice alleged by Mr. Mayes is that the handwritten notes could have served as *additional* impeachment of Mr. Elliott on the discrete issue of the bribery of Donna Mullins. They would not have negated any of the elements of the crime actually charged and this additional impeachment was simply cumulative. Such *incremental* additional impeachment does not undermine the confidence in the outcome of the trial. For instance, in *United States v. Espinoza*, 545 Fed. Appx. 783 (10th Cir. 2013), the Government failed to produce a drug test result for a key witness who testified against the defendant. The witness, an admitted methamphetamine user, testified she had not used methamphetamine since January 2004. However, the Government had a positive drug test from August 2004 which would have demonstrated that she was lying. The Government failed to produce that report, but the Court ultimately found no prejudice. The court first noted that the case against Espinoza was strong even if the suppressed evidence had been available, due to copious evidence of Espinoza's guilt beyond the cooperator testimony. (*Id.* at 786) Moreover, the court found that this evidence of perjurious testimony, which would surely tarnish the witness's credibility, was only incremental and would have provided only "marginal" additional support for the defense. (*Id.*) The court ultimately concluded: "[p]ut another way, because the impeachment evidence could not

have nullified the additional, substantial evidence of Mr. Espinoza's guilt, we are not convinced that the government's suppression undermines confidence in the outcome of his trial." (*Id.*)

Here, of course, there was no suppression and no evidence that the Government did *anything* wrong with these handwritten notes. Moreover, trial counsel and Mr. Behenna, in particular, did yeoman's work impeaching Mr. Elliott. Again, because the Court presided over the trial, only a brief summary of the impeachment needs to be discussed. Mr. Elliott was subjected to vigorous cross-examination, for a lengthy period of time, by counsel for all three defendants. Mr. Elliott was directly impeached by prior inconsistent statements, by advertising videos that he prepared which purported showing him teaching people to lie, and other matters. *After* he testified, Mr. Mayes testified on his own behalf and vigorously attacked Mr. Elliott's credibility. The defense collectively called a lengthy series of third-party witnesses to attack Mr. Elliott. This parade of defense witnesses lasted for almost an entire day of the trial. (See Tr. Vol. IX) For example, Mr. Elliott had testified about the creation of "total loss letters" and that Leana Waters was supposedly involved in their creation. Ms. Waters was called and refuted Mr. Elliott's testimony. (Tr. Vol IX, 1944) The defense called Alicia Scott, a credit union employee who encountered Mr. Elliott and essentially accused him of fraudulent conduct as "reverse 404(b) evidence". (Tr. Vol IX, 1961) They called Scott Banfield to

repeatedly attack Mr. Elliott's credibility and his character. ("And he is one of the greatest manipulators and liars I've ever known.") (Tr. Vol IX, 1994) They called Roger Mayes who attacked Mr. Elliott's credibility, including a specific incident where he claimed to have seen Mr. Elliott engaged in what amounted to bank fraud. (Tr. Vol IX, at 2040-42) They called Jeremy Silva to attack Mr. Elliott's credibility and character. (Tr. Vol IX, 2063) They called Nathan Holmes to essentially do the same. (Tr. Vol IX, 2079.) They called Janette Schulz who attacked Mr. Elliott's credibility on the issue of "role playing." (Tr. Vol IX, p. 2119-20) In short, to say that Mr. Elliott and every aspect of his testimony was subject to vigorous cross-examination and impeachment is an understatement. In that context, any marginal additional impeachment value from any possible cross-examination on the handwritten notes, which amounted to little more than the unremarkable contention that Mr. Elliott initially denied engaging in bribery, cannot possibly undermine confidence in the outcome of the trial.

While in some instances even a single or isolated error can support an ineffective assistance claim, such an error must be egregious and clearly prejudicial. *See Harrington v. Richter*, 562 U.S. 86, 111 (2011) (citation omitted). Where such an isolated error exists, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy" and where the "attorney represented [the

defendant] with vigor and conducted a skillful cross-examination." *Id*. at 111.

Finally, any incremental impeachment value of these handwritten notes must be evaluated in the light of the remaining evidence in the case, a topic that Mr. Mayes' motion understandably ignores entirely. Mr. Mayes' motion relies heavily on the contention that Mr. Elliott's testimony was the only thing that implicated Mr. Mayes in the bribery of Donna Mullins. This is not true. First, the jury heard the tapes of Mr. Elliott coaching Donna Mullins about the money she received, constantly invoking Mr. Mayes' name, which on their face also implicated Mr. Mayes and corroborated Mr. Elliott's testimony. (Gov't, Exhs. 10 and 11) Second, the jury got to watch with their own eyes Mr. Mayes' interview with FBI Agent Lowrance in which Mr. Mayes proudly explained how his dealerships had exploited the loophole in Tinker's lending guidelines to con their customers into buying motorcycles at greatly inflated prices. (Gov't Ex. 8) Thus, Mr. Elliott's trial testimony on this discrete topic *was* corroborated by other evidence.

