**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. CR-20-240-F |
| BOBBY CHRIS MAYES | ) ) ) |
| Defendant. | ) |

## AFFIDAVIT OF W. BRETT BEHENNA

I, W. Brett Behenna, declares as follows under penalty of perjury:

1. My name is W. Brett Behenna.

2. I was part of the legal team that represented Chris Mayes at trial in the above styled case.

3. I joined Mr. Mayes legal team in July 2021.

4. Mr. Mayes' criminal case had existed prior to July of 2021, but July 2021 was the first time I was introduced to the case.

5. From the moment I joined the legal team, I began reviewing discovery to become familiar with the case.

6. In approximately August or September 2021, Mr. Mayes came to my office to show me a handwritten note. This note was not part of the digital file kept by my firm that contained all the related documents in Mr. Mayes' criminal case.

7. Mr. Mayes and myself were the only parties present during the meeting.

8. Mr. Mayes told me the note was written by Andy Elliott.

9. This was the first time I had ever seen the note. It was brought to me in hard copy by Mr. Mayes.

10. I read the handwritten note.

11. I asked Mr. Mayes about the note in an attempt to determine its authenticity and where it came from.

12. Mr. Mayes told me he could not tell me how he got the note in order to protect me. However, Mr. Mayes insisted it was written by Andy Elliott.

13. I explained to Mr. Mayes the dangers of asking questions at trial that the lawyer does not know the answer to or presenting evidence that cannot be authenticated.

14. It was my belief that our team was developing an effective strategy to challenge the credibility of Andy Elliott at trial. I was concerned about disrupting the flow of that examination with a document that was presented to me as secretive in nature, with its origins being kept from me.

15. I explained my concerns to Mr. Mayes.

16. Mr. Mayes said he understood, he just wanted me to see it.

17. Following the meeting in which I was shown the note, I had numerous pre-trial meetings that included Mr. Mayes and the rest of the defense team. Never once did the efficacy or usefulness of the handwritten note come up.

18. Mr. Mayes knew that I was tasked with the cross-examination of Andy Elliott.

19. I meet with Mr. Mayes numerous times to discuss that cross-examination and seek information related to Andy Elliott's cross examination. Mr. Mayes never instructed me or asked me to use the handwritten note to impeach Andy Elliott.

20. At trial, Mr. Mayes never asked me to use the note to impeach Andy Elliott nor did he question why the note was not used following the completion of the cross-examination.

21. Mr. Mayes told me he was happy with the cross-examination and that I did a good job.

22. I cannot specifically remember how the note ended up in an exhibit folder for Mr. Mayes's trial.

23. I could have asked for a digital copy from Mr. Mayes so that it could be included in our exhibit book.

24. I would not have given a copy of that exhibit to the government because I would consider it impeachment.

25. I frequently include impeachment exhibits in my trial exhibit book. Sometimes I use the impeachment exhibits, and sometimes I do not. It depends on the flow and tenner of cross-examination. I include exhibits that I may not use to give myself maximum flexibility when questioning a witness.

26. In the end, I believe I effectively presented Andy Elliott as an untrustworthy person and as the person who actually bribed Donna Mullins. The biggest hurdle in the case for me, was why Andy Elliott was rehired by Mr. Mayes following his firing. The letter would have only muddied those waters even more. I did not think it was useful to inject that Mr. Elliott was originally trying to explain his conduct as innocent before he ultimately admitted his guilt. This is especially true given that in 2017 Mr. Mayes was interviewed by the FBI where he was asked about Donna Mulllins and the Tinker loans, and he did not mention money was paid by Andy Elliott to Donna Mullins. This letter would have raised a lot of questions about what Mr. Mayes knew and when he knew it. These were questions I could not answer because I did not know where the handwritten note came from or how or when Mr. Mayes took possession of it.

27. Finally, I am not aware that Mr. Elliott ever wrote a handwritten note to the United States Attorney's Office. I have never seen such a note.

28. When Mr. Elliott stated at trial that "we gave them a handwritten letter", I took that to mean that his attorney Scott Adams had written a proffer to the government. I had seen that proffer from Scott Adams prior to trial. That is what I thought Andy Elliott was referring to.

FURTHER AFFIANT SAYETH NOT.

I state under penalty of perjury that the foregoing is true and correct.

7-31-2025
Date

W. Brett Behenna

Subscribed and sworn before me this 31st day of July, 2025.

Notary Public

My Commission Number:

My Commission Expires:

4