Moreover, the entire subject matter covered by the notes was only ever a tiny fraction of the overall case. The Indictment in this case charged a conspiracy to commit wire fraud, twelve individual counts of wire fraud, five counts of uttering forged securities and five counts of aggravated identity theft. (Doc. 1) Of those charges, the only one that even raised the issue of Donna Mullins, and the alleged bribery was the overall wire fraud conspiracy charge

in Count 1. Not one of the other counts had anything to do with Donna Mullins or Tinker Federal Credit union. Rather, all of them went specifically to the submission of false loan applications and financial documents to lenders (not Tinker Federal Credit Union), the forgery of signatures on customers' pawn checks and similar fraudulent activity related to both the fake pawn transactions and the dollar buy backs. None of that had *anything* to do with Donna Mullins or bribery

The manner and means section of Count 1 spans approximately 35 lettered sub-paragraphs spanning approximately 14 pages. The allegations involving Donna Mullins are addressed in only one sub-paragraph on page 12 of the Indictment. While this is not a mathematical exercise, it was and is clear that both the issue of Donna Mullins and the bribery and Andy Elliott's credibility in that regard were small parts of the overall trial.

Indeed, Mr. Mayes' Motion seems to suggest that the entire case hinged upon Andy Elliott and his credibility alone. That is also simply not true. With respect to the fake pawn shop and the dollar buy backs, there was an overwhelming amount of evidence to support the convictions completely independent of Andy Elliott. Without re-hashing all the evidence, the Government presented 12 different transactions, along with testimony from the actual consumers involved, which detailed the fraud engaged in by Mr. Mayes and his company. The Government also presented the evidence from

multiple lenders which detailed how they would not have approved the loans in question had they not been deceived of the true facts.

There was testimony from individuals other than Andy Elliott tying Mr. Mayes to this fraudulent activity. For instance, there was the entire line of testimony and documents from Steven David at Peak Acceptance. This was and remains one of the more significant parts of the trial, untouched by Andy Elliott in any way. In summary, Peak had identified that Mr. Mayes' dealerships were engaged in fraud with down payments.  In response, Mr. Mayes fired Mr. Elliott and tried to contain the issue by offering to buy back a few loans. (Gov't Ex. 201) When Peak kept pressing, Mr. Mayes tried to bully and threaten. (Gov't Ex. 204, 207, 208, 209) When those threats did not work, Mr. Mayes just flat out threatened Mr. David and his children, going so far as blackmailing Mr. David with a secret recording. (Gov't Ex. 210) Indeed, Mr. Mayes admitted on the stand that he had in fact made a secret recording of Mr. David. (Tr. 2312) This was another shocking fact. The fact of the recording means that Mr. Mayes went into a social meeting with Mr. David, armed with a recording device, and with a deliberate plan to try to record a conversation that he could and did later use to threaten and strong-arm Mr. David. It demonstrated that Mr. Mayes was *exactly* the sort of person who would engage in bribery and manipulation and was fully consistent with Mr. Elliott's trial testimony.  Indeed, all of that conduct by Mr. Mayes arose from a dispute

about fake down payments, the very same practice that was at the heart of the trial.

There was other testimony and evidence that corroborated Mr. Elliott's testimony. For instance, Mr. Elliott testified that Mr. Mayes was the sort to protect people who were loyal to him, but that he would "burn" you if you moved against him. (Tr. 426-427) There was evidence that Mr. Mayes did that to Mr. Elliott when he left his employment in 2015. (Gov't Ex. 28) The jury was also able to see Mr. Mayes do this to Mr. Gooch from the witness stand – blaming Mr. Gooch for the pawn shop "getting out of control"; claiming that Mr. Gooch was responsible for losing a handle on the pawn shop; and claiming that he had to fire him and take away his interest in Trident because of financial "losses" from the pawnshop. (Tr. 2226-30; 2239-2240) In other words, Mr. Mayes, directly from the witness stand, threw Mr. Gooch under the bus when he was no longer useful, just like Mr. Elliott said he would.

In fact, Mr. Mayes' testimony about needing to fire Mr. Gooch was and is ridiculous. He claimed it was required because the line of credit between Trident and the pawnshop had gotten out of hand. (Tr. 2239-40) As discussed at trial, however, because the pawnshop was a fraud, NPG required the non-sensical paper trial where money flowed from NPG to the dealerships to Trident and back to NPG. All this was set up, as Ms. Wells testified, because that was the way Chris Mayes wanted it done. ("Chris Mayes had wanted there

to be a line of credit." (Tr. 2489)) The whole point of this paper trail, designed by Mr. Mayes, was to create the illusion of real down payments. Mr. Mayes' efforts to explain this ridiculous arrangement as something legitimate was significantly damaging to his own credibility, as was his attempt to blame Mr. Gooch for "losses" which did not actually exist. (Tr. 2237-2240)

These are just a few examples of the evidence that was presented at trial. Even from these few examples, it is clear that there was overwhelming evidence to support the jury's verdict. Mr. Mayes cannot point to anything that undermines the confidence in that verdict and therefore cannot show prejudice.

## <u>CONCLUSION</u>

For these reasons, the Government respectfully requests that this Court deny Mr. Mayes' request for § 2255 relief. He has not satisfied his burden for any of his claims, and he has not demonstrated that he has been prejudiced by any of the alleged errors.

## <u>CERTIFICATE OF SERVICE / MAILING</u>

I hereby certify that on August 7, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record registered with the ECF system.

I hereby certify that on August 7, 2025, I served the attached document by mail on the following, who is not a registered participant of the ECF System:

Bobby Chris Mayes
FCI - Texarkana
#09413-509
4001 Leopard Drive
Texarkana, TX   75501

s/ *Thomas B. Snyder*
THOMAS B. SNYDER
Assistant United States Attorney